# Exhibit 2

Initial Decision Release No. 1260
Administrative Proceeding
File No. 3-17342

## UNITED STATES OF AMERICA
Before the
### SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

| | |
|---|---|
| In the Matter of<br><br>**RD Legal Capital, LLC**, and<br>**Roni Dersovitz** | **PUBLIC REDACTED**<br>**Initial Decision**<br>October 15, 2018 |

Appearances:    Michael D. Birnbaum, Jorge G. Tenreiro, and Victor
Suthammanont for the Division of Enforcement,
Securities and Exchange Commission

Roel C. Campos, Terence M. Healy, and Katie L. Steele,
Hughes Hubbard & Reed LLP; David K. Willingham,
Michael D. Roth, and Eric S. Pettit, Boies Schiller Flexner
LLP for Respondents

Before:    Jason S. Patil, Administrative Law Judge

Respondent Roni Dersovitz spotted a business opportunity while working as a personal injury attorney: lending money to other attorneys who were waiting on their fees from settlements to pay out. This was a profitable line of business and eventually Dersovitz created namesake hedge funds and companies to manage the funds, including Respondent RD Legal Capital, LLC, and originate the loans. Investors testified that they were enticed by marketing representations that Respondents' funds invested only in settled or otherwise resolved cases and did not take on litigation risk. For many years the funds were profitable for investors and Dersovitz alike. The Division of Enforcement nevertheless alleges that Respondents made materially false and misleading statements in violation of the antifraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934 because at times more than half of the funds' portfolios were tied up in cases that involved litigation risk.

In this initial decision, I find that contrary to Respondents' representations to investors, the funds they managed became increasingly invested in certain cases beyond the scope of the funds' strategy. I conclude that Respondents made material misrepresentations, but not to the extent alleged by the Division and not with scienter. Respondents thus violated Securities Act Section 17(a)(2) and (a)(3), but not Securities Act Section 17(a)(1) and Exchange Act Section 10(b) or Rule 10b-5. As a result, I will impose civil monetary penalties, suspend Dersovitz from the industry for six months, prohibit him from associating with an investment company for six months, and order Respondents to cease and desist from further violations.

## Procedural History and Allegations

On July 14, 2016, the Securities and Exchange Commission issued an order instituting proceedings (OIP) against Respondents RD Legal Capital, LLC,[1] and Roni Dersovitz. The OIP alleges that Dersovitz, as president, CEO, and owner of RD Legal Capital, and RD Legal Capital, as managing partner and investment manager of two RD Legal-branded investment funds, defrauded investors in two ways. OIP at 2.

First, Respondents allegedly misrepresented the type and diversification of assets under management in the funds. *See generally* OIP at 2, 3-12. The funds invested in law firm receivables—but what set the funds apart from other litigation financing firms, per Respondents' marketing materials and oral representations, is that the funds invested primarily in receivables from settled or resolved cases, while the competition invested in riskier, "pre-settlement" litigation. OIP at 3-4. However, the Division alleged that some of the cases in which Respondents invested involved litigation risk, contrary to Respondents' disclosures. The percentage of the funds' assets invested in those cases reached as high as 90%, despite representations that 95% of the funds' investments consisted of receivables from settled cases. *Id.* at 3-4.

The second theory of liability concerned the way in which Respondents withdrew money from the funds. *See generally id.* at 2, 12-14. The fund operating documents allowed Respondents to withdraw profits in excess of 13.5%, in certain circumstances. The OIP alleges that Respondents provided misleading data to its third-party valuation agent, leading to inflated valuations of certain assets, which allowed Respondents to withdraw more money than they otherwise would be permitted, draining the funds of liquidity. *Id.*

---

[1]   Abbreviated "RDLC" in some quotations.

Respondents denied the allegations against them and raised fifteen affirmative defenses. *See* Answer (Aug. 8, 2016).

The twenty-four day hearing was held between March 20 and April 27, 2017, in New York City. On August 16, 2017, I granted Respondents' motion, pursuant to Rule 250(d), for a ruling as a matter of law on the valuation allegations, and dismissed those allegations from this proceeding. *RD Legal Capital, LLC*, Admin. Proc. Rulings Release No. 4976, 2017 SEC LEXIS 2504. Post-hearing briefing is complete.[2]

After the Supreme Court's decision in *Lucia v. SEC*, 138 S. Ct. 2044 (2018), the Commission stayed this proceeding. *Pending Admin. Proc.*, Securities Act Release No. 10510, 2018 SEC LEXIS 1490 (June 21, 2018). The Commission allowed the stay to expire on August 22, 2018. *Pending Admin. Proc.*, Securities Act Release No. 10536, 2018 SEC LEXIS 2058. On September 7, 2018, the parties submitted a joint agreement in which Respondents waived their right or entitlement to a new hearing before a different judge and elected to proceed before me on the existing record.

## Findings of Fact

What follows is a description of the nature of hedge funds, descriptions of Respondents' funds, the investments challenged by the Division, and Respondents' marketing of their funds, and summaries of investor testimony and the experts' qualifications.

## 1. Hedge Funds

According to the Commission's Office of Investor Education and Advocacy:

> Hedge funds pool investors' money and invest the money in an effort to make a positive return. Hedge funds typically have more flexible investment strategies than, for example, mutual funds. Many hedge funds seek to profit in all kinds of markets by using leverage (in other words, borrowing to increase investment exposure as well as risk), short-selling and other speculative

---

[2]    Citations to the hearing transcript are noted as "Tr. __." Citations to the Division's briefs are noted as "Div. Post-Hr'g Br." and "Div. Post-Hr'g Reply." Citations to Respondents' briefs are similarly noted.

> investment practices that are not often used by mutual
> funds.

Ex. 3105 at 1.[3] Hedge fund investors typically are accredited investors, as
were the individual investors in the funds at issue here. Ex. 66 at 23. An
individual "accredited investor" has earned income in excess of $200,000 (or
$300,000 together with a spouse) in each of the prior two years, and
reasonably expects the same for the current year, or has a net worth over $1
million, either alone or together with a spouse (excluding the value of the
person's primary residence). 17 C.F.R. § 230.501(a)(5), (6).

Those who choose to invest in a hedge fund intend to place their faith in
the manager with respect to investment decisions, as investors and
investment advisers testified. Tr. 217, 312-13, 1018, 2102-03, 3753-54, 4567-
68. Hedge funds are frequently structured to give the manager substantial
flexibility and discretion to take advantage of unique opportunities that the
manager has the experience and resources to identify and exploit for the
benefit of investors, and where necessary, attempt to mitigate losses from
delinquent assets. Ex. 2396 (Amended Expert Report of Leon M. Metzger)
¶¶ 61-62; Tr. 377, 636, 2839, 3752-53, 4634-35, 5643-44. Hedge fund
managers seek to gain an information advantage that allows them to
outperform market returns. Ex. 2393 (Expert Report of David X. Martin)
¶¶ 51-57; Tr. 5727-28; *see also* Tr. 208-09.

A hedge fund manager can reasonably expect that accredited investors
conduct at least a minimal level of due diligence, which includes reviewing
the fund's offering documents and audited financial statements and
questioning the fund manager. Ex. 2396 ¶¶ 52-53; Ex. 3105 at 1-4; Tr. 196-
97, 363, 465-66, 468, 747, 1007, 4047-48, 4427, 4429-31, 5611-12, 5622.
Investing in a hedge fund with a broad and opportunistic investment strategy
requires ongoing diligence during the pendency of the investment. Tr. 2829-
30, 3756, 5665.

---

3    Exhibit 3105, originally published by the Office of Investor Education
and Advocacy in February 2013, is available at https://www.sec.gov/investor/
alerts/ib_hedgefunds.pdf, and was issued to "educate individual investors
about hedge funds," *id.* at 1, but is accompanied by the caveat that "it is
neither a legal interpretation nor a statement of SEC policy." *Id.* at 6. I find
the quoted background accurate.

### 2. Respondents' Funds

Roni Dersovitz was an attorney licensed in New York and New Jersey. OIP ¶ 5; Answer at 5. He practiced personal injury law for fourteen years. Ex. 1452 at 16. He is the president and CEO of RD Legal Capital, LLC, and the owner of RD Legal Capital and RD Legal Funding, LLC. OIP ¶ 5; Answer at 5; Ex. 66 at 12. Dersovitz has acted as a factor—that is, invested in discounted receivables—for attorneys, law firms, and plaintiffs since 1996. Answer at 1; Tr. 5434; Ex. 63 at 12.[4] He formed RD Legal Funding in 1997 to purchase law firm receivables. Ex. 64 at 23. RD Legal Funding originates the legal fee receivables for Respondents' funds. Tr. 5439-40.

In September 2007, Dersovitz launched two hedge funds. RD Legal Funding Partners, LP (the Domestic Fund), is a Delaware limited partnership organized in 2007, with its principal place of business in Cresskill, New Jersey. OIP ¶ 7; Answer at 1, 6. RD Legal Funding Offshore, Ltd. (the Offshore Fund and, together with the Domestic Fund, the Funds), is an exempted company organized in 2007 under the laws of the Cayman Islands and managed from RD Legal Capital's offices in New Jersey. OIP ¶ 8; Answer at 1, 6.

RD Legal Capital is the general partner and investment manager of the Funds. OIP ¶ 6; Answer at 5. RD Legal Capital is a Delaware limited liability company with its principal office in Cresskill, New Jersey. OIP ¶ 6; Answer at 5. RD Legal Capital was registered with the Commission as an investment adviser from August 2009 through 2014. OIP ¶ 6; Answer at 5. RD Legal Capital does not receive any management fees from the Funds. Tr. 4497. RD Legal Capital receives remuneration from its management of the Funds only

---

[4]   For background, the purchase of receivables for a discount is known as factoring:

> Under a factoring agreement a company sells or assigns its accounts receivable to a factor in exchange for a cash advance. The factor typically charges interest on the advance plus a commission. The price paid for the receivables is discounted from their face amount to take into account the likelihood of uncollectibility of some of the receivables.

IRS Factoring of Receivables Audit Technique Guide at 1 (June 2006), https://www.irs.gov/pub/irs-utl/factoring_of_receivables_atg_final.pdf. I take judicial notice of the foregoing description which is longstanding public guidance of the IRS. 17 C.F.R. § 201.323.

if investors are allocated their full targeted cumulative return. Exs. 66 at 8, 67 at 10.

Respondents provided potential investors in the Funds with offering memoranda.[5] *See* Exs. 57, 60, 63, 64, 66 (Domestic Fund offering memoranda from October 2008, February 2011, December 2011, April 2012, and June 2013); Exs. 58, 59, 61, 62, 65, 67 (Offshore Fund offering memoranda from August 2009, February 2011, August 2011, December 2011, February 2013, and June 2013). Prospective investors received the applicable offering memoranda, subscription agreement, and limited partnership agreement before investing with the Funds. *E.g.*, Exs. 252, 350, 1333, 2742; Tr. 279. These forms set forth terms governing the funds, including the scope of RD Legal Capital's investment authority. Ex. 2396 ¶ 37; Tr. 186, 363, 467-68, 4566-67. Every investor confirmed this in signing a binding "Subscription Agreement" which, in pertinent part, represented that the investor was "relying solely on the facts and terms set forth in" the subscription agreement, offering memorandum, and partnership agreement. *E.g.*, Ex. 2703 at 5.[6]

Except as noted, the provisions pertinent to this proceeding are demonstrated by the February 2011 offering memorandum for the Domestic Fund, which states, under a heading "Investment Program" and sub-heading "Investment Objective and Strategy," that:

> The [Fund] intends to: (i) purchase from law firms and attorneys (collectively, the "Law Firms") certain of their accounts receivable representing legal fees derived by the Law Firms from litigation, judgments and settlements ("Legal Fee Receivables"). The [Fund] will enter into factoring contracts with respect to the Legal

---

[5]  Investors and prospective investors who signed a nondisclosure agreement could also access the offering memoranda and other documentation on Respondents' investor website. Ex. 42 at 3; Exs. 2355A, 2360A, 3095; Tr. 101, 4347.

[6]  The subscription agreement also confirmed that investors (1) are accredited and qualified investors with a minimum net worth; (2) made "an investigation of the pertinent facts relating to the operation of the Partnership" and "reviewed the terms of the Partnership Agreement to the extent [they] deem[] necessary in order to be fully informed"; and (3) have the knowledge and experience necessary to evaluate the merits and risks of investing in the Funds. Ex. 2703 at 2-5.

> Fee Receivables ("Factoring Contracts") . . . [and]
> (ii) provide loans to such Law Firms through the use of
> secured line of credit facilities . . . .

Ex. 60 at 11. The Funds' legal fee factoring strategy was discussed in more detail under the heading "Investment Strategy" and sub-heading "Legal Fee Factoring." *Id.* at 8-9. The February 2011 offering memorandum, like other iterations of the Funds' offering memoranda, explained that "[a]ll of the Legal Fee Receivables purchased by the Partnership arise out of litigation in which a binding settlement agreement or memorandum of understanding among the parties has been reached." *See id.* at 13; Ex. 61 at 14; Ex. 62 at 14. Respondents repeated that language later in the offering memorandum under the heading "Certain Risks" and sub-heading "Counterparty and Credit Risk." *See, e.g.*, Ex. 60 at 17. By June 2013, Respondents appended "or a judgment has been entered against a judgment debtor" to both provisions. Ex. 66 at 13, 18; Ex. 67 at 7.

The Funds' offering memoranda described risks including "credit risk of the counterparty and the risk of settlement default." *See, e.g.*, Ex. 60 at 17. The offering memoranda did not employ the phrase "litigation risk." *Id.* The offering memoranda explained that credit risk relating to the Funds' factored legal receivables "is low" in part because the Funds "will link exposures to [obligors] based on their long term bond rating . . . to limit credit exposures based upon the obligor's credit worthiness." *See, e.g.*, Ex. 60 at 13, 17. The offering memoranda further explained that because of the kinds of receivables the Funds purchased, "one form of credit risk to the [Fund] is dependent primarily upon the financial capacity of the defendants in the settled lawsuit to pay the stipulated settlement amount," but explained that such risk is "low" because "the defendants in these lawsuits . . . generally ha[ve] significant financial resources." *See, e.g.*, Ex. 60 at 13.

In explaining the category of possible investments titled "Other Advances to Law Firms," the offering memoranda disclosed that the Funds "may provide capital to client Law Firms based upon the specific needs associated with the credit request but subject to [certain] parameters," including that the "[r]epayment source is realistic within twelve months or less." *E.g.*, Ex. 60 at 14-15.

The offering memoranda also included flexibility provisions stating that Respondents "will not be limited with respect to the types of investment strategies [they] may employ or the markets or instruments in which [they] may invest," will "seek to capitalize on attractive opportunities, wherever they might be," and "may pursue other objectives or employ other techniques [they] consider[] appropriate and in the best interest of the [Funds]." Ex. 66

at 17; Ex. 67 at 21. The offering memoranda disclosed that "[c]ertain investments of the [Funds] could become delinquent and go into default or foreclosure." *See, e.g.*, Ex. 66 at 19; Ex. 67 at 25.

The offering memoranda referenced an investor website created and maintained by Respondents, and also alerted investors to the existence of an "Independent Accountant's Report On Applying Agreed-Upon Procedures" that was prepared by third party Wiss & Company LLP on a quarterly basis and provided information concerning so-called "workouts" and problem assets in the Funds' portfolios. *See, e.g.*, Ex. 66 at 10, 16; Ex. 67 at 11, 18-19; Ex. 2092 at 7-8 (September 2014 AUP discussing status of investments with a financially troubled law firm); *see also* Exs. 1186, 1246, 1263, 1431, 1490, 1544, 1712, 1796, 1892, 2018, and 2055 (AUPs).

The Funds offered to their investors a targeted cumulative annual return of 13.5%. Answer at 6; Ex. 66 at 24. At the end of each month, the net profits and losses of the Funds, including realized and unrealized gains and losses, were allocated to the accounts of the limited partners of the Domestic Fund and to the shareholders of the Offshore Fund. Ex. 66 at 24; Ex. 67 at 22. Net profits in excess of the investors' targeted return were allocated to the capital account of RD Legal Capital. Ex. 66 at 24; Ex. 67 at 22. If returns were insufficient to meet the return due to investors, RD Legal Capital was required to reserve the entire amount of any shortfall owed to investors and to allocate funds from future gains, if any, to cover any shortfall prior to RD Legal Capital receiving any further return. Ex. 64 at 7-8; Ex. 65 at 9-10. All ordinary expenses of operating the Funds were borne by RD Legal Capital. *See* Ex. 66 at 28; Answer at 7. The Funds bore responsibility for legal, accounting, administrative, auditing, tax preparation, and other professional expenses. Ex. 66 at 28-29.

Investors in the Funds were permitted to withdraw all or part of their capital account attributable to a particular capital contribution in installments, as long as that capital contribution had been invested in the Funds for at least twelve months. *E.g.*, Ex. 66 at 26. As the general partner, RD Legal Capital had the authority to waive any terms related to withdrawals for limited partners, including the one-year lock. *Id.* at 27.

Redemptions from the Domestic Fund were suspended as of April 30, 2015. Ex. 446. As of May 29, 2015, the Offshore Fund suspended all redemptions, began winding up, and implemented a liquidating account to satisfy the pending redemptions. Ex. 451 & 452. The assets in the Funds' portfolio "to some extent are self-liquidating." Tr. 5878-79. Except for collection issues that need oversight, the Funds will continue to self-liquidate in the future because, for example, obligors are required to make payments

8

due to the Funds regardless of who is in charge of RD Legal Capital. Tr. 5874-79.

An investor who invested in the Funds at their inception in 2007 would have realized a gain of well over 200% by the end of 2016. *See* Ex. 2396, Appendix C (comparing return on investment to various comparable benchmarks).

### 3. Respondents' "Special Opportunities" Funds

In 2012 and 2013, Respondents created two new funds, one domestic and one in the Cayman Islands, whose investment strategy was to "purchase from law firms and attorneys . . . certain of their accounts receivable representing legal fees derived . . . from litigation, judgments and settlements . . . arising from multiple civil actions against the Islamic Republic of Iran related to the bombing of the U.S. Marine Corps barracks in Beirut, Lebanon in 1983." Ex. 70 at 19; *see id.* at 8; Ex. 69 at 6. The new funds—referred to by the parties as "special purpose vehicles" or "SPVs"—would also purchase from some plaintiffs in the so-called reparation litigation accounts receivable representing a portion of each plaintiff's final judgment award proceeds. Ex. 70 at 8. RD Legal Capital was the investment manager for the offshore SPV, *id.* at 18, and the general partner for the domestic SPV, Ex. 69 at 17.

### 4. Respondents' Investments at Issue in this Proceeding

The Division contends that four of the Funds' investments departed from the Funds' strategy and were not properly disclosed because they involved matters that had not settled or reached final judgment at the time of the investment, or the receivables were purchased from entities other than law firms: (1) purchases of attorneys' and plaintiffs' receivables arising from the 1983 Beirut barracks bombing; (2) receivables of attorney Daniel Osborn, including cases claiming that pharmaceuticals caused osteonecrosis of the jaw (ONJ);[7] (3) receivables of attorney Barry Cohen; and (4) purchases of receivables arising from the 2010 oil spill in the Gulf of Mexico caused by the explosion and collapse of the Deepwater Horizon oil rig.

---

[7]   According to the American College of Rheumatology, ONJ occurs when the jaw bone is exposed, which leads to the death of the bone from a lack of blood. *See* Osteonecrosis of the Jaw, https://www.rheumatology.org/I-Am-A/Patient-Caregiver/Diseases-Conditions/Osteonecrosis-of-the-Jaw-ONJ.

### 4.1. The *Peterson* *Matter*

The *Peterson* case was one of a series of lawsuits against Iran arising out of the bombing of a Marine barracks in Beirut, Lebanon, in 1983. Tr. 1554-55. Initially, the Funds invested in receivables of two of the plaintiffs' attorneys, Steven Perles and Thomas Fay, but later purchased directly from plaintiffs.

#### 4.1.1. Steven Perles and Thomas Fay

Steven Perles is an attorney at the Perles Law Firm, a boutique law firm in Washington, D.C., that specializes in international claims and reparation matters, particularly pursuing financial compensation against material supporters of terrorist attacks against United States nationals abroad. Tr. 1539. Since 1986, Perles has prosecuted actions against foreign nations such as Libya, Iran, Syria, and the Sudan. Tr. 1539-41. Such matters typically require Perles's clients to obtain a judgment establishing liability against the sovereign for sponsoring the act of terror, which Perles describes as a "hunting license" to enforce against the sovereign's assets. Tr. 1544-45, 1548-49. In Perles's experience, Iran normally "decline[s] to participate in any way through the entry of a final default judgment. And then [it] vigorously defend[s] and frequently collaterally attack[s] during the enforcement phase." Tr. 1549, 1560.

Thomas Fortune Fay is an attorney at the Fay Law Group, PA, who has practiced antiterrorism law since 1996. Tr. 2398-99. Fay has prosecuted actions against nations such as Iran and Libya. Tr. 2399-2400, 2408-09.

Perles and Fay partnered to represent the plaintiffs in the *Peterson* cases. Ex. 558 (Fay & Perles Retainer Agreement); Tr. 1557-59. In 2010 and 2011, both men, through their firms, entered into master assignment and sale agreements with the Domestic Fund, in which they agreed to sell and assign to the Fund legal fees earned on certain cases. Ex. 227 (Perles Law Firm Master Agreement); Ex. 238 (Fay Kaplan Law Master Assignment and Sale Agreement); Tr. 2414-15. The sales were set forth on sequential schedules through which the firms sold a portion of the fees they had earned in obtaining the September 7, 2007, judgment in *Peterson v. Islamic Republic of Iran*, Nos. 01-cv-2094 & 01-cv-2684 in the United States District Court for the District of Columbia. *See, e.g.*, Ex. 1109 (Perles Sch. A-2); Ex. 1458 (Perles Sch. A-9); Ex. 444 at 11 (attachment to email with list of funding schedules between the Funds and the Fay Kaplan firm); Exs. 1175-1176 (Fay Sch. A-3 and amendment); Ex. 2106 (Fay Sch. A-13). The transactions were secured by the entire case inventory of each firm, with personal performance guaranties by Perles and Fay. Ex. 227 at 17-22; Ex. 238 at 24-28; Exs. 1416, 1417.

### 4.1.2. The Litigation

*Peterson* proceeded in stages. First, a liability action was filed in the United States District Court for the District of Columbia in 2001. *Peterson v. Islamic Republic of Iran*, No. 01-cv-2094. It resulted in 2007 in a final default judgment against Iran for $2.7 billion. Ex. 1020 (*Peterson* ECF No. 228). Perles and Fay obtained subsequent judgments against Iran arising out of the 1983 bombing, which, combined with the 2007 judgment, totaled $4.4 billion. Tr. 1555. Next, Perles and Fay sought to enforce the judgment against three pools of assets believed to belong to Iran. Tr. 1555-56. This was a long process, ultimately involving all three branches of government, including litigation all the way to the Supreme Court, an act of Congress, and a Presidential executive order.

In 2008, *Peterson* plaintiffs filed writs of attachment to restrain $2 billion in assets held in the name of Bank Markazi (the central bank of Iran) by Clearstream Banking, S.A., at an account at Citibank, N.A., in Manhattan. *See Peterson v. Islamic Republic of Iran*, No. 10-cv-4518, 2013 WL 1155576, at *5 (S.D.N.Y. Mar. 13, 2013) ("*Clearstream I*"). The district court issued a writ of execution as to these assets, which had the effect of restraining them. *Id.* While *Clearstream I* was pending, on February 5, 2012, President Obama issued Executive Order No. 13599, declaring that "all property and interests" of Iran held in the United States were to be considered "blocked" assets. 77 Fed. Reg. 6659. This facilitated the recovery of the restrained assets. *See Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1318 (2016). And on August 10, 2012, the Iran Threat Reduction and Syria Human Rights Act of 2012, 22 U.S.C. § 8701 *et seq.*, went into effect. The practical effect of this statute, particularly § 8772, was to "simplify" the process for enforcing the *Peterson* judgment. Tr. 1575.

In 2013, the district court granted partial summary judgment on behalf of the plaintiffs and ordered the turnover of the restrained and blocked assets and directed the Department of the Treasury to issue a license permitting transfer of the restrained and blocked assets into a trust established for the benefit of the *Peterson* plaintiffs (the qualified settlement fund). *Peterson*, 2013 WL 1155576, at *28-34; Ex. 1733 at 8; Ex. 1734; *see* Tr. 1585-86, 1710. The defendants appealed, but in July 2014, the United States Court of Appeals for the Second Circuit affirmed the district court's judgment. *See Peterson v. Islamic Republic of Iran*, 758 F.3d 185, 191 (2d Cir. 2014). The Supreme Court granted certiorari and affirmed in April 2016. *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1317 (2016).

The views of Dersovitz, Perles, Fay, and appellate specialists Dersovitz hired to examine *Peterson* changed over time. At the outset of *Clearstream I*,

Dersovitz believed the *Peterson* judgment did not meet the Funds' investment criteria, because he lacked sound, reliable information that the plaintiffs would collect. Tr. 2914 (Dersovitz testifying that "a judgment without having monies restrained in my mind is different than a typical settlement"); Tr. 5879-80, 5896. By mid-2010, Perles had transcripts of depositions taken in Italy of the directors of an Italian bank and information from an office of the Treasury Department establishing that the restrained assets at Citibank were being laundered by Iran into the United States. Ex. 2487 (English translation of Italian deposition); Ex. 3109 (Perles email to Dersovitz attaching Treasury Department letter); Tr. 5883-88. At that point—with an informational advantage—Dersovitz considered the opportunity a "perfect fit" for the Funds. Tr. 5885-86. With a non-appealable judgment in the underlying *Peterson* action, and funds identified at Citibank that would ultimately be used to satisfy the judgment, the filing of the *Peterson* turnover action completed the elements needed for the investment to fit the Funds' paradigm, and as Dersovitz explained, it was "just a matter of waiting out the judicial process." Tr. 5894-95, 6627. In Dersovitz's opinion, *Peterson* then became no different than any other case in the portfolio, because "accelerat[ing] legal fees on settlements and judgments that are collectible" is what the Funds do. Tr. 6169-70. Since 2011, Dersovitz understood that the risk in *Peterson* had to do with the duration of the legal process, and that while Iran could delay the process, it could not stop it. Tr. 5951-53.

As *Clearstream I* was progressing, to confirm and validate the Funds' informational advantage, Dersovitz hired an appellate attorney from Reed Smith, James Martin, to analyze a variety of issues related to the turnover litigation. Tr. 3391, 3398-99. From 2012 to 2014, Reed Smith prepared eight memoranda covering a variety of issues including the merits of the turnover litigation and various constitutional and state law issues. Exs. 1455, 1456, 1677, 1691, 1770, 1906, 1907, 1916; Tr. 3396, 3399, 3404-05. Reed Smith invested more than 400 hours analyzing the turnover litigation, Tr. 3403-04, and a review of the memoranda it produced shows that the firm consistently concluded that the turnover litigation had merit and that the *Peterson* plaintiffs were likely to succeed.

Martin testified that there is "no such thing as a sure bet" in litigation, Tr. 3458-59, but that he was at all times confident that the *Peterson* plaintiffs were likely to succeed in *Clearstream I*. Tr. 3417-18. Martin opined that three independent bases for enforcing the *Peterson* judgment had merit. Tr. 3410-11, 3455, 3501. Once the assets were transferred to the qualified settlement fund, Dersovitz believed the "money was never going back [to Iran] legally and practically." Tr. 5939. Reed Smith agreed that such an occurrence was "unlikely[, i]f not impossible." *Id.*; Ex. 573. Before purchasing any judgment

awards from the *Peterson* plaintiffs (as opposed to attorneys' legal receivables), RD Legal retained other lawyers at Reed Smith to evaluate whether purchases from the plaintiffs would be enforceable under federal law or considered loans under various state laws, which turned on the non-recourse nature of the transactions and the allocation of collection risk to Respondents. Ex. 6 at row 16 (indicating first purchase from a *Peterson* plaintiff on September 13, 2012); Ex. 714 at 51-107 (Aug. 21, 2012, memorandum from Reed Smith to Dersovitz).

Perles testified that, until certiorari was granted, he had an "unyielding" view that the plaintiffs would prevail. Tr. 1685; *see* Tr. 1617-18. In late 2015, Perles was unsure if the Solicitor General, whose views the Supreme Court had requested, would defend the constitutionality of 22 U.S.C. § 8772, although it ultimately did so. Tr. 1618-19. Fay did not share Perles's concerns and always believed the *Peterson* plaintiffs would be able to enforce their judgments. Tr. 2456, 2459, 2460-61. And Perles understood that even without § 8772, the *Peterson* plaintiffs could enforce their judgments under New York State law and the Foreign Sovereign Immunities Act. Tr. 1688-90.

But if the collection action in *Clearstream I* had failed, Respondents had several other options for recovering the fees and awards purchased by the Funds. First, Perles and Fay signed guaranties and agreed that the Funds had recourse against all of the assets of their respective firms for any monies owed. *Supra* at 4.1.1.; Ex. 1108; Tr. 1633-34, 2434-35.

Second, the *Peterson* judgment could have been satisfied by other Iranian assets, including a building located at 650 Fifth Avenue in Manhattan, which *Peterson* plaintiffs, in cooperation with the United States Attorney for the Southern District of New York, were attempting to seize and liquidate via litigation. Tr. 1621-23. The proceeds of a forfeiture sale of the property will be used to compensate victims of Iranian terrorism, including clients of Perles and Fay. Tr. 1556. A judgment of forfeiture was entered on October 4, 2017. Order, *In re 650 Fifth Ave.*, No. 08-cv-10934 (S.D.N.Y) (ECF No. 2089). There was also approximately $6.7 billion held in an account at JP Morgan, which is subject to a separate collection action. Tr. 1556-67. Perles contended that the funds were illicitly laundered into JP Morgan by Clearstream.

Finally, the receivables the Funds purchased could be partially satisfied from a $1 billion fund set up by Congress for victims of terrorism pursuant to the United States Victims of State Sponsored Terrorism Act, 34 U.S.C. § 20144. Tr. 1713-14.[8]

---

[8]    These funds were first available in 2016.

4.1.3. The Funds' *Peterson* Positions

The following chart displays changes to the Funds' *Peterson*-related positions over time, expressed as a percentage of the value of the Funds and as a percentage of the dollars deployed by the Funds.

### Positions of Funds in the Peterson *cases*

| Date | Value of Funds (%) | Dollars deployed (%) | Ex. 2 Reference |
|---|---|---|---|
| June 30, 2011 | 17.56 | 16.33 | row 2 |
| December 31, 2011 | 27.89 | 25.33 | row 8 |
| August 31, 2012 | 37.47 | 34.10 | row 16 |
| December 31, 2012 | 46.86 | 45.57 | row 20 |
| December 31, 2013 | 62.19 | 55.15 | row 32 |
| December 31, 2014 | 66.41 | 51.68 | row 44 |
| December 31, 2015 | 71.72 | 57.69 | row 56 |

The *Peterson* trades were not a single position, but rather many individual transactions with different terms, counterparties, and risk profiles. Ex. 2393 ¶¶ 40-49; Tr. 3997-99, 5726-28. Respondents hedged duration risk by structuring some of the *Peterson* trades as rebate transactions (which increase in value over time) and others as flat-fee transactions (which decrease in value over time). Tr. 4031-32. The *Peterson* trades could also be satisfied by diverse sources of collateral. Tr. 5726-28.

The purchase price of the Domestic Fund's investment in Perles's *Peterson* fees was $20 million. Exs. 6, 227. The Domestic Fund purchased more than $34 million in legal fees from Fay Kaplan Law for $12.5 million. Exs. 6, 238; Ex. 444 at 11.

After the Supreme Court's decision, Fay and Perles refinanced their loans with other lenders and paid off the Funds. Tr. 1600, 2419. On May 12, 2016, using third-party financing, Fay paid the Domestic Fund $36,898,260.71. Ex. 2998. On September 21, 2016, using third-party financing, Perles paid the Domestic Fund $62 million. Ex. 2333 at 1; Tr. 1612-14.

The weighted average actual annualized return for the Perles and Fay transactions, including transactions "participated," or sold, to third parties,

was 34.23%. Ex. 2393, Exhibit 5A (chart showing actual annualized return on Fay and Perles *Peterson* legal fee receivables).[9] Investments in the *Peterson* judgment increased the average expected duration of the Funds' positions by as much as 12 months from June 2011 to June 2014. Ex. 2393 ¶¶ 32-33; *id.* at Exhibit 3. But for most of the period from February 2015 to September 2016, the *Peterson* receivables lowered the overall duration of the Funds' positions. *Id.* ¶ 33.

Respondents broadened the types of *Peterson* trades they were willing to execute and scaled up the size of the *Peterson* investments only to the extent that developments approached certainty that the *Peterson* collection action would succeed. When Respondents first started investing in the *Peterson* judgment in 2010, they limited the Funds' purchases to legal fees for which the attorney had signed a performance guaranty and also pledged his entire case inventory as collateral. Ex. 6 at column D. It was not until September 2012—after President Obama signed the asset-blocking executive order and § 8772 went into effect—that the Funds began entering into non-recourse transactions with *Peterson* plaintiffs through individual assignment and sale agreements. Ex. 6 at row 16. Respondents increased the size of the Funds' investments in the *Peterson* judgment as collection of judgment proceeds became increasingly certain. Tr. 4082, 6615; Exs. 1369 at 7, 1676 at 10, 1939 at 11, 2149 at 9 (2011-2014 Offshore Fund audited financial statements showing *Peterson* growth from 14% of net assets in 2011 to 74% in 2014); Exs. 12 at 5, 14 at 6, 16 at 6, 19 at 6 (2011-2014 Domestic Fund audited financial statements showing *Peterson* growth from 47% of capital in 2011 to as high as 75% in 2013). By June 30, 2015, the Funds had spent more than $32 million purchasing portions of the *Peterson* plaintiffs' judgment proceeds. *See* Ex. 6 at cells C16 through C254, excluding advances to Fay at cells C222, C226, C232 & C241.

As the *Peterson* opportunity became more attractive over time from a risk perspective, a higher concentration of *Peterson* assets reduced overall portfolio risk, Respondents' experts explained. Ex. 2396 ¶ 112; Ex. 2393 ¶ 13 ("[A]s the concentration of Peterson receivables in the portfolio increased, overall portfolio risk declined."); Tr. 5726-28.

Respondents took other actions to manage and attempt to minimize risks associated with the *Peterson* trades. In their funding agreements,

---

[9]   By comparison, the weighted average actual annualized return for the Funds' non-*Peterson* receivables for which payment has been received was 24.75%. Ex. 2393, Exhibit 5B.

Respondents provided that the plaintiff or her lawyers agreed that the trustee managing the assets should disburse those assets directly to Respondents, in the event that turnover was ordered, eliminating the risk that the plaintiff's lawyers would abscond with the payouts. Ex. 1108 at 6; Ex. 238 at 8; Tr. 1613 (Perles testifying that the *Clearstream I* trustee "paid the RD loan back directly," and the funds "never went to [Perles's] office"). In addition, Respondents sold interests in some of the *Peterson* trades to third parties such that the third parties bore, to some extent, some of the risks of those trades. *See, e.g.*, Ex. 713 (May 17, 2013, master participation agreement); Ex. 3146 (various schedules to master agreement).

In Martin's opinion, "the risk management procedures of RD Legal ensure that the actual level of the risks incurred remain consistent with its approved risk profile that arise from its investment strategy." Ex. 2393 ¶ 73.

Based on their information advantage and risk management efforts, Respondents held a sincere, good faith belief that the Funds' investments in the *Peterson* judgment were collectively the "best trade in the book." Ex. 216 at 35-36 (transcription of a recorded telephone conversation involving, among others, Dersovitz and Jason Garlock of Cobblestone Capital Advisors); Tr. 5726-28 (Dersovitz testifying that "in [his] estimation, it was like investing into cash . . . at a discount"); Tr. 395-96 (investor testifying that Dersovitz was "gung ho" about *Peterson*); Tr. 492 (prospective investor testifying that Dersovitz was "effusive" about *Peterson*); Tr. 2876-77, 4281, 6176, 6791.

### 4.2. Daniel Osborn and the ONJ Cases

The Funds also invested in legal fee receivables from attorney Daniel Osborn. Osborn practiced through the Beatie & Osborn firm between 1998 and 2008. Tr. 1242-44. Following the firm's dissolution, Osborn practiced through Osborn Law, PC. Tr. 1251-52. Prior to its dissolution, Beatie & Osborn had a long relationship with Respondents, involving the purchase and successful collection of more than $7 million in fees. *See* Ex. 1186 (email from Fund administrator to investors attaching March 2011 AUP); Tr. 1350. Beatie & Osborn's breakup, however, caused liquidity problems that threatened the Funds' ability to collect on fees they had previously purchased from the firm. Ex. 1186 at 5.

Around 2005, Osborn began representing plaintiffs injured by certain prescription drugs, including in cases against Merck, Novartis, and Proctor & Gamble related to the so-called "ONJ cases." Tr. 1242-43, 1247-49, 1251-52; Ex. 192 ¶ 13. The Funds' first investment in the ONJ cases was a $177,000

16

advance to Beatie & Osborn in August 2008, for potential fees from the action against Novartis. *See* Ex. 5 at row 2.

After Beatie & Osborn's breakup, Respondents hired an independent law firm, Smith Mazure, to conduct due diligence with respect to Osborn—including interviewing Osborn, auditing the ONJ cases and Osborn's remaining case inventory, and, on at least one occasion, visiting his law offices. Tr. 1249, 1252-53, 1343, 1355; Exs. 1137, 1431, 2064, 2072. After a favorable review, Respondents agreed to advance funds to Osborn's new firm in an effort to preserve the Funds' ability to recoup their previous investments. Tr. 2672, 5550-52. Osborn signed a guaranty and assigned his entire case inventory as well as a $1 million life insurance policy as collateral for the Funds' investment in the Osborn ONJ cases. Tr. 1311-12; *see* Ex. 477 at 6. The Smith Mazure audit was not a one-off engagement; the firm repeatedly concluded that the anticipated legal fees due to Osborn should exceed the balance due to the Funds. *See, e.g.*, Ex. 1431 at 5-6 (Mar. 31, 2012, AUP); Ex. 1712 at 7-8 (Mar. 31, 2013, AUP).

Osborn's firm experienced financial difficulties such that, without continued investment from the Funds in the ONJ receivables, the Funds would not have been able to recoup their prior investments in Osborn's cases. Tr. 1249-50, 5565-66; Ex. 481 at 2. Dersovitz and others at the Funds considered the ONJ investments to be a workout and not part of the Funds' primary strategy. Tr. 2672, 2680, 4473, 4610-11, 4637, 5825-26; Exs. 371, 610.

Dersovitz invoked the flexibility provisions of the offering memoranda when he authorized the initial funding for the ONJ cases. Ex. 721 at 1; Tr. 2676-77. Schedules A-1, A-2, and A-3 to the Osborn Law master assignment and sale agreement were applied to pay off outstanding receivables owed by Beatie & Osborn. Ex. 721 at 1.

The Funds' offering documents and due diligence questionnaires did not disclose the ONJ case investments as workouts. Tr. 2672-73, 2681-82, 5825-26. But the quarterly AUPs prepared by Wiss & Company did disclose those investments and explained why Respondents believed they were in the best interests of investors after multiple audits and based on the record of successful verdicts and settlements in individual ONJ trials. *See* Ex. 1712 at 7-8 (Mar. 31, 2013, AUP); *see also, e.g.*, Ex. 1431 at 5-6 (Mar. 31, 2012, AUP); Ex. 1544 at 5-6 (Sept. 30, 2012, AUP); Tr. 1350. The March 2013 AUP also noted that Respondents had "increased the portfolio concentration limit for the Novartis Pharmaceutical Company to $9MM." Ex. 1712 at 7-8.

By November 2012, there had been at least a dozen trials in the cases against Novartis; while the plaintiffs were successful in about half of them, Osborn's two clients were unsuccessful at trial. Tr. 1279-80. By the end of 2012, Respondents were aware that none of the ONJ cases had yet settled. Tr. 2671. The litigants in the case against Merck entered into a settlement agreement in March of 2014, more than four years after the last advance to Osborn with respect to that case. *See* Ex. 2064 at 3 (Nov. 21, 2014, letter from Osborn); Ex. 5 at row 18. None of Osborn's Merck clients had settled before the global settlement. Tr. 1295-96. Between July 2013 and August 2014, Respondents sold participation interests in the assets relating to the Novartis case to a third party for a total of $7.5 million. Ex. 3117. When the matter against Procter & Gamble settled, Osborn and his co-counsel received $593,200 in fees. Ex. 192 ¶ 64.

By the end of 2015, the remaining purchase price of Osborn receivables in the Funds was nearly $10 million. Ex. 2 at cell D56. They were valued at approximately $16 million. *Id.* at cell F56. As of October 2016, including amounts received from Osborn and his co-counsel and from a participation agreement, the Funds had received almost $14 million for their ONJ investments, half a million dollars more than the total amount advanced to Osborn. *See* Exs. 3116, 3117; Tr. 5555-57, 5559.

The following chart displays changes to the Funds' positions in the ONJ cases over time, expressed as a percentage of the value of the Funds and as a percentage of the dollars deployed by the Funds.

### Positions of Funds in the ONJ cases

| Date | Value of Funds (%) | Dollars deployed (%) | Ex. 2 Reference |
| --- | --- | --- | --- |
| June 30, 2011 | 10.57 | 9.59 | row 2 |
| December 31, 2011 | 12.20 | 10.82 | row 8 |
| August 31, 2012 | 10.46 | 9.57 | row 16 |
| December 31, 2012 | 10.44 | 10.08 | row 20 |
| December 31, 2013 | 11.09 | 10.91 | row 32 |
| December 31, 2014 | 8.68 | 10.02 | row 44 |
| December 31, 2015 | 9.69 | 10.32 | row 56 |

From January 2015 through December 2016, the Domestic Fund entered into additional agreements with Osborn Law, advancing the firm $580,000 with respect to potential fees related to *Ruiz v. Affinity Logistics*, a wage-and-hour class action. Ex. 477 at 122; Ex. 3117 at 4; Tr. 1320-22, 5563-64.

Respondents' decision to invest in the potential fees was preceded by a favorable ruling from the Ninth Circuit Court of Appeals adjudicating that Osborn's clients were employees, not independent contractors. *Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093 (9th Cir. 2014). *Ruiz* settled for nearly $14 million after the conclusion of the hearing in this proceeding. *Ruiz v. XPO Last Mile, Inc.*, No. 3:05-cv-02125 (S.D. Cal.) (ECF Nos. 432 & 433).

Following the *Ruiz* settlement, Osborn's other case inventory remains collateral for amounts still owed to the Funds. *See, e.g.*, Tr. 1277-78, 1284-87, 1325-29. Dersovitz testified that he had "every reason to believe that [the Funds] should get repaid" on its Osborn positions. Tr. 2683-84.

### 4.3. Barry Cohen

Barry A. Cohen is a Florida attorney who has been practicing since 1966 with various firms, handling both criminal and civil matters. Tr. 1389-91. Cohen's firm entered into a master assignment and sale agreement with the Domestic Fund, in which it agreed to sell and assign to the Domestic Fund legal fees earned on two cases relevant here. Ex. 202 at 29-80, 81-135; Tr. 1420-21. First, Cohen represented James J. Licata in a criminal matter in 2007. Ex. 202 at 29; Tr. 1394-95. Second, Cohen represented the relator in a *qui tam* action arising under the False Claims Act against WellCare Health Plans. Ex. 202 at 81; Tr. 1407, 5568-69.

The Funds' investments in the Cohen cases occurred between 2007 and 2009. Ex. 202 at 29, 81. The AUPs disclosed and described the Cohen investments. *See, e.g.*, Ex. 1892 at 8-9; Ex. 1246 at 7; Ex. 1544 at 7-8.

#### 4.3.1. The Licata Matter

Cohen was hired by Licata in early 2007 under a $15 million retainer. Tr. 1395, 1435. The fee was earned the day the retainer agreement was signed. Tr. 1435; *see also* Tr. 5779-80. Because Licata could not pay the agreed amount in cash, he and his wife assigned a mortgage they owned and their interest in an apartment building in New Jersey known as "Bel Air" to two entities formed by the Cohen firm. Tr. 1395-96, 1435, 5786-87. In October 2007, the Domestic Fund advanced $2.5 million to purchase $3.3 million due to the Cohen firm arising out of the Licata representation. Ex. 201 ¶¶ 21, 23; *see also* Ex. 202 at 29. As security for, and to guarantee payment, the Cohen firm caused to be pledged to the Domestic Fund the Licata mortgage and the interest in the Bel Air. Ex. 202 at 29; Tr. 5571, 5788-89. By December 2007, the Licata matter concluded, for probation and house arrest. Tr. 5779-80. In 2009, the Domestic Fund advanced the Cohen firm an additional $1,075,000 with respect to Licata. Ex. 201 ¶¶ 25, 28-29; *see also* Ex. 202 at 42, 53, 65.

Collection on the mortgage promissory notes and foreclosure of the Bel Air building both required litigation—which took place from 2007 through at least 2014—before true ownership of those assets could be established. Ex. 1892 at 8-9; Tr. 5788-89, 5796-97. The quarterly AUPs provided investors with some information on the status of these assets. *See* Ex. 1186 at 7; Ex. 1431 at 7; Ex. 1712 at 8-9; Ex. 2092 at 9. Ultimately, the Cohen entity— and by extension, Respondents—lost all ownership interest in the Bel Air building. Tr. 1400-01, 5797-99.

### 4.3.2. The *WellCare* Actions

In May 2009, the United States filed a criminal case against WellCare Health Plans, together with a deferred prosecution agreement between the United States, the State of Florida, and WellCare. *See* Deferred Prosecution Agreement, *United States v. WellCare Health Plans*, No. 8:09-cr-203 (M.D. Fla. May 5, 2009) (ECF No. 4). Under the terms of the agreement, WellCare agreed to pay $80 million to the United States and the State of Florida, but there was no provision for paying any civil relator in the *qui tam* action— such as Cohen's client—under that agreement. *See id.* The criminal case was "separate and apart" from the *qui tam* action. Tr. 1412-13, 1450. In June 2009, when Respondents advanced funds to the Cohen firm with respect to the *qui tam* action, Cohen believed that the firm would be entitled to obtain fees from the monies WellCare paid under the deferred prosecution agreement; the United States Attorney "disagree[d] that a Relator is entitled to recovery of forfeiture proceeds where, as here, the United States intends to intervene in the *qui tam* suits and obtain a civil recovery," because "the law does not permit the Relator to also share in forfeiture proceeds from a criminal resolution." Letter to Barry A. Cohen dated June 1, 2009, at 2, *WellCare* (M.D. Fla. July 20, 2011) (ECF No. 16-8). The district court rejected the Cohen firm's motion to intervene in the criminal action to enforce its claim to legal fees. Order, *WellCare* (Sept. 21, 2011) (ECF No. 25).

After the resolution of the *qui tam* action, the Cohen firm failed to remit to Respondents any amounts it may have received from that action, resulting in a lawsuit by the Domestic Fund against the Cohen firm filed in January 2013. *See* Ex. 201 ¶ 84 ("The Cohen Firm has not paid as much as a single dime to [the Domestic Fund] on account of legal fees arising out of the WellCare Turnover Litigation").

The following chart displays changes to the Funds' Licata and *WellCare* positions over time, expressed as a percentage of the value of the Funds and as a percentage of the dollars deployed by the Funds.

### *Positions of Funds in the Licata and* WellCare *cases*

| Date | Value of Funds (%) | Dollars deployed (%) | Ex. 2 Reference |
|---|---|---|---|
| June 30, 2011 | 16.39 | 11.37 | row 2 |
| December 31, 2011 | 17.25 | 11.17 | row 8 |
| August 31, 2012 | 12.47 | 7.92 | row 16 |
| December 31, 2012 | 11.69 | 7.13 | row 20 |
| December 31, 2013 | 12.20 | 6.69 | row 32 |
| December 31, 2014 | 13.05 | 6.55 | row 44 |
| December 31, 2015 | 8.99 | 6.85 | row 56 |

*4.4. Deepwater Horizon Claimants*

With respect to the Deepwater Horizon oil spill, the Funds provided advances to entities such as claims processors, claim administrators, and accounting firms. *See* Exs. 410-415 (schedules to Master Assignment and Sale Agreement between Domestic Fund and Claims Strategies Group); Ex. 8ZL at rows 208-227 (investments with Gary Wittock, CPA, Clay C. Schuett & First Financial of Baton Rouge); Tr. 1213-14. Approval for these investments came from Dersovitz. Tr. 1215-17. Between June 2012 and July 2015, the Funds deployed over $8 million—as high as 7.82% of the total funds deployed by the Funds and 3.77% of the fair value of the Funds—with respect to the BP case. Ex. 2 at cells P11-P51, Q50, and S43. Dersovitz testified that he believed these investments could be permitted under the offering documents' "flexibility clause." Tr. 2665-67.

The following chart displays changes to the Funds' BP positions over time, expressed as a percentage of the value of the Funds and as a percentage of the dollars deployed by the Funds.

### *Positions of Funds in the Deepwater Horizon Settlement*

| Date | Value of Funds (%) | Dollars deployed (%) | Ex. 2 Reference |
|---|---|---|---|
| August 31, 2012 | 0.68 | 0.90 | row 16 |
| December 31, 2012 | 0.45 | 0.81 | row 20 |
| December 31, 2013 | 0.97 | 2.67 | row 32 |
| December 31, 2014 | 2.68 | 7.04 | row 44 |
| December 31, 2015 | 1.41 | 7.50 | row 56 |

### 5. Marketing the Funds

In the hedge fund industry, marketing materials and presentations, such as those used by Respondents, are designed to serve as an introduction to a fund and its manager, not as a comprehensive explanation of the fund's investment strategy or portfolio composition. Ex. 2396 ¶¶ 35, 41, 50, 54; *see* Tr. 466-67, 4454, 4607. According to Amy Hirsch, who had long experience in the industry before signing on to consult for Respondents, it is standard industry practice to describe a fund's investment strategy in general terms and potential risks broadly in marketing materials. Tr. 4476, 4550-54.

#### 5.1. *Respondents' Marketing Pitch to Prospective Investors*

In November 2012, Respondents had a conference call with representatives of Cobblestone Capital Advisors, an SEC-registered investment adviser firm, which was considering investing in the Funds. Cobblestone's Jason Garlock recorded the call, per the firm's practice for discussions with "lead managers" like Dersovitz. Tr. 432. According to Dersovitz it was "a typical investor call." Tr. 6166-67. The call occurred after Cobblestone had begun its due diligence of the Funds, which included an in-person meeting with Rick Rowella, then-marketing director of RD Legal Capital and conversations with Katarina Markovic and Meesha Chandarana, business development and marketing employees at RD Legal Capital. Tr. 411-428; *see* Ex. 276. Prior to the call, Respondents sent Cobblestone presentations, demonstrations, and memoranda regarding the Funds' strategy. Exs. 276, 282, 293, 302, 2772.

Before the call, Garlock understood the Funds' strategy to involve "purchasing receivables from law firms." Tr. 416. On the call, Dersovitz explained that the Funds "accelerate legal fees on settlements and judgments that are collectable." Ex. 216 at 9.[10] He explained that attorneys might need the fee acceleration services in a small percentage of settlements, such as a settlement with a minor child plaintiff or a class action, in which a court approval process delays payment of the settlement. *Id.* at 9-11, 17; *see* Tr. 441, 446, 488.

Dersovitz told Cobblestone representatives: "What we're dealing with primarily, 100 percent, are settled cases. So there is no litigation risk in the strategy." Ex. 216 at 7. Markovic similarly said that the Funds' "focus is very, very specific," and that Respondents worked with only "settled" claims. *Id.* at

---

[10]   Exhibit 216 is a transcription of the Cobblestone recording. Page citations to the exhibit refer to the pages of the transcript.

31-32. Garlock testified that he understood Markovic's representations (like Dersovitz's) to mean the Funds' strategy was to invest in "only settled claims [with] no litigation risk." Tr. 452-53.

Dersovitz was asked on the conference call whether "all the receivables that you're buying [are] the result of an agreed upon settlement? Or are there cases that actually go to a court decision?" Ex. 216 at 9. He answered:

> A settlement is a settlement is a settlement. At some point during the litigation process, Party A agrees to pay Party B. And what we're doing is accelerating the legal fees to attorneys that are entitled to their fee.
>
> Now we accelerate legal fees on settlements and judgments that are collectable.

*Id.*

The questioning continued: "the judge can't change that settlement, right? I mean so the settlement is agreed between the two parties, the judge just manages the payout process?" *Id.* at 10. Dersovitz said that "99.99999 percent of the time that's true," explaining that "[i]f a complaint or a comment is made that a settlement is inappropriate, it's always because it's not enough." *Id.* at 10-11. Garlock found it significant that the Funds purchased receivables where "two parties had agreed" because that meant "both wanted to settle." Tr. 439.

For Garlock, who is not an attorney, there was no distinction between a settlement and a judgment, and he interpreted Dersovitz's statements about the lack of litigation risk to apply to both. Tr. 491, 501. The absence of litigation risk was important to Garlock because Cobblestone was "looking for . . . finance economic-based strategies" in which to invest, "not strategies that were funding litigation." Tr. 436.

Dersovitz explained to Garlock that the Funds' two main risks were duration and theft. Ex. 216 at 17. They also discussed concentration risk— which Garlock was "always concerned about" with respect to potential investments—with specific reference to *Peterson*, Novartis, and Merck. *Id.* at 35-36; *see* Tr. 425. Regarding duration risk, Dersovitz explained that there was "a predictability" associated with how long the legal process should take before payment is made, and that Respondents, as a rule of thumb, would essentially double or triple that time. Ex. 216 at 17. It mattered to Garlock that Respondents saw "a predictability around [duration risk]," because that made the risk easier to manage. Tr. 447. Although Dersovitz named duration one of the main risks of the investment, he also stated that "historically, that

has been an insignificant issue," and explained that duration impacts return on investment rather than principal, and further that, due to the structure of the returns to investors, the first reduction in return on investment impacts Respondents rather than the investor. Ex. 216 at 19-20.

Dersovitz also said that the risk of theft "can be tremendously mitigated," and that theft "has not been a real issue" because Respondents "have the best hammer available"—that is, for the attorneys with whom Respondents would do business, their law "license is on the line." Ex. 216 at 20-21; *see also* Ex. 478 at 2 (investor notes of meeting with Respondents noting "huge hammer for collecting: can get them disbarred").

When asked about the line of credit aspect of the portfolio, as seen in the offering memorandum, Dersovitz explained that he "personally [was] not a fan of that asset class because it's not bankruptcy-proof. You're just a secured creditor, and you usually get diluted." Ex. 216 at 15-16. Accordingly, Dersovitz told Cobblestone that the line of credit business was "a diminishing component of the business," and that the $2.5 million balance of the line of credit investments was "a de minimis piece of the business." *Id.* at 16-17.

At the end of the call, Cobblestone representatives asked about *Peterson*, which it described as a "*settlement* with the U.S. Government and Iran." *Id.* at 35-36 (emphasis added). Dersovitz did not explicitly correct the questioner, but in his response he described the opportunity as involving a "$2.65 billion *judgment* [obtained] in 2007," not a settlement. *Id.* at 37-39 (emphasis added). Dersovitz described subsequent legal developments and delays the plaintiffs experienced in trying to collect their award. Garlock understood from what he was told by Respondents that *Peterson* was part of the Funds' portfolio. Tr. 490-91, 493-95.

Ultimately, Cobblestone declined to invest because of concerns about the *Peterson* concentration and "difficulty understanding how an act of Congress is the same as a legal settlement." Tr. 462.

### 5.2. Respondents' Marketing Materials

Respondents developed marketing materials through a "collaborative process," but Dersovitz had the final approval of all materials. Tr. 5503-04. In 2010, Respondents hired Hirsch on a consulting agreement to help create "institutional quality marketing materials," among other things. Ex. 3101. Before coming aboard, Hirsch was of the view that the marketing materials were not "institutional quality": "You would get an email, for example, as part of the marketing scheme, and it would have one line. It wouldn't explain what the line meant. It didn't have maybe the right disclaimer on it." Tr. 4445-46. By October 2013 at the latest, Respondents retained industry

compliance professionals to review their marketing materials. Ex. 1831; Ex. 210 at 23-24; Tr. 4489.

### 5.2.1. General Marketing Documents

A one-page marketing document describing the Funds' "opportunity and strategy" explained that the "RD Legal Group purchases legal fee receivables of settled litigation cases from law firms." Ex. 267; Ex. 282 at 3 ("RD Legal purchases legal fee receivables from law firms once cases have settled."); *see also* Ex. 35; Ex. 293 at 44. Another marketing document, titled "Overview," reiterated: "RD Legal purchases legal fee receivables from law firms once cases have settled." Ex. 41 (version reflecting returns through year end 2012); *see also* Ex. 491 ("RD Legal factors legal fee receivables from US-based law firms once cases have settled."). The "Overview" stated that the funds "principally consist of purchased legal fees associated with settled litigation." Ex. 41. A third document, "Executive Summary," explained that the Funds' "portfolio is principally comprised of purchased legal fees associated with settled litigation [that is] past the point of any potential appeals or other disputes." Ex. 252 at 58. It added that the fees "are generally payable by bond rated entities such as Municipalities, Insurers and public Corporations with aggregate portfolio exposures limited based upon the creditworthiness of the relevant Payor." *Id.*; *see also* Ex. 240 at 2; Ex. 591 at 47.

Respondents' December 19, 2011, marketing presentation stated that as of August 31, 2011, 94.99% of the Funds' portfolios were in fee acceleration balances and 5.01% were in lines of credit. Ex. 31 at 12, 14. It described fee acceleration as for "Settled Cases Only." Ex. 31 at 11; *see also* Ex. 31 at 12 (explaining strategy as purchasing "attorney fees only on settled cases"). An earlier version of the presentation promised "full investor transparency to portfolio positions." Ex. 29 at 4.

### 5.2.2. "Alpha Generation and Process"

Respondents also marketed the Funds with a document titled "Alpha Generation and Process." *See, e.g.*, Ex. 293 at 1, 19-42; Ex. 336 at 1, 6-33. Iterations of the Alpha Generation document represented that the Funds' portfolio "is principally comprised of purchased legal fees associated with settled litigation." Ex. 269 at 3; Ex. 38 at 4; Ex. 40 at 4; *see also* Ex. 47 at 4 ("The primary strategy of the Funds . . . is to factor Legal Fee receivables associated with settled litigation from US based attorneys."). By November 2013, the Alpha presentations distinguished the primary strategy of the Funds from the special opportunities funds. Ex. 384 at 7. Like the "Executive Summary," the Alpha Generation document explained that the "legal fees which arise from settled litigation are past the point of any potential appeals

or other disputes and therefore the dollar value of the minimum legal fee can be accurately determined." Ex. 38 at 4.

The Alpha Generation presentation listed three risks relating to fee acceleration:

(1) seller and obligor default, which the document explains are mitigated by several factors, including that "Defendant(s) have no incentive to settle if they cannot make payment [so] the settlement validates financial capacity";

(2) portfolio concentration, a risk the document explains is mitigated by "exposure limits on Obligors"; and

(3) the time value of money, a risk mitigated by Respondents' "[e]xpertise of knowing the typical tenure of payment for each of the various settlements."

Ex. 38 at 12; *see* Ex. 40 at 12. These presentations also explained that the Funds' advances "are capped [by obligor] based upon long term bond ratings to lower event risk." Ex. 38 at 15; Ex. 40 at 15. The November 2013 version of the presentation replaced portfolio concentration with attorney theft as one of three risks identified. Ex. 384 at 13.

### 5.2.3. Due Diligence Questionnaire

Respondents typically shared a due diligence questionnaire (DDQ) with potential investors, which was based on a template provided by the Alternative Investment Management Association.[11] *See, e.g.*, Exs. 244, 533; Tr. 5245-46. In describing Respondents' strategy, versions of the DDQ stated that Respondents' "portfolio consists of two investment products": "Fee Acceleration (Factoring)" and "Line[s] of Credit." Ex. 39 at 11 (Sept. 2012 DDQ); Ex. 262 at 11 (Dec. 2011 DDQ) (same); *see* Ex. 48 at 9 (June 2014

---

[11] As background, I note that according to AIMA, "the first AIMA DDQ—for investors conducting due diligence on hedge fund managers—was published in 1997. It was a response to requests from investors for a standardized set of questions. Since then, the DDQs have gone on to become the industry-standard template." https://www.aima.org/sound-practices/due-diligence-questionnaires.html. According to AIMA, "for investors, the DDQ is an early step in the due diligence process but by no means is it the last step. Investors use the information they get from the responses to these questions to develop areas of focus for further questions and discussion with managers and to cross check information from other sources." *Id.*

DDQ) ("The Funds are predominantly invested in legal fee receivables, and less than 1% is in credit line facilities."). The DDQs represented that fee acceleration, or factoring, is the Funds' "primary investment product and represents approximately ninety-five (95) percent of assets under management," and explained that fee acceleration "is the purchase of a legal fee at a discount from a law firm, once a settlement has been reached and the legal fee is earned." Ex. 39 at 11; *see also* Ex. 262 at 11 (same); Ex. 244 at 18-19 (Dec. 2010 DDQ). Dersovitz testified that he is "certain that 95 percent [was] an accurate number" to describe the percentage of the Funds' assets invested in factoring as recently as September 2012, although he disclaimed "personal knowledge" of it in the following breath. Tr. 2668.

As late as June 2014, the DDQ represented that the Funds' strategy was "unique" because:

> We have not identified any other registered entities that traffic solely in post-settlement legal fee receivables. There are entities that lend money to contingency fee attorneys, but they take litigation risk, which we don't.

Ex. 48 at 9. The DDQ stated that lines of credit constituted "approximately five (5) percent of" assets under management, and described the Funds' line of credit product as different from factoring because, among other things, the credit risk relating to the lines of credit depends "on the financial stability of the law firm who is the borrower." Ex. 39 at 11-12. The DDQ stated that the line of credit portion of the Funds' strategy was not expected to be a substantial part of the Funds' business going forward. Ex. 39 at 12.

The DDQ represented that the Funds have "payor concentration limits based on the . . . bond rating of the payor" and that such limits "protect [the Funds'] investors from having a heavily weighted exposure to any one payor default." Ex. 39 at 11. The DDQ went on to explain: "diversification is managed by limiting the level of portfolio exposure based on the obligor's . . . credit worthiness." Ex. 39 at 13.

### 5.2.4. Frequently Asked Questions

Respondents also shared versions of a "frequently asked questions" (FAQ) document with investors seeking to learn about the Funds. *See, e.g.*, Ex. 1592 at 1, 25-30. The FAQ described Respondents' "basic strategy" as "one in which receivables arising from settled law suits are purchased at a discount" and explained that the "primary focus is on purchasing the aforementioned receivables of settled cases, or non-appealable judgments." *E.g.*, Ex. 42 at 1; Ex. 44 at 1; Ex. 49 at 1. "Proof of settlement" was listed as one of the Funds' investment criteria. Ex. 42 at 1. The FAQ represented that

the Funds' investment strategy is different from those of "competitors that execute legal fee strategies" in several ways, including that Respondents were "the only significant sized, SEC registered entity that we are aware of with a 'post settlement' strategy," whereas "[t]here are many groups doing pre-settlement funding to various degrees of success." Ex. 42 at 3; Ex. 44 at 2; Ex. 49 at 2.

The FAQ stated that while there are billions of dollars in contingency cases settled annually in the United States, Respondents participate in only "a small percentage of this total which has a 'post settlement payment delay' associated with the payment of the settlement." Ex. 42 at 3; Ex. 44 at 3; Ex. 49 at 3. The post settlement payment delays "range[d] from nine months to upwards of 2 years and can be caused by a number of factors such as additional court procedures that need to be completed before a settlement can be disbursed, lack of staffing in courts, insurance company policies and, State by State statutes, etc." Ex. 42 at 2; Ex. 44 at 2; Ex. 49 at 2. According to FAQs dated as late as July 2014, Respondents "rarely purchased" receivables relating to mass torts and multi-district litigation because the four-year duration of such matters created a "duration mismatch." Ex. 42 at 4; Ex. 44 at 4; Ex. 49 at 4. As early as September 2012, however, Respondents acknowledged that duration had "increased over the years" as the Funds diversified from personal injury cases into "class action cases and multi-district cases." Ex. 297A. The Funds' "greatest overall risk" was "duration and its effect on risk/reward." Ex. 42 at 4. Additional risks included the Funds' lack of "complete control of cash," the "related risk . . . [of] attorney theft," and obligor-related risk. Ex. 42 at 4.

Regarding transparency, the FAQs noted various documents that investors received or were available online. Ex. 42 at 3.

### 5.2.5. Iran Special Purpose Vehicle Marketing Materials

Respondents marketed the Iran SPV with two documents: a "Summary of Investment Opportunity" (the *Peterson* timeline), Ex. 36, and the "Memorandum of Terms for Private Placement" (Iran SPV term sheet), Ex. 45. The 2012 *Peterson* timeline sets forth the background of the *Peterson* litigation and analyzes the merits of the turnover litigation. Ex. 36. The "Timeline to Resolution" section notes that it "likely will take until at least July 2013 to resolve all of the issues raised in the consolidated litigation and obtain a favorable judgment. An appeal of a favorable judgment likely would follow and be concluded sixteen to eighteen months later, around December 2014." *Id.* at 2. In the "Investment Steps, Funding and Settlement Procedures" section, the 2012 timeline notes that "RD Legal has been working in concert with" the *Peterson* attorneys and communicating with

plaintiffs about the potential for cash advances. *Id.* It also notes that "RD Legal has deployed $25 million" to the *Peterson* attorneys "to be repaid on turnover of the Citibank account." *Id.* It further states that "RD Legal will purchase future cash flows from the *Peterson* Plaintiffs at a discount." *Id.* At the time, the Iran SPV had not been formed as a legal entity. Tr. 5530. Respondents would provide the timeline to prospective investors even without a nondisclosure agreement. Tr. 6520-22.

The 2013 *Peterson* timeline, Ex. 46, is similar to the 2012 version in format. It notes that Respondents are "seeking investors to participate in a special business opportunity—financing the litigation receivables of the *Peterson* Plaintiffs' judgment." *Id.* at 2. The document states that "pending appeals will likely take eighteen months to resolve, concluding sometime in 2015." *Id.* It does not state the amount deployed for *Peterson* investments, as the 2012 version did. *Compare* Ex. 46 at 2, *with* Ex. 36 at 2. The 2013 timeline notes that "RD Legal *has purchased* and will continue to purchase" from *Peterson* plaintiffs, whereas the 2012 version stated only that it will purchase such cash flows. Ex. 46 at 2 (emphasis added); Ex. 36 at 2.

The Iran SPV term sheet described the general structure and opportunity of the Iran SPV. It stated that the investment was structured as a special purpose vehicle with duration of two to three years, with a 0% management fee and a 30% performance fee, and closing dates in September and October 2013. Ex. 45 at 1. The term sheet stated that Respondents were "seeking investors to participate in a special business opportunity—financing litigation receivables of a judgment against Iran in the 1983 Marine Corps barracks bombing in Beirut." Ex. 45 at 1. The term sheet described the background of RD Legal Capital and RD Legal Funding but did not reference the Funds. After describing the investment opportunity, the term sheet discussed three potential risks: (1) normalized relations between the United States and Iran leading to a treaty nullifying laws favorable to collecting on Iranian assets; (2) additional claimants; and (3) the judgment being overturned. *Id.* at 2. The term sheet described congressional action as "unlikely" and the risk of the judgment being overturned as "de minim[i]s" and explained that, under New York law, the *Peterson* plaintiffs had a first priority lien on the assets. *Id.*

*5.3. Non-Marketing Materials*[12]

In addition to materials prepared for the primary purpose of marketing, Respondents also produced various documents primarily for keeping investors informed. These included: (1) "independent accountant's reports on applying agreed-upon procedures"; (2) annual audited financial statements; (3) Respondents' underwriting department's "Lotus Notes" databases; (4) RD Legal Capital's password-protected investor website; and (5) a so-called "Citibank Memorandum."

5.3.1. Independent Accountant's Report on Applying Agreed-Upon Procedures

Respondents released the "Independent Accountant's Report on Applying Agreed-Upon Procedures" the first three quarters of each year. *See, e.g.*, Ex. 1431 at 3. The agreed-upon procedures were created by the accounting and business consulting firm Wiss & Company, LLP, to detail their findings upon implementing certain procedures outlined in the Funds' offering memoranda. *See, e.g.*, *id.* The AUPs were sent as a matter of course to all current investors, but not prospective investors. *See* Tr. 5038-39.

Wiss "judgmentally selected" a sample of receivables in the Funds' portfolios and conducted certain "tests" over those cases, including verifying whether the documents for the case associated with each receivable "did reflect valid settlements" and verifying evidence that "the case has been settled." *E.g.*, Ex. 1431 at 3-4.[13] The sections of the AUPs relating to the sample cases contained additional language stating that "based upon review by the law firm of Smith Mazure, it was determined that in each of the cases, the documents did reflect valid settlements for which the Assignment and Sale agreement was made" and also that Smith Mazure confirmed that with "no exceptions" the Funds followed their due diligence procedures by "verify[ing] there is proof the case has been settled." *See, e.g.*, Ex. 1064 at 4-6; Ex. 1074 at 4-6; Ex. 1103 at 4-6; Ex. 1132 at 4-5; Ex. 1186 at 3-5; Ex. 2018 at 5-6. Thus, when a Cohen, ONJ, or *Peterson* receivable was included in the

---

[12]   I use the title "non-marketing" to distinguish materials whose primary purpose is not to market the Funds. However, as discussed below, non-marketing materials were generally made available to potential investors who signed a nondisclosure agreement and requested access as part of their due diligence on the Funds.

[13]   This AUP was identified in the Division's Proposed Finding of Fact No. 221 as a "typical" example of an AUP.

sample,[14] the reader of the AUP could get the impression that such receivable represented a settled litigation.

However, in addition to the sample cases, the AUPs contained a section on "asset delinquencies," which presented Dersovitz's "comments about certain potentially delinquent/open receivables." *See, e.g.*, Ex. 2018 at 7-10. The end of the delinquent receivables section noted that further information or documentation was available on request. *Id.* at 10.

These narratives changed over time to account for new developments, but to take one example, the first quarter 2012 AUP described the ONJ cases as ongoing litigation in which an "overall settlement" had not yet been reached: "Recent trial verdicts and settlements provide additional evidence supporting the collateral position of the Osborn obligation. . . . These sixteen settlements & verdicts give rise to a $1.61MM average and Management believes this bodes extremely well for a significant overall settlement." *See* Ex. 1431 at 6; *see also* Ex. 1186 at 5 (referring to the "unsettled ONJ case inventory"). Some of the AUPs noted that the Osborn advances were entered into in part in an effort at "preserving [Respondents'] previous capital advances" to Osborn. Ex. 1186 at 6. After being shown the description of the Funds' investments in Osborn in the first quarter 2011 AUP (which is similar to the description in other AUPs), Osborn testified that it accurately described the status of the litigation and ongoing funding. Tr. 1350.

By late 2009, the AUPs also described the problems the Funds were having in collecting on the Cohen cases. Ex. 1083 at 7-8. Elliot Buchman, the CFO of the Cohen firm, testified that the first quarter 2011 AUP narrative accurately described the status of the Cohen investments. Tr. 5785-86.

The AUPs did not discuss *Peterson* in the section on "asset delinquencies."

### 5.3.2. Annual Audited Financial Statements

The Funds drafted annual financial statements, which they had audited before releasing to investors. *E.g.*, Ex. 1141. From 2011 through 2015, Marcum LLP, a large public accounting and auditing firm, audited the financial statements, which were the responsibility of the Funds'

---

[14]   None of the AUPs mentioned the investments directly in *Peterson* plaintiff receivables. Investments in *Peterson* attorney receivables, however, were part of the "judgmentally selected" samples of the second quarter 2011 and 2012 AUPs. Exs. 1246, 1490.

management. Tr. 3179-80. The financial statements ordinarily were given to potential investors only upon request and after signing a nondisclosure agreement. Tr. 6740.

The financial statements contain a condensed schedule of investments, divided into legal fee receivables and line of credit receivables, and listing a *payor* or *obligor* for each receivable, from information supplied by Respondents. *E.g.*, Ex. 1141 at 9 (Offshore fund financial statements for 2010); Tr. 3185, 6869. As the auditors for the financial statements understood it, *payor* indicates who is obligated to pay the Funds with respect to the particular receivable listed in the schedule. Tr. 3187.

The *payor* for the Funds' *Peterson* positions was listed variously as "Citibank," "U.S. Government," "Funds under control of the U.S. Government," or "Qualified Settlement Trust." *See* Ex. 10 at 8; Ex. 11 at 6; Ex. 13 at 8; Ex. 15 at 8; Ex. 16 at 6; Ex. 18 at 6; Ex. 19 at 6; *see* Tr. 3192-93, 3222, 3225. Dennis Schall of Marcum testified that these characterizations were reasonable from an accounting standpoint, but that it would also have been reasonable to list "Bank of Iran" or "*Peterson* Fund" as the *payor*. Tr. 3193-95, 3226-28.

As the name implies, the condensed schedule of investments provides limited information on each scheduled investment. Thus, investors were not able to determine from these schedules how many different cases or investments each *payor* line item represented. *See, e.g.*, Tr. 248, 860-61, 1167; *see also* Tr. 6869. For example, a line item for Merck combined investments related to a settled Vioxx matter and unrelated investments in the unsettled ONJ litigation. *Compare, e.g.*, Ex. 12 at 5, *with* Ex. 2869 at 8-9. The financial statements listed Novartis or Merck as *payors* from 2010 through 2014, even though neither yet had an obligation to pay. Ex. 9 at 8; Ex. 10 at 8, Ex. 18 at 6; Ex. 19 at 6; Tr. 2671.[15] The condensed schedule did not contain a separate entry to reflect the total percentage of the Funds' assets invested in the ONJ cases, because they were listed under separate obligors—Novartis and Merck. *E.g.*, Ex. 13 at 8; Tr. 2685-87.

Starting with 2011, some of the financial statements contain a note on "finance concentrations," stating that the "total exposure within the portfolio for any single payor is limited based upon the lowest of the long term unsecured bond ratings" and that "portfolio exposure limitation ranges from 15% to 30%" to the highest rated obligors. Ex. 12 at 21. In the 2012 and 2013

---

[15]   Schall recalled that Respondents told him that Novartis had an obligation to pay at the time of Marcum's audit. Tr. 3186.

statements, the concentration note adds that the investment manager "may make exceptions increasing the portfolio exposure above the above limits on a case by case basis." Ex. 14 at 25; Ex. 16 at 25. None of the financial statements indicate that an exception or exceptions were made.

Respondents also issued separate audited financial statements for the Iran SPV. *See* Exs. 17, 20, 21. These statements contained notes on some of the risks involved, including the risk that the *Peterson* litigation may be unsuccessful and purchased receivables may not be satisfied. Ex. 17 at 21-22; *see* Ex. 20 at 21; Ex. 21 at 21. The SPV financial statements also noted that "normalization of relations between the U.S. federal government and Iran could positively or negatively impact the Fund depending on how relations are normalized." Ex. 20 at 21. This language was provided to the auditors by Respondents, who did not provide similar language for the Funds' financial statements. Tr. 3234-37. As of year-end 2014, the percentage of the Offshore *SPV* partners' capital invested in *Peterson* was 91.40%, while 74.16% of the Offshore *Fund* partners' capital was invested in *Peterson*. *Compare* Ex. 20 at 6, *with* Ex. 18 at 6. The Funds' financial statements did not contain *Peterson*-related disclosures similar to those in the SPV financial statements.

### 5.3.3. RD Legal Capital Website

RD Legal Capital maintained a password-protected website where various documents, such as AUPs, financial statements, marketing documents, and certain e-mails and memoranda, could be accessed. Tr. 4360, 5837; Ex. 2354A. Respondents offered to provide a password upon request to investors or prospective investors who signed a nondisclosure agreement. *See, e.g.*, Ex. 244 at 2. The website did not contain a list of the Funds' investments or individual positions. Garlock received access to the website while doing due diligence for Cobblestone, but found he was unable to determine the Funds' holdings from information on the website. Tr. 424; Ex. 302 at 1. When he e-mailed Chandarana to ask if the website had a "list of portfolio holdings," she directed him to a Lotus Notes database. Ex. 302.

### 5.3.4. Lotus Notes

RD Legal Funding's underwriting department used Lotus Notes as a virtual filing system for documentation of transactions. Tr. 4760. Respondents maintained a document library or database and a "demo" library. Tr. 4392-93, 4760; Ex. 650 at 1. The former is the working library used by the underwriting department and the latter was used to demonstrate the nature and functionality of the system to someone who was unfamiliar with it. Tr. 4393; Ex. 650 at 1. The files within the Lotus Notes libraries were organized alphabetically by the name of the originating entity of a

contemplated or realized transaction, rather than by particular litigation—that is, the library was not organized so that an investor could determine for "which cases Merck is an obligor." Tr. 4865-66, 4871. The program's search function could be used for the titles of folders and documents, but not to search the contents of documents. *See* Tr. 4910-11. As of 2015, the document library contained 175,486 documents, Tr. 4848, and included documentation related to all of the assets that RD Legal Funding considered originating, whether or not the transaction was consummated, and whether it was originated for the Funds or for third parties. Tr. 4315, 4857-58, 4886.

The demo library did not contain every position the Funds held, but instead contained "an example of some of the cases," Ex. 650 at 1, relating specifically to only six entities. Ex. 711 (screenshot of demo library). It did not contain any documents relating to *Peterson*, the ONJ cases, or the Cohen cases. *Id.*; Tr. 4962-63.

From 2009 through fall 2013, certain of the marketing materials for the Funds offered investors remote access to the Lotus Notes database upon condition of signing a nondisclosure agreement. *E.g.*, Ex. 39 at 15; Exs. 758, 766, 769. For potential investors who did not sign a nondisclosure agreement or ask for full access, Respondents would conduct an in-person demonstration of the Lotus Notes system, with historical transactions that were closed instead of current transactions in the Funds. Tr. 6265, 6290-91. Remote access to the Lotus Notes libraries was withdrawn from Fund investors in late 2013. *See* Tr. 6012-13; Ex. 3112. Dersovitz testified that the proprietary nature of their investment-related information was the motivation for withdrawing remote access. Tr. 5841-43, 6278. However, documentary evidence suggests the presence of personally identifiable information in some of the documents as the motivation. Ex. 724 at 1. Beginning in the fall of 2013, the Funds' marketing materials stopped mentioning investor access to the Lotus Notes database. *See* Ex. 719 at 5; Ex. 1900 at 11.

During the hearing, Jehanara Haider, Respondents' assistant director of operations and a member of the underwriting department, conducted a demonstration of Respondents' Lotus Notes document library. From her demonstration, it could not be determined whether the database contains lists of individual investments in each of the Funds' portfolios, Tr. 4851-55, the top five positions in the Funds' portfolios, Tr. 4776-77, or whether the search function could be used to find investments in the Funds' portfolios that may relate to "unsettled" or non-final cases. Tr. 4874-78, 4886-87. Haider testified that these types of queries were not the way she used the system for her work in underwriting, and that she would have to ask Dersovitz or someone in accounting or investor relations if an investor made such an inquiry. Tr. 4839-40, 4851-52.

### 5.3.5. Citibank Memorandum

In February 2012, Respondents internally circulated a draft "Citibank Memorandum" regarding increasing the Funds' exposure to *Peterson*. Ex. 272. The final version of the Citibank Memorandum, which twice describes *Peterson* as a "settlement," was dated February 28, 2012, Ex. 1324, and posted on Respondents' website on March 12, 2012. Ex. 3096 at row 193. Dersovitz testified that the memorandum was intended to "connect the dots for all investors that the Citibank exposure that they saw on the financials related to a position involving Iran, Clearstream, restraining funds and so on." Tr. 5586. The memorandum was not mailed or e-mailed to investors. Tr. 3551-52. Dersovitz directed at least some investors to go to the website to see the memorandum after it was posted. *See* Ex. 278.

The draft memorandum starts: "Due to a large increase in the amount of advances for Citibank, N.A., we now have a need to increase its concentration limitations." Ex. 272 at 3. The draft notes that "As of January 31st [2012], we have advanced \$15 million solely on this litigation to two law firms, exceeding the 10% limit imposed by its level 2 rating." *Id.* The document describes risks in *Clearstream I*, which it considers low:

> [T]he primary risk of the transaction is the time it will take to complete the remaining legal steps in the Federal District Court of NY, before the monies can be turned over to the lawyers for distribution. Not much different from the standard risk of time that we take (albeit admittedly this is longer). . . . We believe that the payment default risk of this institution is very low over the 2-3 year time period that we expect this matter to remain outstanding. It must be noted that Citibank has now fully segregated these monies and that it is no longer being held in the name of Clearstream. This financial risk is that of Citibank alone . . . .
>
> Going forward, we will be enacting a 30% limitation for Citibank exposure. For the future, we are expecting plenty of new capital inflows; however with the low expected risk, we may be increasing our exposure with Citibank. This limitation along with inflows should keep our exposure at a steady balance until the settlement pays fully and we are able to draw down our receivables.

*Id.*

The final posted memorandum contained a few notable revisions. It predicted an expected duration of three years rather than two to three. Ex. 1324. Language stating that the *Peterson* investment's "standard risk of time" was "longer" than the Funds' usual investments was removed from the final version. The final version also adds that "due to the confidential nature of [*Peterson/Clearstream I*], we are unable to give full details on its standing." Ex. 1324. Finally, one reference to "this matter" was changed to "this settlement."

Between June 2012 and July 2012, the *Peterson* position grew to exceed the 30% limit announced in the memorandum. Ex. 2 at cells M14 and M15 (showing increase of *Peterson* concentration from 26.42% to 31.18%). Although the *Peterson* concentration continued to increase, Respondents did not publish a subsequent Citibank exposure limitation memorandum. Tr. 3815-18.

## 6. Investor Testimony

Several potential and actual investors testified regarding their interactions with Respondents. All but two of these witnesses—Salvatore Geraci and Travis Hutchinson—were presented by the Division.

### 6.1. Jeffrey Burrow

Jeffrey Burrow is an investment advisor who owned Valley Wealth, an investment advisory firm, until August 2014, when it merged with United Capital, for whom Burrow was working at the time of the hearing. Tr. 92-93.

Chandarana contacted Burrow in the spring of 2011 to propose an investment in the Funds. Tr. 94-95. In an introductory call in late June 2011, Chandarana "succinctly" explained Respondents' investment strategy. Tr. 95; *see also* Ex. 244 at 2. Chandarana gave Burrow examples of the types of cases that the Funds were factoring and of the payors in those cases, stating that they were creditworthy companies, and included pharmaceutical companies, insurance companies, and municipalities. Tr. 95-96. Chandarana spoke about diversification risk, which, according to Burrow, was that the timing of repayment was uncertain, although this could be mitigated by having many different notes with different estimated time frames. Tr. 96-97. Respondents provided Burrow with the Funds' offering documents, the Form ADV Part 2A, the 2010 audited financial statement, and marketing documents. Exs. 244, 252, 1199; Tr. 181-82. Respondents also offered access to the website, although Burrow viewed it as essentially a backup of documents Respondents' emailed to him, rather than a source of new information. Tr. 101-02, 140, 190-91. As part of his diligence process, he spoke to someone at the Funds' administrator. Tr. 181-82. For Burrow, the most important

document regarding the "terms of the deal" is a fund's offering memorandum. Tr. 186. As a non-lawyer, he did not know the difference between a settlement and a judgment, both of which he viewed as opportunities for future receivables. Tr. 193, 198-99.

Before making additional recommendations to clients, Burrow met with Dersovitz at the St. Regis Hotel in San Francisco in November 2011. Tr. 107. The information Dersovitz conveyed matched what Chandarana had told Burrow and what he had read in the marketing and offering documents. Tr. 107, 118, 126, 146, 148. Dersovitz told Burrow that the Funds were unique because "what he did didn't exist anywhere else." Tr. 129. Burrow asked if the cases in which Respondents invested were non-appealable and Dersovitz said "absolutely." Tr. 130-31. According to Burrow, Dersovitz also stated that obligors were entities that were "well known or easy to be understood financially," and mentioned pharmaceutical companies as an example. Tr. 130-31.

Dersovitz gave Burrow examples of risks of the investments, including attorney theft and duration risk. Tr. 118. Burrow understood that duration risk involved a delay between reaching a settlement and its payment, because there was "a lot of procedure." Tr. 149, 199-200. In discussing diversification, Dersovitz told Burrow that the timing of the settlements in which the Funds invested was staggered. Tr. 132. Dersovitz did not discuss any workout situations. Tr. 132. If Burrow had been told that the Funds had positions in ongoing cases, "they would not have received money from my investors." Tr. 125-26.

In September 2013, Dersovitz and Markovic pitched Burrow an opportunity to invest in the Iran SPV, which Burrow considered "separate" from and "very different than" the Funds. Ex. 373; Tr. 152, 158. Burrow was not interested in the opportunity for his clients (except for one) because it had "just too many risks." Tr. 152-53, 155; Ex. 372. Burrow did not recall anyone from Respondents telling him that the Funds had invested in *Peterson*, although Dersovitz may have said that he had personally done so. Tr. 152-57, 160. Burrow testified that conducting diligence on the *Peterson* position was beyond his ability and would have required much more time than he had, given that he had approximately 400 clients. Tr. 216. Reviewing the risk disclosures in the Iran SPV offering documents on the stand, Burrow testified that none of those risks were disclosed to him with respect to his clients' investments in the Funds. Tr. 166-69. Burrow only became aware of the Funds' *Peterson* positions in 2015 when the Funds suspended redemptions. Tr. 171-72.

At that time, Burrow spoke with Dersovitz and Markovic, who explained that one reason for the suspension was the size of the Funds' *Peterson* position, which had not yet started paying. Tr. 160, 171. In August 2015, Burrow asked for a list of positions in the Funds, because he could not understand how the receivables had become so concentrated. Tr. 171; Ex. 460. Respondents emailed Burrow a document containing an anonymized list of assets in the Funds. Ex. 460 at 9-17. The total "indicated portfolio value" is more than $172 million, *id.* at 17, yet no single entry exceeds $12 million, so Burrow could not understand mathematically how any one asset made up the majority of the Funds' assets. Tr. 173-74. Further, without a key to the codes used in the law firm and position ID columns, there was "absolutely no indication that any of these [positions] were different from . . . the types of notes that were put in place on the fee acceleration strategy previously." Tr. 174.

Burrow's first client invested in the Funds in September 2011; four more clients invested over the next eighteen months. Tr. 126, 239. His clients invested a total of $3.6 million in the Funds over that period. Tr. 241-42. By the time of the hearing, all of Burrow's advisory clients had submitted redemption requests, and all but one had received their principal and earned interest. Tr. 175-76. The exception is a client who filed a redemption request in May 2016—a year after the Funds had suspended redemptions—and, as of the date of Burrow's testimony, had not received a redemption payment. Tr. 175-76.

### 6.2. Tom Condon

Tom Condon is the investment manager for himself and his extended family. Tr. 949-50. After "extensive" oral and written communications with Respondents—including his receipt of the offering memorandum, financial statements, valuation reports, AUPs, access to Lotus Notes (which he did not possess the technological savvy to use), and a listing of every position in the portfolio—Condon invested $1 million in the Domestic Fund in early 2012. Tr. 950, 971-72, 992-93, 995; Exs. 2703, 2869, 2870, 2879. Condon also received access to the investor website, although he did not recall using it. Ex. 3107 at 2; Tr. 1004, 1058. Condon was attracted by the legal factoring side of the business—"a diversified portfolio of settled legal cases." Tr. 953-54. He "would have wanted to know if there was anything other than a settled case in this portfolio," because it may have influenced his decision-making. Tr. 1056.

As part of his due diligence, Condon posed twenty questions to Respondents in an email in late 2011, which, along with Respondents' answers, he copied into a document containing his notes on the opportunity.

Ex. 263; Tr. 959-61. Condon asked for the "primary cause of payment delays," which Respondents stated were "court appeals and other operational issues," such as cases requiring approval by a judge, if there was a fairness hearing or the plaintiff was a minor, or distribution of settlement proceeds by the administrator in larger cases. Ex. 263 at 4-5; *see* Tr. 1023-27. Condon also asked whether there was "any chance that the obligation to pay a judgment could be overturned or re-enter litigation." Ex. 263 at 5. Respondents said that the Funds "are only purchasing receivables after a settlement agreement has been signed by all the parties. . . . We will purchase the receivable once the settlement is signed and all the terms are agreed to by both parties even if it is conditioned on final court approval." *Id.* Condon did not make any distinction between settlements or judgments and considered the terms interchangeable. Tr. 1029-30. What was important to him was that there was no "chance the obligation to pay a judgment could be overturned or reenter litigation." *Id.* Condon asked these questions because he "wanted to be a hundred percent sure . . . that there was no litigation risk." Tr. 967-68.

Respondents pitched the Iran SPV to Condon in the fall of 2013. Tr. 970-71. Although the list of positions Condon received in December 2011 contained numerous entries for "Peterson, et al v. Islamic Republic of Iran," Ex. 2869 at 8, Condon testified that the SPV pitch was the first time he had heard of the case, Tr. 970-71. He testified that he did not know until October 2013 that the Funds were invested in *Peterson*. Tr. 973; *see* Tr. 974-76. Condon filed a partial redemption request in early 2014 because he "was unsettled by learning that the Iran case was such a big portion of the fund." Tr. 977, 1048. Condon later requested redemption of the rest of his investment and at the time of the hearing had received approximately $1.4 million on his $1 million investment. Tr. 1050-51.

### 6.3. *Warren Levenbaum*

Warren Levenbaum is the general partner and founder of the Levenbaum & Trachtenberg law firm and the CEO of the American Association of Motorcycle Injury Lawyers. Tr. 2948. He has been a lawyer for over 45 years, during which time he has also served as a prosecutor and worked as a criminal defense attorney. Tr. 2948-50.

Levenbaum met Dersovitz or someone from Respondents at a convention of people who "servic[e] the plaintiffs' personal injury community," and became interested in the Funds. Tr. 2950-51. He began doing diligence on the Funds in 2010, which included meeting with Dersovitz in Respondents' New Jersey office, speaking to several of Respondents' employees, and reviewing Fund documents. *See, e.g.*, Tr. 2952; Exs. 528, 531. He made two investments totaling $400,000, in March 2011 and April 2012. Tr. 2964.

After discussions with Dersovitz and reviewing the written materials he received, Levenbaum came to understand that Respondents had a "niche" in accelerating the legal fees to lawyers with respect to cases where liability had been "settled and resolved," but it could take months or years for the cases to be funded, as well as investing a "small percentage" in the line of credit business. Tr. 2951-52, 2957, 2960; Ex. 233 at 2. From his professional experience, Levenbaum understood various other attorney financing mechanisms and sources, such as advancing money to clients with structured settlements or buying a large stake in a case on appeal. Tr. 2953-58. He was not interested in investing in those opportunities, "first and foremost" due to the risk involved. Tr. 2958. Levenbaum had the impression that Respondents' strategy "was reasonably safe compared to other types of loaning operations to the plaintiffs, legal community." Tr. 2953. At the meeting in Cresskill, Dersovitz told Levenbaum that fee acceleration was 95% of the business and 5% was in lines of credit. Tr. 2975. According to Levenbaum's contemporaneous notes, Hirsch confirmed those percentages in a call in February 2011. Ex. 536 at 2. The next month, Levenbaum had a call with Rick Rowella, then an employee of RD Legal, and two other employees. Ex. 537. Rowella told him that Respondents had $61 million invested in 100 positions, concentrated in 25 attorneys or law firms, which led Levenbaum to understand that the Funds were diversified. Ex. 537 at 1; Tr. 2997-98. In addition to liking the strategy, Levenbaum valued transparency and diversification. Tr. 2965-66, 2975.

Levenbaum initially testified that it was his understanding that the Funds' did not have positions in cases that had not yet settled. Tr. 3001. Levenbaum acknowledged that the offering memorandum referred to the purchase of receivables from "litigation, judgment and settlements," but testified that it did not change his impression. Tr. 3088-89; *see* Ex. 235 at 5. He also conceded that an AUP he received and reviewed before investing described the Novartis ONJ case as ongoing and unsettled, although Levenbaum interpreted this as part of a workout and not the Funds' primary strategy. Tr. 3105-07; Ex. 539 at 24-25. And, although Levenbaum reviewed the materials he was sent before investing, he did not access the investor website or Lotus Notes database, or review in detail AUPs and financial statements he received after he made his investments, which he "probably just skidded over." Tr. 3004-05, 3045-46, 3071.

Levenbaum had "no understanding, no knowledge whatsoever," whether Respondents had already invested in *Peterson* by the time of his second investment in the Funds. Tr. 3021; *see* Tr. 3097-98. Levenbaum did not learn about the *Peterson* position until a May 2015 conference call on which Dersovitz "apologized for . . . not timely following up with investors about the

Iran victims' funding dilemma as it impacted RD's ability to timely meet its quarterly distributions." Tr. 3020-21.

On May 4, 2015, days after receiving the Funds' illiquidity notice, Levenbaum submitted a redemption request. Ex. 549 at 1. As of the hearing, Levenbaum had received $579,614.66 on his $400,000 investment, and was due an additional $108,000 in interest. Tr. 3044-45.

### 6.4. Asami Ishimaru

Asami Ishimaru has worked in the financial services sector for around thirty years, and at the time of the hearing she was starting an investment strategy business. Tr. 265-66, 350.

She first heard of the Funds in 2009. Tr. 266. By early 2010, Ishimaru met with representatives of Respondents, who explained that the primary strategy of the Funds was to purchase from law firms and attorneys certain accounts receivable representing legal fees derived from judgments and settlements, but for various reasons experienced a delay in receiving payment. Tr. 266-68. Dersovitz explained that some reasons for the delay included settlements with municipalities or minors, class actions, and mass torts. Ex. 231. Ishimaru was told that all of the cases in which the Funds invested were cases where the "defendant was willing and able to pay." Tr. 375-76. In addition to reviewing Fund documents and her discussions with Respondents, Ishimaru had access to the Lotus Notes database, however she did not use it much because she "didn't think [she] would really glean anything to make [her] understanding of the fund any better." Tr. 273, 401.

Ishimaru was attracted by the strategy "because it seemed that it was really a matter of duration," and the payors "for the most part had fairly good credit ratings." Tr. 267. She was aware of, and had no interest in investing in, funds that loaned money to lawyers who were "fighting a case." Tr. 268; *see also* Tr. 271. As a non-lawyer, she did not know the difference between a settlement and a judgment and the use of one or the other of those terms did not make a difference to her investment decision. Tr. 375-76; *see also* Tr. 278, 367.

Dersovitz also told Ishimaru that he managed "a well-diversified portfolio." Tr. 276; *see also* Tr. 402. She does not recall Respondents telling her before she invested about workout situations, cases where the defendant was fighting an obligation to pay, or other exceptions to their strategy. Tr. 280-81. Ishimaru understood that the offering documents provided the investment manager with considerable flexibility. Tr. 377. Ishimaru invested $100,000 in the Domestic Fund on February 26, 2010. Tr. 278; Ex. 2744. At the time, the Funds had not yet invested in *Peterson*.

41

On July 29, 2011, Ishimaru and a college classmate, Paul Craig,[16] visited Respondents' offices in New Jersey, because Craig was "looking for an investment opportunity that made regular payouts," and Ishimaru was considering further investment in the Funds. Tr. 287-90. Ishimaru did not recall any differences between the Funds' strategy as explained by Dersovitz at the office meeting and the strategy when she first invested. Tr. 289. Ishimaru did not recall whether *Peterson* or the Cohen cases were mentioned on that visit. Tr. 302, 400. Ishimaru conceded that she had received an AUP before the office meeting that explained, in part, the Cohen cases. Tr. 381-82. However, because she was investing her own money in the Funds, she was not as diligent as she would have been if she were investing someone else's money. Tr. 378. She only "glanced at . . . some of" the AUPs, and did not "carefully review[] every single one." Tr. 377. Craig invested $2 million in the Domestic Fund on August 25, 2011; Ishimaru did not make an additional investment. Ex. 168 at 2.

In early 2012, Ishimaru and Craig asked marketing director Rick Rowella for a list of the "top five obligors of the portfolio." Tr. 301. Rowella emailed them a spreadsheet showing the top five to be: "Citibank, N.A.," Merck, Novartis, AstraZeneca, and "USA (Gov't of)." Ex. 1319. Ishimaru was "really shocked with . . . how big the Citibank exposure was." Tr. 303. Rowella informed Ishimaru that the Citibank position referred to "money that was frozen by the U.S. government that the Iranian government owns," and it "could be used to pay to the families of the victims of this Iranian terrorist attack." Tr. 302, 304, 332-33. This was the first she heard of *Peterson*. Tr. 304.

Throughout 2012, Ishimaru, Craig, and Steven Gumins, a friend of theirs who had also invested, expressed to Respondents—via email, phone calls, and meetings—their concerns with the *Peterson* position. *See, e.g.*, Ex. 286 at 1 (email exchange referencing phone call between Dersovitz and Craig); Ex. 1339 at 1-2 (Ishimaru noting that she had lunch with Hirsch and "was able to get more information regarding the Citibank exposure"). Ishimaru was concerned both because *Peterson* represented a concentration risk, Tr. 303, and because it seemed to her to hold "a lot of political risk," and was "not the same kind of settlement" as was involved in the Funds' other positions. Tr. 311; 345-46. In addition, she believed that the uniqueness of the *Peterson* position made its risk difficult to assess relative to the examples of

---

[16]   Craig did not testify but is discussed here because Ishimaru had direct, contemporaneous contact with him with respect to all of his pertinent dealings with Respondents.

post-settlement delay Dersovitz previously described. Tr. 402-04. Although she independently researched the case, she "didn't really understand what was going on" because of the case's complicated legal and political posture. Tr. 396.

In response to their concerns, Dersovitz told the group that he "hope[d] to bring these concentrations down." Ex. 277 at 2. After further questions from Craig, on March 13, 2012, Dersovitz wrote that it was "one of the best assets in the book" and that he was looking to purchase "a much greater amount in another vehicle." Ex. 278 at 2. He also praised the Funds' transparency, saying "we're trying to be the most forthcoming manager you can deal with and while there is always room for improvement, I simply can't imagine many managers being more transparent than us." *Id.*

More questions followed, and on June 10, 2012, Dersovitz wrote to Ishimaru that "the concentrations for this asset could significantly increase," and directed her to the Citibank memo on Respondents' website. Ex. 287 at 1. Although Ishimaru was "uncomfortable" with the *Peterson* exposure, the Fund had "a nice return, so [she] kind of just was hoping for the best" and did not submit a redemption request at that time. Tr. 347; *see also* Tr. 408.

Ishimaru submitted a redemption request on February 25, 2013, because she "found out that the concentration of this Iranian exposure was . . . so high that [she] didn't really care if [she] was getting 13-and-a-half percent." Tr. 347, 408; Ex. 2759 at 2. Ishimaru received a return of $152,737 on her $100,000 investment; Craig received almost $2.6 million on his $2 million investment. Ex. 168 at 2; Tr. 361.

### 6.5. *Steven Gumins*

Steven Gumins runs Athens Capital Management, LLC, which is an extension of a family office managing approximately $75 million. He founded the firm in 2001. Tr. 3599-3601. Gumins has been a registered investment advisor for more than thirty years and holds series 7, 63, and 66 licenses. Tr. 3656. He has no legal background. Tr. 3604.

Gumins heard of Respondents in late summer of 2011 from Craig and Ishimaru. Tr. 3601. As part of his due diligence, on September 11, 2011, he had a four-hour meeting with Dersovitz and Craig at Respondents' New Jersey office. Tr. 3602-03. Dersovitz "explained [the Funds] extremely well and had a lot of documentation to back it up." Tr. 3603. Gumins understood that the Funds "only invested in settled court cases, period." Tr. 3603, 3611. Gumins did not review the Funds' offering memoranda or subscription agreement, because to him they were "boilerplate," but he had Brian Torres, Athens's CFO, review the documents. Tr. 3601, 3605-06, 3688. Ten days after

43

the meeting, Athens invested $1,500,000 in the Domestic Fund; it made two further investments for a total of $2,050,000: $250,000 on December 1, 2011, and $300,000 on July 2, 2012. Exs. 592, 595, 3067; Tr. 3610-12, 3660-61.

Gumins first heard about *Peterson* after Athens's first two investments in the Funds, through a February 2012 email from Respondents. Ex. 588; Tr. 3613-14. He was against investing in *Peterson* because of the "headline" or political risk, and because he had moral objections to it. Tr. 3613-14. Even though Gumins knew about Dersovitz's interest in *Peterson* before making Athens's third investment, he testified that, based on Dersovitz's representations, he did not think the Domestic Fund held *Peterson* positions at that time. Tr. 3623-24. Over the next year, Gumins received from Respondents reports and marketing documents that discussed *Peterson*, including marketing documents relating to the Iran SPV, and was copied on, and involved in, email exchanges among Ishimaru, Craig, and Dersovitz that discussed *Peterson*, but Gumins testified that he did not read any of the materials, even emails to which he replied. *See, e.g.*, Tr. 3620-21, 3626, 3665-67, 3671-72, 3681, 3683, 3690. On January 15, 2013, Gumins emailed Dersovitz to ask for "our exposure to Iran onshore and offshore." Ex. 598 at 3. Dersovitz said it was at "roughly 40 – 45% and now beginning to dial down with new dollars." *Id.* at 2. Two weeks later, Athens submitted a request to redeem its full investments in two installments. Ex. 3085. As of June 30, 2014, Athens Capital received payment of its full principal and interest, receiving a return of almost $2.5 million. Ex. 168; Tr. 3661-62.

### 6.6. TIGER 21 Investor Testimony

TIGER 21—shorthand for "The Investment Group for Enhanced Results in the 21st Century"—is a "peer-to-peer learning network" for high net worth investors. Tr. 726; *see* Tr. 6098-99. Its members meet monthly in groups to discuss investment opportunities. Tr. 595. Members engage in "collaborative intelligence," sharing information and evaluating investment opportunities, but they invest individually. Tr. 893-94, 935-36. Five members of two TIGER 21 groups testified, and their testimony is organized below by group.

#### 6.6.1. Group 5

Members of Group 5 included Allen Demby, a retired ophthalmologist and registered investment adviser, Tr. 2163; Alan Mantell, a consultant and non-practicing lawyer, Tr. 591-93; Ex. 482; Arthur Sinensky, a semi-retired management consultant, Tr. 3296; Steven Wils, a private investor who formerly ran a food distribution business, Tr. 869-70; Randy Slifka, a manager of hedge fund portfolios and real estate investor, Tr. 600; and George Mrkonic, Tr. 2194. Slifka had a consulting agreement with

Respondents for promoting the Iran SPV. Tr. 3832-33. Demby, Mantell, Sinensky, and Wils testified.

In February 2013, Sinensky and Dersovitz—who went to the same synagogue and country club and have known each other for approximately twenty years—met for breakfast, during which Dersovitz provided a "high level, introductory" summary of the Funds, including "what the investment opportunity was . . . [and] how it worked." Ex. 329; Tr. 3297-98, 3301-03. Sinensky understood that Respondents invested in cases "that have been resolved or settled and an award has been made"—meaning the case "was finalized." Tr. 3304. Afterward, Sinensky recommended to Group 5 that it allow Dersovitz to give a presentation. Ex. 329; Tr. 3301-02.

Shortly before the presentation to Group 5, Demby visited Respondents' offices in New Jersey, and spoke with Dersovitz and Markovic. Ex. 501; Tr. 2167. The visit lasted approximately forty minutes, during which Respondents stated that the Funds invested "in cases that have been fully adjudicated" with "no appeals pending" and that "no single investment in the fund would exceed 5 percent of the fund." Tr. 2167-69.

On April 11, 2013, Demby, Mantell, and Sinensky attended a presentation by Dersovitz and Markovic at a townhouse in New York City used by TIGER 21. Tr. 599-603, 2204, 3302; *see* Exs. 336, 501. According to Markovic, Dersovitz "launched into the *Peterson* case immediately," which he called "the best case of [his] portfolio," and on which he spent half the presentation. Tr. 6791. However, neither Mantell nor Demby recalled any discussion of *Peterson*. Tr. 629, 2173-74. At the time, the *Peterson* positions made up nearly 50% of the Funds on a fair value basis. Ex. 2 at cell O24.

Mantell recalled that Dersovitz presented the Funds as "exclusively focused" on funding matters "where the fees arose out of cases where judgment had already been obtained and the opportunity to appeal had passed," as well as settlements, and the payors were primarily "insurance companies" that were "good for the money." Tr. 604-05, 735. The fact that the receivables were purchased from lawyers provided additional assurance because of their fiduciary duties. Tr. 605.

Mantell recalls that Dersovitz told investors that there was no risk of appeal from the judgments and settlements in which the Funds invested. Tr. 617; Ex. 336 at 9. Mantell took that to mean there was "no risk of the merit of the case. The merit of the case had nothing to do with the matter." Tr. 605-06. Mantell and Sinensky did not recall Dersovitz describing any risk that the settlements and judgments in which the Funds purchased receivables could be appealed. Tr. 610, 624, 3310-11. Mantell recalled that

Dersovitz told him that the risk of obligor default was minimal because, in the case of a settlement agreement, the agreement itself "validates financial capacity" of the obligor. Tr. 618-19 (discussing Ex. 336). Mantell also recalled that Dersovitz said the concentration risk of the portfolio was low. Tr. 619, 621. Mantell testified that concentrations of 25 percent or more may not concern him if the payor is creditworthy, but could otherwise concern him. Tr. 790-94.

A couple weeks after the presentation, Sinensky forwarded to Dersovitz a *Wall Street Journal* article about entities lending money to personal injury plaintiffs at high rates of interest. Ex. 343, 561. In response, Dersovitz "point[ed] out that [the article] deals with pre-settlement funding which is very distinct from what we're doing." Ex. 343; *see also* Tr. 3317-18. Sinensky took this as "an affirmation that the RD Legal fund does not do what this article is talking about." Tr. 3318.

In May 2013, Demby invested $1 million in the Offshore Fund. Ex. 504. Demby still was unaware of any *Peterson* positions in the Funds. Tr. 2180. Demby read the subscription documents thoroughly before investing. Tr. 2213. In June 2013, Sinensky invested $500,000 in the Offshore Fund. Ex. 718 at 3. Sinensky recalled that Dersovitz mentioned *Peterson* during their discussions, but in the context of the Iran SPV, not the Funds. Tr. 3311-12. He did not recall Dersovitz mentioning that the Offshore Fund had *Peterson* positions. Tr. 3320, 3324-26. Prior to investing, Sinensky received the February 2013 Offshore offering memorandum, which he did not review in full. Tr. 3319-20. Mantell submitted his subscription documents in June 2013, investing $325,000. Ex. 2850 at 14. Prior to investing, Mantell read the entirety of the offering memorandum. Tr. 631. Mantell testified that he thought that the Funds were "newly created" when he invested, although he could not explain what gave him that impression. Tr. 787-88.

At the time Mantell invested, it would have mattered to him if Respondents were deviating from their original business plan—a phenomenon he describes as "style drift." Tr. 699-701. Further, he did not know that the Funds would invest in *Peterson*. Tr. 654. In June 2013, the concentration of the Funds' *Peterson* positions on a fair value basis was approximately 53%. Ex. 2 at cell O26.

By June 2013, Wils, who missed Respondents' presentation to Group 5, attended a presentation before another group. Tr. 871-72; *see also* Ex. 718 at 3. During that meeting, Wils understood that Respondents bought receivables that were "settled" from law firms that needed cash flow. Tr. 872-73. Although he had a limited understanding of legal terms, Wils understood "settled" to mean that "a judgment has been handed down by a judge."

Tr. 874. Dersovitz also mentioned that "a special purpose vehicle . . . was in the works" related to *Peterson*, but "he did not go into great detail about it." Tr. 876. Wils understood it to be "a separate entity" from the Funds. Tr. 877.

Wils and Sinensky attended a meeting at Respondents' office in New Jersey in July 2013. Tr. 882-83; *see* Ex. 351. At that meeting, Wils sat in on a pitch Dersovitz gave to "two or three" prospective investors and then had a separate conversation with him. Tr. 884-85. Over the course of about two hours, Dersovitz again said that the investment was in "settled legal claims." Tr. 885.

Wils invested $800,000 in the Onshore Fund shortly after the visit to Respondents' office. Ex. 2834. Wils testified that he invested based on the "overview" marketing document and how Dersovitz orally represented the Funds. Tr. 894-95. Wils also had access to, but did not use, the investor website and other materials before investing. Tr. 915-16, 930; Ex. 336. Wils later believed that he had not done enough due diligence. Tr. 929.

At the time Wils invested, "because [*Peterson*] was presented on two occasions as a special purpose vehicle . . . that had a higher return," Wils assumed that there were no *Peterson* positions in the Funds. Tr. 895-96, 917. Wils had not asked about any specific positions in the Funds nor had he reviewed any historical financials before investing. Tr. 931-32. Wils testified he would not have invested had he known that 50% of the Funds' portfolio was invested in *Peterson*. Tr. 896. Yet, after learning about the *Peterson* concentration, he did not immediately redeem in full, but instead left $350,000 in the Fund. Tr. 902-03. At the time of his testimony, Wils had already received approximately $991,000 in redemption payments on his initial investment of $800,000, with more to come. Tr. 910.

In September 2013, Markovic sent emails pitching the Iran SPV to Wils, Mantell, and Sinensky and attached related documents. Exs. 360, 361, 362. To Wils and Mantell, she described the SPV as "separate from our flagship fund in which you are invested." Exs. 361, 362. She also wrote: "As you may recall, from time to time, we come across very large cases that we cannot take full advantage of in our flagship funds" and informed them that Respondents were launching the SPV "to absorb the excess capacity" of the investment in *Peterson*. Exs. 361, 362. A little later, Sinensky—noting that the SPV would likely be a "topic of conversation" at an upcoming TIGER meeting— forwarded to Dersovitz a question from Demby. Ex. 364 at 2-3. Dersovitz responded, noting that "the outcome [of the *Peterson* investment] appears to be binary, with a very small probably [*sic*] in my own estimation, for non- payment," and setting forth the basis for his opinion that *Peterson* was a good investment. *Id.* at 1-2.

Later that month, Mantell became concerned about advances made with respect to the "workout" of the Osborn receivables, which he read about in an AUP. Tr. 666-70; *see* Ex. 369. Mantell disagreed with the "workout" approach and instead thought Dersovitz should consider writing down the Osborn positions. Tr. 669-71. Mantell did not redeem at the time because the dollar amounts of the advances "were not huge in proportion to the fund." Tr. 668. Mantell raised his concerns with Dersovitz, who wrote that Smith Mazure "fully evaluated" the Osborn positions, and that Dersovitz decided to continue the Osborn relationship "once the collateral was evaluated and it was determined that there was a great deal of excess collateral and we were able to achieve control of cash." Ex. 371 at 2. Dersovitz continued, saying that "the focus of the business remains exactly the same as it has always been, to advance cash on settlements and/or judgments with a clearly identified corpus of money to collect from. I assure you that has not changed, nor will ever change." *Id.* Dersovitz's response concerned Mantell. Tr. 674-76. In retrospect, Mantell testified that he "probably" would not have invested had he known the Osborn positions represented approximately "10 percent of the book." Tr. 672-73.

On March 23, 2014, the *Wall Street Journal* published an article titled, "Hedge Fund's $100 Million Bet: Iran Will Pay for Terror Attack." Ex. 55.[17] The article reported that Respondents were "already . . . buying rights to some of the payments received by victims' families, as well as fees earned by their attorneys involved in the case." *Id.* at 2. Upon reading the *Journal* article, Demby testified that he was "shocked and appalled" because he "wanted nothing to do with" *Peterson*. Tr. 2182-83.

The next morning, Demby emailed Markovic to ask "what percentage of RD Legal Capital Fund is invested in the Iranian litigation settlement?" Ex. 393. Later that day, Demby forwarded the article to other Group 5 members, including Mantell, Sinensky, Wils, Slifka, and Mrkonic, along with a note of concern indicating that he was "pretty sure that Katerina and Ron D stated previously that this fund and the Iranian settlement fund are separate entities and that the existing fund would not participate in the Iranian settlement 'opportunity'." Ex. 395. Demby spoke with Dersovitz and Markovic that afternoon and reported the results to other Group 5 members that $54.8 million of the total $178 million in the Fund was invested in *Peterson*. Ex. 398.

---

[17]   I did not admit the article for the truth of the matters it asserts, but to help provide context to investors' reactions, without regard to the accuracy of the reporting.

Mrkonic responded that it "sounds like [Dersovitz] . . . diverted his primary fund into" *Peterson*, which was "very hi [*sic*] risk for him and thus for us." Ex. 397 at 2. Sinensky responded that the situation was "clearly, deeply troubling," and noted that Dersovitz had not warned him about the content of the *Journal* article. *Id.* at 1-2. Slifka replied: "Ron told me that he had a 20% position and that he was going to lay it off to the [S]wiss, and to a hedge fund." *Id.* at 1. Slifka found the "lack of disclosure [to be] very upsetting." *Id.* To him, the size of the *Peterson* position was "at best style shift, and more likely taking too much risk with other peoples [*sic*] capital." *Id.* However, a year before this exchange, Slifka emailed various potential investors about the Funds on at least six occasions, telling them about the *Peterson* opportunity and stating that the Funds had a "disproportionate" and "oversized" position in *Peterson*. *See* Exs. 1632, 1643, 1672, 1673, 1685, 1688. Wils felt "blindsided" because he recalled that "it was presented that the Iranian claims were in a special purpose vehicle at a higher risk, and, therefore, a higher reward, by Mr. Dersovitz on two separate occasions." Tr. 900-01.

After receiving Demby's emails, Mrkonic emailed Markovic to request an immediate redemption: "I am very concerned to learn that the [RD] legal primary fund is invested in the Iran matter. I understood to be a separate fund completely." Ex. 683 at 3. That evening, Slifka spoke to Dersovitz and reported back to the group that Dersovitz told him that "he is indeed selling down his position." Ex. 400 at 1-2. Mantell responded that he "wholly agree[d]" with another group member that the *Peterson* position was "more than style drift," and said that he informed Dersovitz of his intent to "redeem in full." *Id.* at 1. Demby emailed Markovic that evening to request a full redemption. Ex. 392; Tr. 2183. Mantell requested a redemption the next day. Ex. 2843. Mantell redeemed because he "felt the risk profile of the fund, as revealed by the financial statements of 2013, was intolerable," referring both to certain Osborn receivables and *Peterson*. Tr. 702-03. Demby redeemed because he personally felt that Dersovitz had "violated [his] trust," and "put a very large investment into a settlement that was really, really risky and well above [his] risk tolerance." Tr. 2190.

Wils and Sinensky met with Dersovitz in person to relay the TIGER 21 investors' dissatisfaction, including that the investors "felt that we had been deceived as a group," but found that Dersovitz was "a bit evasive and didn't really directly answer our concerns." Tr. 905-06. Wils redeemed his investment in two partial requests beginning in April 2014. Tr. 902-04. Sinensky redeemed his investment in September 2014 because of his concern with the *Peterson* exposure. Ex. 171 at 2; Tr. 3337-38. As of the time of his testimony, Sinensky had received $624,000 in redemption payments on his

$500,000 investment, with additional redemption payments forthcoming. Tr. 3390.

### 6.6.2. Group 4

In September 2013, Dersovitz and an RD Legal employee gave a presentation to TIGER 21 Group 4, which David Ashcraft attended. Tr. 1460-61; *see also* Ex. 718 at 3. Ashcraft formerly owned a software company and currently owns a renaissance festival, which includes a farm and land being used for home development. Tr. 1459-60. Dersovitz presented the Funds' investment strategy as "basically buy[ing] settlements," which Ashcraft interpreted as cases that "had already been judged." Tr. 1461-62, 1467-68. For the purposes of the investment, Ashcraft did not distinguish between settlements and judgments. Tr. 1497. Part of Dersovitz's pitch to Group 4 was that the "wide set" of assets that were purchased mitigated concentration risk. Tr. 1463-65, 1501-02. Dersovitz also presented the Iran SPV. Tr. 1470-71. Ashcraft's opinion was that the Iran SPV had a risk profile that was "night and day" from that of the Funds. Tr. 1471-73, 1514-15. Ashcraft did not recall Dersovitz stating that the *Peterson* position was in the Funds. Tr. 1474. Following the presentation, Markovic sent Iran SPV marketing documents to Ashcraft. Ex. 367. He was not interested in the SPV. Tr. 1474-75.

Ashcraft also reviewed the offering memorandum, but believed that Dersovitz's oral statements were "far more relevant," because "you invest in people; not documents." Tr. 1507-08. In January 2014, Ashcraft invested $750,000 in the Offshore Fund. Ex. 718 at 3; Tr. 1477. At that time, Ashcraft did not understand that there were *Peterson* positions in the Offshore Fund. Tr. 1483-85.

When Ashcraft learned of the *Peterson* exposure, sometime in "March or April of 2014," he was "surprised." Tr. 1486-87. Ashcraft spoke to Markovic "a number of times" and told her that the "the root causes of people's concerns is they're becoming aware of the fact" that the Funds were invested in the same case as the Iran SPV. Tr. 1534-35; *see also* Ex. 2947 at 1-2. At the time of his testimony, Ashcraft had received one redemption payment of $76,000, on his $750,000 investment, which was valued at $886,000. Tr. 1492.

### 6.7. *Andrew Furgatch*

Andrew Furgatch has degrees in business administration and law. Tr. 2001. He practiced law for several years before becoming an officer of the Public Insurance Company, which operates under the trade name Magna Carta, where he is currently the chairman of the board and CEO. Tr. 2001-02.

At a September 2013 investment conference in Monte Carlo, Markovic gave Furgatch a brief introduction to the Funds and the not-yet-launched Iran SPV in a "speed dating" format, along with a thumb drive containing documents relating to the Funds. Tr. 2002-04, 2060-61. Markovic pitched the Funds' strategy as purchasing accounts receivables from law firms to collect on attorney's fees. Tr. 2006. Furgatch believes Markovic's description of the Funds was consistent with Respondents' written documents that he received. Tr. 2011. Markovic mentioned that the Iran SPV was a "high-risk, political risk, one-off situation," and told Furgatch that she did "not know a whole lot about" it, but that he should ask Dersovitz for more information. Tr. 2005-06. Furgatch was "absolutely not at all" interested in the Iran SPV. Tr. 2005.

In October 2013, Furgatch visited Respondents' office in New Jersey, where he met Dersovitz and various employees of Respondents. Tr. 2007. Dersovitz described the Funds' strategy in "the same way" as Markovic and the Funds' FAQ; that is, that the Funds "invest[ed] in cases that were already resolved, but it was just a matter of a timing risk of when the money gets collected." Tr. 2011. Furgatch understood Respondents to be distinguishing themselves from other funds that took on litigation risk—"investing in . . . the outcome of a litigation"—which his company already had a "tremendous amount of" and which the company was not interested in taking on more of. Tr. 2010-11. Furgatch's understanding was that the Funds' positions were "collateralized by the collectibles as distinguished from essentially [a] nonsecured line of credit to a firm." Tr. 2012, 2015. That day, Furgatch also met the head of the underwriting department and received a copy of Respondents' underwriting guidelines, which Furgatch felt to be "critically important." Tr. 2017-19; Ex. 228.

At a subsequent lunch meeting with Dersovitz and Markovic before Furgatch invested, Dersovitz and Furgatch spoke at length regarding *Peterson*, which Furgatch was "vehemently against investing in." Tr. 2026-29. When Furgatch asked if the Funds had invested in *Peterson*, Dersovitz "hemmed and hawed," before concluding that "he thinks maybe there could be some residual negligible amount" in the Funds, but "he was just parking it there until the special situations fund was launched." Tr. 2029. Furgatch believed that *Peterson* had political and litigation risk. Tr. 2030-02. However, he relied on what he heard from Dersovitz and did not do independent analysis of the case. Tr. 2092-93. Furgatch explained that Magna Carta did not "dig[] in to examine the substance or the merits of any of the individual investments that [Dersovitz] invested in." Tr. 2124. Although Magna Carta was given access to the Funds' website, Furgatch did not know whether anyone in fact accessed it. Tr. 2117-19, 2158-59.

In April 2014, Furgatch caused Magna Carta to invest $10 million in the Domestic Fund. Tr. 2004-05. The following January, Miriam Freier, a relative whom Furgatch had brought on to consult on alternative investments, heard rumors of Respondents' liquidity issues at a conference in Miami. Tr. 2037-39. As a result, Furgatch spoke with Dersovitz and Freier emailed questions to Markovic. Tr. 2040; Ex. 450. During a phone conversation in May 2015, Dersovitz inaccurately informed Furgatch that approximately "10-20% of domestic fund [is] in Iran." Tr. 2041-42; Ex. 447. Furgatch was very upset at the time, as he was worried about Respondents' ability to satisfy Magna Carta's redemption request. Tr. 2046-47; Ex. 459 at 4; Ex. 447 at 2-3. A few days later, Freier forwarded to Furgatch an email containing Markovic's answers to her questions, which included the information that 70.44% of the fair value of the Domestic Fund was invested in *Peterson*. Ex. 450 at 2-3. Furgatch was "blown away" by the discrepancy between the numbers Dersovitz gave him and those from Markovic. Tr. 2051-52.

As of the date of Furgatch's testimony, Magna Carta had received $12,129,000 in redemptions, and was awaiting the payout of the holdback amount. Tr. 2096-98, 2133.

### 6.8. Kyle Schaffer

Kyle Schaffer is a partner and a member of the board of directors of Ballentine Partners, a registered investment adviser based in Massachusetts, and he has twenty-six years of experience in the financial services industry. Tr. 1064-65. In the fall of 2013, two Ballentine analysts learned of the Funds and brought the opportunity to Schaffer. Tr. 1066.

On December 4, 2013, Schaffer had an introductory call with Markovic. Tr. 1067-68. Schaffer then had other calls and meetings with Respondents during his due diligence, including visits to Respondents' offices in February and June 2014. Tr. 1087, 1103-05; Ex. 478. He also received written materials from Respondents, including an offering memorandum, the FAQ, an AUP, three years of financial statements, and access to the website. Exs. 2923, 2933; Tr. 1114-15, 1136, 1156-57, 1172. Schaffer thought Dersovitz and Markovic were "adept in telling [him] the same story" during his various conversations with them. Tr. 1087-88.

One aspect of that story was that the Funds' primary strategy was to invest in receivables for "only cases . . . that were already settled." Tr. 1069; *see* Tr. 1112-15. Schaffer took that to mean that there was "one less dimension of risk." Tr. 1070, 1103. He was not interested in "presettlement funding" opportunities, and would have wanted to know if the Funds were exposed to similar risks. Tr. 1071. Dersovitz also distinguished Respondents'

business from the competition by noting that other funds "are in the legal receivables space generally, but they are presettlement players, meaning that they're funding cases that are still on, with uncertain outcomes." Tr. 1102-03. Schaffer is not a lawyer, and although he "recognize[d] there probably is a difference" between settlements and non-appealable judgments, he "couldn't explain them." Tr. 1115. For him, "they both provide[d] the same degree of comfort." *Id.* Schaffer understood the Funds' primary risks to be duration, theft, and nonpayment. Tr. 1098. Markovic told Schaffer that obligors for the primary strategy tended to be "insurance companies, government entities, and Fortune 500 companies." Tr. 1071-72; *see also* Ex. 478 at 1. She also said that Respondents' "book" had 335 positions from 200 attorneys in 68 cases, which led him to believe Respondents' portfolio was "broadly diversified." Tr. 1074-75; *see also* Ex. 478 at 2.

Markovic also discussed the Iran SPV during the introductory call. Tr. 1077-78. She said it was to be a new fund, but that Dersovitz had made deals with the attorneys before. Tr. 1077-79. But Schaffer did not know at the time if those deals were still in the Funds' portfolios. Tr. 1079, 1097. Markovic also told him that Respondents were then "considering going directly to [*Peterson*] plaintiffs" to purchase some of their claims. Tr. 1079-80; *see also* Ex. 478 at 3. Schaffer testified that he was not interested in *Peterson* plaintiff investments for his clients. Tr. 1081-83. Dersovitz did not tell him during his June 2014 site visit that the Funds were invested in *Peterson*. Tr. 1107-08. Schaffer read the Alpha Generation presentation to mean that the Iran SPV was an "exception" to and "very different" from the Funds' primary strategy. Tr. 1119-20; Ex. 489 at 4.

Schaffer recommended that his clients invest with Respondents. Tr. 1123. In January 2015, one invested $1 million in the Domestic Fund and another invested $2 million in the Offshore Fund. Tr. 1123-24.

Following those investments, in June 2015, Schaffer read an article in the *Wall Street Journal* discussing the Funds' investments in *Peterson*. Tr. 1126-30. This was the first time he was aware the Funds were invested in *Peterson*. Tr. 1096. He thought the article was "unnecessarily unflattering" and a "little bit of a hatchet job," but he knew that his clients would see it and he wanted to know Respondents' perspective, so he arranged a meeting with Dersovitz. Tr. 1129-30. Dersovitz represented that 55% of the dollars deployed in the Funds were invested in *Peterson*. Tr. 1132. Schaffer encouraged his clients to redeem following the meeting. Tr. 1133. His recommendation was based on (1) the Funds' illiquidity, (2) the Funds' position in *Peterson*, which "was not what [he] believed [they] signed up for," and (3) the Funds' concentration in *Peterson*, which Schaffer felt was a "poor portfolio management decision." Tr. 1133-34.

Schaffer's client who invested in the Domestic Fund filed for redemption. Tr. 1135. The client invested in the Offshore Fund is participating in that fund's wind-down. Tr. 1135-36. As of the date of his testimony, Schaffer's clients had received one-third to two-fifths of their investment back. Tr. 1136. In July 2016, after the initiation of this proceeding, Ballantine was informed by the Division that "no money is missing [from the Funds] and investors may do quite well." Ex. 2928.

### 6.9 Salvatore Geraci & Travis Hutchinson

Sal Geraci is a member of HHM Wealth Advisors, a registered investment advisor, whose clients first invested in the Funds during the summer of 2012. Tr. 2726-27, 2744. Geraci is a certified public accountant, certified financial planner, and has a law degree. Tr. 2727, 2792. Geraci personally invested in the Funds in July 2012. Ex. 2999; Tr. 2731-32, 2745. Travis Hutchinson, the managing member and financial planner for HHM, was also involved with doing due diligence on the Funds for HHM's clients. Tr. 2819, 2821. The primary risks HHM was concerned with were: liquidity, interest rates, inflation, concentration, and obligor risk. Tr. 2739-40, 2761. Geraci was aware of investment opportunities in "cases that were still being heard," but decided not to invest in them. Tr. 2779-80.

Geraci testified that he would have wanted to know before he invested, and recommended that clients invest, if the Funds had more than 10% of their portfolio in unsettled cases—as was the case with the ONJ Novartis position. Tr. 2784-85. Hutchinson testified that to his knowledge the Funds never invested in "mass tort litigation where there was no settlement yet," such as the ONJ Cases. Tr. 2866-67.

Geraci and Hutchinson were aware of the *Peterson* position before Geraci and HHM clients invested. Tr. 2751-52, 2880. They relied on Dersovitz to evaluate the risks involved in *Peterson*. Tr. 2783-84, 2861. In March of 2014, after reading a story in the *Wall Street Journal* about Respondents, Geraci emailed Markovic to ask if the Funds would "participate in the new fund Iranian judgment." Ex. 1936 at 2. He also told Markovic that Dersovitz had told him that the Domestic Fund had $6 million in *Peterson*. *Id.* In response, Markovic informed him that the Domestic Fund had deployed $18 million into the *Peterson* positions. Ex. 1936 at 1.

Before Geraci and his clients invested, he understood from Respondents' employees that the Funds had "concentration limiters" that capped how much exposure they can take on as to any single obligor. Tr. 2793. He testified that he would have wanted to know if those limits had been changed. Tr. 2794. Hutchinson believed the offering memorandum "allowed

54

[Respondents] quite a bit of discretion" to exceed the self-imposed concentration limits. Tr. 2855.

Geraci is still invested with Respondents and has a standing redemption request to supplement his income. Tr. 2774-75.

### 7. Expert Qualifications

The parties presented the testimony of three retained experts pertinent to liability issues: Professor Anthony Sebok, Leon Metzger, and David Martin. Sebok, who has taught at law schools since 1992, testified as an expert witness on behalf of the Division. Ex. 223 at 2. He holds advanced degrees in politics and law. *Id.* Since 2002, Sebok has specialized—through academic research, scholarship, and conference presentations—in issues of investments in litigation. *Id.* at 3; Tr. 2509-10. He serves as an ethics consultant for the litigation finance company Burford, which partly invests in litigation where liability has not been established. Tr. 2510. For the purpose of his opinion, Sebok defines "factoring" as "a process by which a business sells to another business, at a small discount, its right to collect money before the money is paid." Ex. 223 at 8. As discussed below, Sebok's opinion is that the types of risks associated with Respondents' pertinent investments were greater than those typically associated with factoring "a settlement or a final non-appealable judgment obtained after litigation with an appearing defendant." *Id.* at 9, 25-41.

Respondents presented the expert testimony of Leon M. Metzger. Metzger has approximately thirty years of experience in the hedge fund industry in senior positions and academia. Ex. 2396 at 1. He has taught over thirty graduate courses on the management, operation and regulation of hedge funds. *Id.* He served as the vice chairman of a firm that provides services to hedge funds. *Id.* He has testified before Congress on hedge fund matters on three occasions, and has appeared as an expert on such matters before government agencies and multilateral organizations. *Id.* Metzger has an MBA. *Id.* at 2. Here, Metzger's opinions primarily address whether the representations in the offering memoranda and other key documents are consistent with the standard of care according to the customs and practices of the hedge fund industry.

Respondents also presented David X. Martin, who "provides advisory services on complex risk and fiduciary issues" through his "strategic risk management consulting firm." Ex. 2393 ¶ 1; *see id.* at App'x A (curriculum vitae). Martin has "held senior positions at PricewaterhouseCoopers (PwC), Citibank, and AllianceBernstein" during more than forty years working as a financial executive. *Id.* ¶ 1. He has "extensive experience with investment

strategies, quantitative research, exchanges, supervising trading desks, performing due diligence on major pricing vendors, [and] investment research." *Id.* He is the author of two books and numerous white papers on risk and risk management. *Id.* ¶ 3. Martin is a certified public accountant and has an MBA. *Id.* ¶ 5.

## Conclusions of Law

Respondents are charged with willfully violating the antifraud provisions of the Securities Act and the Exchange Act. OIP at 14. Dersovitz is charged with willfully aiding and abetting and causing RD Legal Capital's violations. *Id.*

Exchange Act Section 10(b) prohibits the use or employment of any manipulative or deceptive device "in connection with the purchase or sale of any security"; specifically, Section 10(b) and Rule 10b-5 prohibit: (1) employing any device, scheme, or artifice to defraud; (2) making material misstatements of fact or statements that omit material facts; or (3) engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. "[C]onduct that produces a false impression" is deceptive. *Dennis J. Malouf*, Securities Act Release No. 10115, 2016 WL 4035575, at *6 (July 27, 2016), *petition for review filed*, No. 16-9546 (10th Cir. Sept. 8, 2016); *see also SEC v. Dorozhko*, 574 F.3d 42, 50 (2d Cir. 2009) ("In its ordinary meaning, 'deceptive' covers a wide spectrum of conduct involving cheating or trading in falsehoods.").

Securities Act Section 17(a), which applies "in the offer or sale of any securities," prohibits: (1) employing any device, scheme, or artifice to defraud; (2) obtaining money or property by means of any material misstatement of fact or statements that omit material facts; or (3) engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser. 15 U.S.C. § 77q(a). Unlike Section 10(b), a finding of manipulative or deceptive conduct is not required for a violation of Section 17(a). *Malouf*, 2016 WL 4035575, at *10-11.

Scienter is required to prove violations of Securities Act Section 17(a)(1) or Exchange Act Section 10(b) and Rule 10b-5, whereas negligence is sufficient to prove violations of Securities Act Section 17(a)(2) or (a)(3). *Aaron v. SEC*, 446 U.S. 680, 701-02 (1980); *Ira Weiss*, Securities Act Release No. 8641, 2005 WL 3273381, at *12 (Dec. 2, 2005), *petition for review denied*, 468 F.3d 849 (D.C. Cir. 2006). Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Aaron*, 446 U.S. at 686 n.5. Scienter can be established by extreme recklessness, which is "an

extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *SEC v. Steadman*, 967 F.2d 636, 641-42 (D.C. Cir. 1992) (internal quotation marks omitted); *see also Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 639 (D.C. Cir. 2008) (explaining that as extreme recklessness is a lesser form of intent, "the danger [must be] so obvious that the actor was aware of it and consciously disregarded it").

Any misstatements or omissions must be material. A representation or omission is material if there is a substantial likelihood that disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the total mix of information available. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32, 240 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *see Azrielli v. Cohen Law Offices*, 21 F.3d 512, 518 (2d Cir. 1994) ("A fact is to be considered material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares."). Both Securities Act Section 17(a) and Exchange Act Section 10(b) prohibit "'half-truths'—literally true statements that create a materially misleading impression." *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, 568 U.S. 442 (2013). Whether a statement is misleading is judged from the point of view of an objective investor. *See TSC Indus.*, 426 U.S. at 449.

Liability under Securities Act Section 17(a)(1) and (a)(3) and Exchange Act Rule 10b-5(a) and (c) may be predicated, in some circumstances, on conduct involving misstatements. *See SEC v. Goldstone*, 952 F. Supp. 2d 1060, 1205-06 (D.N.M. 2013); *SEC v. Familant*, 910 F. Supp. 2d 83, 95 (D.D.C. 2012); *Malouf*, 2016 WL 4035575, at *8, *11-12.[18] For example,

---

[18]   Courts have held that "[a] defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rule[] 10b-5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions." *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011); *see also Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 987 (8th Cir. 2012); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177-78 (2d Cir. 2005); *SEC v. St. Anselm Expl. Co.*, 936 F. Supp. 2d 1281, 1298-99 (D. Colo. 2013); *SEC v. Benger*, 931 F. Supp. 2d 908, 913-16 (N.D. Ill. 2013); *Familant*, 910 F. Supp. 2d at 93-94; *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, No. 2:03-MD-1565, 2006 WL 469468, at *21 (S.D. Ohio Feb. 27, 2006). In *Malouf*, the Commission disagreed with this approach. *See* 2016 WL 4035575, at *5-11 & n.14.

"*repeated* acts, such as repeatedly making or drafting materially misleading statements over a period of time," may create liability under Securities Act Section 17(a)(3). *Malouf*, 2016 WL 4035575, at *12 (emphasis in original).

In the context of the securities statutes, willfulness means intentionally committing the act that constitutes the violation, and "does not require that the actor 'also be aware that he is violating one of the Rules or Acts.'" *Timothy S. Dembski*, Exchange Act Release No. 80306, 2017 WL 1103685, at *13 (Mar. 24, 2017) (quoting *Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000)), *petition for review denied*, 726 F. App'x 841 (2d Cir. 2018). The willfulness requirement may be satisfied by negligent conduct. *See C. James Padgett*, Exchange Act Release No. 38423, 1997 WL 126716, at *7 n.34 (Mar. 20, 1997).

Insofar as the Division has proved that Respondents made material misstatements, Respondents do not contest the following elements: They obtained money "by means of" such misstatements within the meaning of Section 17(a)(2). *See* 15 U.S.C. § 77q(a)(2); *SEC v. Stoker*, 865 F. Supp. 2d 457, 465 (S.D.N.Y. 2012). The misstatements were made "in the offer or sale of any securities" within the meaning of Securities Act Section 17(a) and "in connection with the purchase or sale of any security" within the meaning of Exchange Act Section 10(b). *See* 15 U.S.C. §§ 77q(a), 78j(b); *SEC v. Zandford*, 535 U.S. 813, 819-20, 825 (2002); *United States v. Naftalin*, 441 U.S. 768, 778 (1979). And the misconduct involved use of interstate means. *See SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 865 (S.D.N.Y. 1997) (jurisdictional element is broadly construed and easily satisfied), *aff'd*, 159 F.3d 1348 (2d Cir. 1998); Thomas Lee Hazen, Treatise on the Law of Securities Regulation § 17.13 (WestLaw 2018) ("It is very difficult to imagine a securities transaction that does not in some respect involve an instrumentality of interstate commerce.").

To establish Dersovitz's causing liability, which would subject him to sanctions under Securities Act Section 8A and Exchange Act Section 21C, the Division must establish (1) a primary violation of any provision of the Securities Act or Exchange Act; (2) his act or omission contributed to the violation; and (3) he knew or should have known that the act or omission would contribute to the violation. *Robert M. Fuller*, Securities Act Release No. 8273, 2003 WL 22016309, at *4 (Aug. 25, 2003), *petition for review denied*, 95 F. App'x 361 (D.C. Cir. 2004). Negligence is sufficient to establish that he caused a violation of a provision that does not require scienter. *See KPMG Peat Marwick LLP*, Exchange Act Release No. 43862, 2001 WL 47245, at *19 (Jan. 19, 2001), *petition for review denied*, 289 F.3d 109 (D.C. Cir. 2002).

**8. Respondents Made Material Misrepresentations and Omissions**

The Division argues that Respondents made material misrepresentations and omissions in their oral and written communications with investors, specifically in relation to the investments discussed in the findings of fact. For the reasons discussed below, I find that Respondents made material misstatements with respect to certain of their Osborn and Cohen receivables, but not with respect to *Peterson* or Deepwater Horizon.

*8.1. In the Offering Memoranda and Other Disclosures, Respondents Represented that "All" of the Funds' Investments Arose from Settlements and Judgments*

Respondents contend that they were permitted under the offering memoranda to make the investments challenged by the Division, and, to the extent that other written or oral statements to investors were contradicted by clear language in the offering memoranda, the terms of the offering memoranda control. Resp. Post-Hr'g Br. at 5-6.

In securities cases, whether a particular written disclosure should trump misrepresentations made in other writings or orally to investors "is highly fact-specific and therefore is not amenable to bright-line rules." *SEC v. Morgan Keegan & Co.*, 678 F.3d 1233, 1250 (11th Cir. 2012). I agree with Respondents that I should begin with consideration of the terms of the offering memoranda, which were the cornerstone of the "total mix" of information available to investors. *See Brown v. E. F. Hutton Grp., Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993) ("[W]ith respect to the Partnership's risks, the Brochure directs the potential investor to the Prospectus, the single most important document and perhaps the primary resource an investor should consult in seeking that information."). But in the offering memoranda as well as in other representations, Respondents gave investors the distinct impression that the Funds were invested exclusively in legal receivables from cases that were resolved by settlement, an agreement between parties, or, in some instances a judgment against a debtor—with little to no litigation risk.

The terms of the offering memoranda advised readers that Respondents "will": (a) purchase from law firms receivables representing legal fees derived from "litigation, judgments and settlements"; (b) purchase from plaintiffs receivables representing proceeds from final judgment awards or settlements; (c) provide loans to law firms through secured lines of credit; and (d) provide capital to law firms to pursue certain other opportunities outside of these categories. *E.g.*, Ex. 60 at 5, 13-14; Ex. 66 at 5. The offering memoranda also include a flexibility provision stating that Respondents will "not be limited with respect to the types of investment strategies [they] may employ or the

markets or instruments in which [they] may invest," will "seek to capitalize on attractive opportunities, wherever they might be," and "may pursue other objectives or employ other techniques [they] consider[] appropriate and in the best interest of the [Funds]." *E.g.*, Ex. 60 at 17. The offering memoranda set forth a broad and diverse strategy—within the litigation receivables field—that by its nature is forward looking and subject to change over time, and do not mention any specific cases held in the Funds' portfolios.

Notwithstanding the flexible mandate, the offering memoranda stated that the Funds had to that point employed a more limited investment strategy. From 2007 to 2012, each offering memorandum stated that the Funds had only purchased legal fees arising from settlements or memoranda of understanding; after 2012, the offering memoranda stated that judgment receivables had also been purchased. For example, the July 2007 Domestic Fund offering memorandum, while authorizing Respondents to purchase legal fees from litigation or judgments prospectively, nonetheless states that: "All of the Legal Fee Receivables purchased by the Partnership arise out of litigation in which a binding settlement agreement or memorandum of understanding among the parties has been reached." Ex. 1017 at 12. From July 2011 through the hearing, eight offering memoranda (four Domestic and four Offshore) used language substantially similar to the foregoing, but included it not just in the "strategy" section of the document, but also in the "risk" section. *See* Ex. 61 at 14, 21; Ex. 62 at 14, 21; Ex. 63 at 13, 17; Ex. 64 at 13, 17; Ex. 65 at 16, 25; Ex. 66 at 13, 18; Ex. 67 at 16, 24; Ex. 591 at 90, 94.

In reading these provisions, the offering memoranda represented that, as of the date the offering was published, "all" of the Funds' past purchases arose from settlements or judgments. Or stated differently, no offering memorandum ever advised a reader that the Funds had ever purchased a legal fee arising out of anything other than a settlement or judgment.

In addition to the offering memoranda, the Division contends that statements and omissions in other documents are actionable. Much like the offering memoranda, Respondents' Disclosure Brochure on Form ADV-Part 2A in 2011 stated that "except for some of the 'other advances' provided to law firms [not pertinent here], all of the legal fee receivables purchased by the funds arise out of litigation in which a settlement agreement or memorandum of understanding among the parties has been reached." Ex. 218 at 10. In 2012, 2013, and 2014, the pertinent language read that "all of the legal fee receivables purchased by the funds arise out of litigation in which a Legal Fee has been earned and the settlement has either occurred or is pending." Ex. 219 at 11; Ex. 220 at 10-11; Ex. 1932 at 12. Although Metzger does not identify the Form ADV-Part 2A as a "key" document for investors, he relies on it to support the opinions in his report and does not

opine that it should receive the "little weight" he ascribes to marketing materials. *See* Ex. 2396 ¶¶ 75, 82, 97.

Unlike the offering memoranda, however, Respondents argue that marketing materials are deserving of limited weight. They rely on Metzger's opinion describing the state of the industry. I conclude that industry practice is not inconsistent with the law recognizing the primacy of key documents, and the weight I ascribe to certain representations in marketing materials is informed both by the law and his opinion. Metzger's expert opinion is that "reasonable accredited investors should have understood that the funds' marketing materials were meant to provide a brief summary of the investment opportunity only and did not purport to contain all relevant terms that may be of interest to prospective investors." Ex. 2396 ¶ 13i. He notes that "the SEC's own guidance to investors places little weight on marketing materials." *Id.* ¶ 50. In Metzger's opinion, "the examples that the [Division] cites in non-critical marketing documents must be read in the context of critical documents" such that the Division's position would not represent the actual mix of information available to an investor if it is allowed to "'cherry pick' language from less-important documents, and then ignore the critical ones." *Id.* ¶ 57. Metzger considers the offering memoranda and limited partnership and subscription agreements to be "critical documents." *Id.* ¶ 57 n.27. By contrast, he considers marketing materials to be "'appetizers' to pique investor interest." *Id.*

The Division's position, however, is supportable with respect to the marketing materials that provided information consistent with the offering memoranda in a fashion that the investor would have no reason to believe was canceled by offering memoranda language. Indeed, some of the marketing materials reinforced the representations in the offering memoranda and Forms ADV that all previously purchased receivables were from settled litigation.[19] For example, the June 2014 DDQ uses language of

---

[19]  Respondents' reliance on *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir. 1996), *Carr v. Cigna Securities, Inc.*, 95 F.3d 544 (7th Cir. 1996), and *Dodds v. Cigna Securities, Inc.*, 12 F.3d 346 (2d Cir. 1993), is misplaced. *See* Resp. Post-Hr'g Br. 5 & n.5. Those cases stand for the proposition that oral statements regarding an investment will not create liability where offering documents prominently display contrary warnings. *See Olkey*, 98 F.3d at 4-9 (opining that dismissal was warranted despite allegations that managers downplayed the riskiness of the investment strategy because the investors' "claims" that risks were undisclosed were "contradicted by the disclosure of risk made on the face of each prospectus"); *Carr*, 95 F.3d at 545, 547 (holding that allegation that oral representation

(continued...)

exclusivity, like the early offering memoranda, in stating that Respondents have "not identified any other registered entities that traffic solely in post-settlement legal fee receivables." Ex. 48 at 9. The DDQ continued: "There are entities that lend money to contingency fee attorneys, but they take litigation risk, which we don't." *Id.* The December 2012 and January 2014 DDQs also contain this language. Exs. 1640 at 13, 1900 at 9. The Division also notes that the September 2012 DDQ states that the Funds' portfolio "consists of two investment products": fee acceleration or factoring, which the document noted were purchased "once a settlement has been reached," and lines of credit. Ex. 1479 at 11; Div. Post-Hr'g Br. at 6. That DDQ could easily give the reasonable reader the impression that 95% of the Funds' portfolio was in post-settlement receivables.

Other oral and written representations by Respondents further bolstered the impression given in the offering memoranda that the Funds invested in "primarily, 100 percent, . . . settled cases." Ex. 216 at 7; *see also id.* at 31-32. It was a point of emphasis during the conference call with representatives of Cobblestone, for example, that "a settlement is a settlement is a settlement" and that settlements result only when one party "agrees to pay" the other, *id.* at 9, even though Dersovitz also referred to *Peterson* as a judgment and implied that the Funds held some *Peterson* receivables. And investors, such as Condon, were reassured orally and in emails that the Funds were "only purchasing receivables after a settlement has been signed by all the parties." Ex. 263 at 5; *see also, e.g.*, Tr. 375-76 (receivables only from cases where the "defendant was willing and able to pay"); Tr. 1069 ("only cases . . . that were already settled"). Although these interactions varied among investors, they were a consistent feature in the marketing of the Funds.

That said, the statements in other marketing materials are less problematic. For example, the Division notes that the FAQ and Alpha Generation documents use the words "basic," "primary," and "principally" in relation to settled cases and judgments to describe its strategy. Div. Post-Hr'g Br. at 6. Those terms mean that settlements and judgments were most

---

that "the limited partnerships were safe, conservative investments" were fatally undercut by documents "warning [plaintiff] in capitals and bold face that it was a **RISKY** investment"); *Dodds*, 12 F.3d at 348, 350-51 (holding that warnings, including "**THE SECURITIES OFFERED HEREBY INVOLVE A HIGH DEGREE OF RISK**," put the reasonable investor on notice of the risks of certain investments despite oral representations by an investment adviser that the investments were suitable for an investor pursuing a conservative strategy).

important or central to the Funds' strategy, but they imply that the Funds have room for other types of investments. None is synonymous with words commonly used to signify exclusivity, such as "exclusive," "sole," "only," or "lone."

### 8.2. Certain Positions of the Funds Made These Statements False and Misleading

The statements in the offering memoranda, DDQs, and Forms ADV were inaccurate because when they were made Respondents had already taken sizable positions in Cohen and ONJ receivables that were not based on settlements or judgments. However, I conclude that the Division failed to establish by a preponderance of the evidence that that statements were materially false or misleading with respect to the *Peterson* and Deepwater Horizon positions.

#### 8.2.1. Cohen and ONJ

Respondents' positions in the Cohen and ONJ matters were not judgment or settlement-based legal receivables. Instead, those investments presented risks qualitatively different than the risks presented by conventional factoring. Sebok, whose experience makes him well situated to address this issue, identified the ONJ cases and Cohen matters as investments with litigation risk, stating that they "are indistinguishable from transactions that are typically conducted by firms that 'take litigation risk.'" Ex. 223 at 26-27. Pre-judgment and pre-settlement receivables present a considerably greater risk because of the increased duration before payment and also the "risk inherent . . . to litigation—a contingent event that depends on numerous factors." *Id.* at 13-14. The Funds' investment in ONJ case receivables illustrates the effects of this litigation risk—particularly, as highlighted by Sebok, the "subjective attitudes of judges and juries; [and] the possibility that new facts and law will be developed after the factoring contract is complete." *Id.* at 14. Indeed, unlike some of the successes in ONJ cases handled by other attorneys, Osborn's did not proceed as well as expected and were not resolved by settlement until 2014—and even then on terms less favorable to Osborn's clients than expected.

Respondents concede that "the Division is correct that the key difference between [pre- and post-settlement strategies] is litigation risk." Resp. Post-Hr'g Br. at 9. And, to their credit, Respondents also acknowledge that "the Division is correct that the Funds' purchase of legal fees relating to . . . the 'ONJ cases' . . . did not fall squarely within the Funds' post-settlement strategy." Resp. Post-Hr'g Br. at 2.

Respondents contend, however, that the ONJ positions were "part of a 'workout' of legacy investments that fell into delinquency . . . and the offering documents gave Respondents flexibility to enter into workouts when necessary to preserve the Funds' ability to recoup their investments." Resp. Post-Hr'g Br. at 2. However, regardless of whether the offering memoranda authorized workouts, the issue is that the offering memoranda represented that all of the legal receivables the Funds have purchased were based in a settlement or judgment. Although Osborn's success in subsequent, unrelated contingent fee litigation appears to have helped to ameliorate some of the Funds' losses, the existence of a workout position predicated on substantial investments in pre-settlement legal fee receivables contradicts the language of the offering memoranda.

Respondents also argue that the ONJ positions were "more akin to an attorney line of credit" authorized by the offering memoranda "than a purchase of pre-settlement legal receivables." Resp. Post-Hr'g Br. at 2. However, Respondents structured the ongoing ONJ investments as purchases of legal receivables (not lines of credit); the ONJ positions were part of the portfolio which was valued using discounted cash flow, Tr. 1830-31, whereas lines of credit were not; and Respondents reported the ONJ positions in their audited annual financial statements as "Legal Fee Receivables," Ex. 1141 at 9. Respondents do not argue that the ONJ or Cohen investments fall within the offering memoranda's "Other Advances to Law Firms" category, which has, as one mandatory limitation, that the "repayment source is realistic within twelve months or less." *E.g.*, Ex. 60 at 14-15.

The Cohen receivables in *WellCare* and Licata also did not arise from a settlement agreement or memorandum of understanding. No award had been determined at the time Respondents purchased the *WellCare qui tam* receivable, and I concur with Sebok's assessment that it lacked the character of a post-judgment or post-settlement fee receivable, and instead presented the risks of unadjudicated contingency fee litigation. Ex. 223 at 27. Again, much like the ONJ cases, the unfavorable outcome by Cohen on behalf of his client—substantially underperforming expectations—demonstrates the heightened risks of such a contingent investment. In addition, the Licata receivable also did not arise out of a settlement or memorandum of understanding. Although Respondents' position was that Cohen earned the fee upon agreeing to represent Licata in a criminal action, Licata lacked the funds to pay of the fee. The language in the offering memoranda that all receivables arose from settlements highlights the importance of that representation by explaining that credit risk is low because the defendants who have agreed to settle and pay the money are deep-pocketed corporations that have little or no credit risk. Instead, Licata was a criminal defendant

who could not pay the $15 million retainer and instead assigned Cohen's firm interest in real property that turned out to be worthless. Tr. 1395-96, 1400-01, 1435, 5786-89, 5797-99.

In defense of its Cohen positions, Respondents contend that because "*these transactions . . . were consummated years before* the period covered by the [OIP]," they "cannot support the Division's claims that later statements by Respondents about the Funds' primary strategy were false or misleading." Resp. Post-Hr'g Br. at 2-3 (emphasis added). But the question is not when transactions commenced; what matters is when the misrepresentations were made. Here, the offering memoranda continued to mispresent that all of the Funds' past purchases arose out of settlements throughout the period covered by the OIP.

### 8.2.2. Deepwater Horizon

A more recent and novel investment by the Funds relates to legal claims from the Deepwater Horizon disaster in the Gulf of Mexico. The Division has established that a small percentage of the Funds' assets were invested in such positions. Because the terms of the Deepwater Horizon settlement fund allowed claims to be filed on behalf of claimants by representatives other than counsel, some of the Funds' settlement-based receivables were purchased from non-law-firm entities—claims processors, claim administrators, and accounting firms. While this represents a departure from past investments of the Funds, given that the settlement specifically authorized this, I find that the opportunity was consistent with one of the emerging opportunities the Fund manager could reasonably take advantage of under the terms of the offering memoranda's flexibility provision. *See* Tr. 2665-67. In this respect, I credit Metzger's opinion that new opportunities such as the Deepwater Horizon settlement fund were consistent with the flexibility provision, which itself was consistent with industry standards. Ex. 2396 ¶¶ 13i, 60-61. Metzger noted that a "2003 SEC Staff report cites the flexibility provided by broad investment mandates as a benefit of hedge fund investing." *Id.* ¶ 62 n.31 (citing "Implications of the Growth of Hedge Funds," Staff Report to the United States Securities and Exchange Commission, (September 2003)).

In addition, by March 2012, Respondents were indicating that they would "further use [their] skill set in a number of different receivable secured strategies," which Metzger interpreted as a "signal[] that the focus was on broad-based receivable-secured strategies, and could include accounting and claim aggregator firms." *Id.* ¶ 80 (citing March 2012 DDQ at 12). Although the offering memoranda did not specifically mention advancing money to non-attorney representatives, the representatives were authorized to file claims

against a settlement fund. As such, these entities were something of a surrogate for law firms for purposes of the settlement process, and I do not find the absence of reference to such entities to be material. *See* Tr. 2665-67. While the class of persons authorized to act on behalf of claimants was broader than attorneys, the investments were otherwise substantially similar to the core investments of the Funds. Neither Sebok nor the investor witnesses expressed concern over the deployment of fund assets into positions related to the Deepwater Horizon settlement.

### 8.2.3. *Peterson*

The focus of the Division's case is its challenge to the Funds' *Peterson* positions. The Division argues that various risks associated with *Peterson* rendered representations in the Funds' key documents inaccurate or would have required additional disclosures to be accurate.

While Respondents' experts and some fact witnesses expressed the view that the *Peterson* positions were authorized by the Funds' governing documents, *e.g.*, Ex. 2396 ¶ 69, other witnesses—Gumins, for example—expressed a negative view of the Funds investing in *Peterson*—in large part because the case related to Iran. But the Funds' offering documents contained no limitations on the subject matter of the settlements or judgments from which the receivables they purchased were generated.

However, the Division argues that because the *Peterson* receivables did not arise out of a settlement or memorandum of understanding, but instead from a judgment, all the offering memoranda that issued from approximately 2010 to late 2012, among other documents, were inaccurate. *See also* Tr. 2916-17 (Dersovitz admitting that *Peterson* was not settled). Respondents take the position that the distinction between settlements and judgments is one without a difference, because it does not have a meaningful effect on their core approach, which involves investing in legal receivables with the following three characteristics: (1) an already imposed legal obligation to pay; (2) a credit-worthy source of funds to make the payment; and (3) a delay between the imposition of the obligation and payment. Resp. Post-Hr'g Br. at 9; Ex. 2396 ¶ 84. In other words, Respondents claim that their misrepresentations were not material. *See Levinson*, 485 U.S. at 231-32.

The Division relies primarily on the testimony of discontented[20] investors to argue that the *Peterson* positions were materially different from

---

[20]   I do not use *discontent* in a pejorative sense. Although almost all investors profited, a number seemed genuinely discomfited, particularly after the *Wall Street Journal* published articles intimating that the *Peterson*

(continued...)

investment in settlements. *See* Div. Post-Hr'g Br. at 19-21. Testimony of investors and record evidence of their behavior is one way to judge materiality. *See Rothberg v. Rosenbloom*, 771 F.2d 818, 821 (3d Cir. 1985). Investors testified that they did not understand the distinction between the legal terms "settlement" and "judgment." *E.g.*, Tr. 1029-30. But the investor testimony nevertheless indicates that investors chose to invest in the Funds because of what they understood to be the benefits of investing only in settled litigation—in contrast to the other litigation financing funds that were also looking for investors. *See, e.g.*, Tr. 1115-16, 2117, 2779-80. Investors understood that the risks—specifically, "litigation risk"—were different when the opposing party had not "agreed to" make the payment in question. *E.g.*, Tr. 952, 1070-71. And some even drew that distinction with *Peterson* in the context of explaining why they had no interest in investing in the Iran SPV. *See, e.g.*, Tr. 1470-71, 1474-75.

Investors' reactions to learning about the *Peterson* investment were more equivocal. Some redeemed their full investment upon learning about *Peterson*. *E.g.*, Exs. 392, 2843. They testified to feeling "duped" or "shocked and appalled." Tr. 172, 2182-83. Others, however, immediately redeemed only part of their investment, *e.g.*, Tr. 902-03, 977, 1048, 1050-51, or decided to maintain their investment, *e.g.*, Tr. 347, 408. In addition, as noted above, some investors showed a distinct undercurrent of discomfort in investing in *Peterson* merely because the case was in the news and associated with Iran. *See, e.g.*, Tr. 311, 345-46, 3613-14. I find it likely that investors' unease with the subject matter of *Peterson* was responsible for at least some of the redemptions. For all of these reasons, the redemptions carry less weight than they otherwise might.

And by their own admission none of these investors performed the due diligence necessary to understand *Peterson*'s procedural or legal posture—including that there was a final, non-appealable judgment—or the actual risks associated with the *Peterson* investments. That isn't to say that it was the investors' burden to find information. *Accord Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 887 (9th Cir. 2008); *Metro-Goldwyn-Mayer, Inc. v. Ross*, 509 F.2d 930, 933 (2d Cir. 1975). But a person's uninformed, subjective concerns cannot substitute for the objective materiality standard. *See Morgan Keegan & Co.*, 678 F.3d at 1245 ("[In *TSC Industries*], [t]he Supreme Court noted the

---

investments were unduly risky or improperly valued. Though the evidence made available to me does not establish the precise risk posed by the *Peterson* investments, it is easy to understand why such articles would provoke an investor's concern.

'universal[] agree[ment]' that materiality is an 'objective' inquiry involving the significance of an omitted or misrepresented fact to a reasonable investor." (last two alterations in original)). For these reasons, the investors' testimony and behavior alone may not satisfy the Division's burden in proving that Respondents' misrepresentations were material.

Division expert Sebok provides more objective reasons. He posits that the "completion risk" related to a post-default judgment factoring contract to be "relatively high" compared to the "relatively minimal . . . burdens of enforcement" for a factoring contract that "arises from adjudication," because in the latter case a "party has availed itself of the judicial process, [which is] typically an indicator that there is an ability and incentive to pay a lawfully rendered judgment." Ex. 223 at 20-21. For Sebok, "under conditions where completion requires significant attorney legal services, such as in a default judgment or a settlement where the conditions subsequent are complex and might take years to resolve, the contract becomes much riskier." Ex. 223 at 23.

Although Sebok does not claim to have read any of the *Peterson* pleadings or purport to quantify the risk that the Funds would not collect on any particular *Peterson* positions, *see* Tr. 2593-94, 2640, he expressed the opinion that the type of collection risk associated with those positions was different than that of a settlement or fully adjudicated judgment, and instead more like a default judgment—which may require different risk disclosures. Sebok explained that default judgments generally have higher completion risk due to high enforcement costs, low likelihood of enforcement, or both. Ex. 223 at 36-38. Sebok's specific opinion is that the *Peterson* positions involved completion risks that were less like a settlement and more like litigation financing. *Id.* at 21.

I also credit Sebok's opinion that in contrast to default judgments, "completion risk in post-settlement factoring is extremely low because . . . a factor, by definition, can more definitively ascertain 'the quality and value' of the legal claim upon which a counterparty's proceeds depend." Ex. 223 at 21.

Yet, because Sebok was admittedly unfamiliar with the particulars of *Peterson*, *see* Tr. 2593-94, it is necessary to look further. Sebok's opinion on the heightened risk associated with post-default actions against foreign nations is consistent with the testimony of the experienced counsel in *Peterson*. Perles testified that obtaining a default judgment is only "the beginning of the case" because there is "significantly more work involved in enforcing the case than there is in winning the judgment." Tr. 1559-60. Iran, in particular, "decline[s] to participate in any way through the entry of a final default judgment" but then "vigorously defend[s] and frequently collaterally

attack[s] during the enforcement phase . . . with the best lawyers in the country that [its] money can buy." Tr. 1549, 1560.

Sebok himself points to *Jacobson v. Oliver*, 555 F. Supp. 2d 72 (D.D.C. 2008), as an example of the typical outcome in post-default actions involving Iran, "a foreign government that is hostile to the United States." Ex. 223 at 38. The *Jacobson* court found that, "at the point at which the default judgment had been obtained, the risk that the attorney would receive no proceeds from the case [was] high." *Id.* at 39 (citing 555 F. Supp. 2d at 86). Sebok claims that "*Jacobson* illustrates that the completion risk faced by an attorney in a default judgment case with a foreign adverse party that rejects jurisdiction is equivalent to the risk faced by an attorney at the outset of litigation." Ex. 223 at 39. He goes on to assert that "when RDLC made its initial investment in the *Peterson* case, the completion risk faced by the attorneys whose fees it 'purchased' was qualitatively similar to the completion risk faced by the attorney in *Jacobson* at the point that the court . . . deemed such risk to be high." *Id.*

I disagree. *Jacobson* relates to a 1992 contingency fee arrangement to represent plaintiffs against Iran. At that time, the FSIA granted immunity from lawsuits to foreign states with only limited exceptions, such that the lawsuit was dismissed in 1993. *Cicippio v. Islamic Republic of Iran*, No. 92-cv-2300, 1993 WL 730748 (D.D.C. Mar. 13, 1993), *aff'd*, 30 F.3d 164 (D.C. Cir. 1994). As the *Jacobson* court observed, plaintiffs' claims "were foreclosed by the immunity conferred on Iran by the [FSIA]." 555 F. Supp. 2d at 82. According to the court, "much of the risk" involved in the representations was that, even though Iran did not appear to defend the action, they "still faced numerous challenges [in obtaining a judgment in Jacobsen's favor] . . . . A second, even greater risk was also present: the risk of nonpayment." *Id.* at 86 (quoting *Jacobsen v. Oliver*, 451 F. Supp. 2d 181, 201 (D.D.C. 2006) (alterations in original)). In 1996, Congress amended the FSIA to allow for lawsuits "against foreign states that sponsor terrorism." *Jacobsen*, 201 F. Supp. 2d at 97. Thus in *Peterson*, one challenge to obtaining a judgment was already gone; and unlike *Jacobson*, where the plaintiffs had not identified any Iranian assets to satisfy a judgment, the *Peterson* plaintiffs had. Although there remained substantial obstacles to collection following the 1996 amendment, *Jacobson* does not illustrate the risks in *Peterson*.

Indeed Perles's evaluation of *Peterson*—as opposed to the typical post-default action—also deemed success relatively certain at an early date. By no later than November 2011, as corroborated by contemporaneous evidence, Perles was "[a]bsolutely" confident that the collection effort would succeed. Tr. 1685; *see* Ex. 1252. In a vacuum, Perles's opinion would not be particularly objective. He was plaintiffs' counsel with an interest in securing

funding from Respondents. But Respondents' expert, Martin, identifies several unique characteristics of *Peterson* that suggest its risk profile differed from the typical post-default action. As a preliminary matter, Martin addressed the Division's allegation "that RD Legal repeatedly misrepresented to investors the type of assets it was purchasing because Peterson receivables were associated with a default judgment as opposed to a settled lawsuit, and included the purchase of plaintiff awards as well as attorney fees." Ex. 2393 ¶ 12 (citing OIP ¶¶ 1-4). Martin concluded that this allegation was "not correct from an investor perspective." Ex. 2393 ¶¶ 12, 20. Martin determined that "Peterson receivables and receivables from settled cases . . . are both valued using the same methodology, and both fall squarely within the same narrow asset class." Ex. 2393 ¶ 12; *see id*. ¶ 16. Martin opined that "the valuation of any legal receivable purchased by RD Legal . . . is based on an appropriate[] [methodology] . . . regardless of whether the underlying receivable is backed by a settlement, a judgment, an attorney fee, or a plaintiff award." *Id*. ¶ 12. Martin further stated that the methodology used by Respondents' independent valuation service is "routinely used and widely accepted in the financial markets when pricing assets—including fixed income, bond-like instruments—which have a future expected payoff." *Id*. ¶ 19. I am persuaded by Martin's analysis of this question.

As I already concluded above, the Funds' investments in *Peterson* were within the scope of the Funds' investment strategy as authorized in the offering memoranda. As is typical with some hedge funds, particular positions were not detailed in those materials, so there was nothing atypical or wanting as to the disclosures as they related to *Peterson*. In this particular context and given the sophistication of the Funds' accredited investors, I cannot say it was Respondents' duty to make detailed disclosures about the Funds' *Peterson* positions. But the fact that similar valuation methodologies were used does not address whether the quantum of risk in post-default actions in general and *Peterson* in particular differed materially from the risk in settled cases. That a valuation methodology is widely used for different types of instruments does not mean that a misrepresentation about which particular type of asset a fund purchases is not material under the securities laws.

Turning therefore to the purported risks, Martin provided expert opinions on four principal questions about *Peterson*, two of which I will now discuss: (1) "what impact, if any, Peterson receivables had on the overall risk of the portfolio and on realized returns to investors"; and (2) "whether Peterson receivables represent a single homogenous asset with a uniform and correlated risk profile." Ex. 2393 ¶¶ 8-9.

In answering the first question about the overall risk of the portfolio, Martin's discussion of the Funds' so-called "information advantage" informs his opinion about how the *Peterson* positions impacted risk. Martin explained that an information advantage can be a result of: (1) better data collection; (2) better data analysis; and (3) better use of the analysis "for advantage and execution with timing and flawless precision." Ex. 2393 ¶ 51 (citing John Sviokla, *Five Keys to Creating an Information Advantage*, Harvard Bus. Rev. (Jan. 19. 2010)). Martin determined that Respondents' information advantage arose "because it built a network of law firms that were willing to sell their receivables, it was able to successfully evaluate the collectability of, and otherwise value, those receivables, and it was able to purchase the receivables at an advantageous price." Ex. 2393 ¶ 52.

Part of Respondents' information advantage came from Dersovitz's "personal expertise" and "years of litigation experience." *Id.* ¶ 53. In addition, Martin found that the information advantage developed as Respondents "devoted substantial resources over the years to engage a variety of professionals to evaluate various aspects of its investment decisions," such as Reed Smith vis-à-vis *Peterson*. *Id.* ¶ 54. Martin also determined that Respondents "identified a number of facts that supported [their] conclusion that investing in Peterson receivables would carry minimal risk and be profitable." *Id.* ¶ 58; *see id.* ¶¶ 59-63. Dersovitz learning from Perles about the Italian depositions establishing that the assets at Citibank were being laundered by Iran is a prime example of this. Information advantage is not necessarily having a monopoly on information, but rather identifying, analyzing, and understanding the import of information before competitors, so that it can be acted upon profitably. And in this respect, based on Dersovitz's own expertise and relevant external expertise, the Funds anticipated and understood the import of a series of developments that predicted the distribution of funds to the *Peterson* attorneys and plaintiffs, including President Obama's blocking order, Section 8772, partial summary judgment in *Clearstream I*, the creation of the qualified settlement fund, and the Second Circuit's affirmance of *Clearstream I.* Each of these events further decreased concerns about collection risk.

Another aspect of Respondents' information advantage came "in the form of asset price observations based on arms-length sales of Peterson receivables to third-party buyers." *Id.* ¶ 55. Martin found that "pricing data provided by these third-party sales supported RD Legal's assessments regarding the value of the Peterson receivables, and these assessments were further reinforced by the fact that other Peterson receivables were [sold] at fair market value as determined by" the independent valuation expert. *Id.*

But the fact that Respondents obtained and exploited an information advantage does not mean that the *Peterson* positions did not materially change the risk profile of the Funds.

Martin also offered an evaluation of certain objective characteristics of the relative riskiness of the receivables. Contrary to the Division's allegation "that Peterson receivables were a riskier investment than receivables associated with settled cases," Ex. 2393 ¶ 13 (citing OIP ¶¶ 11, 56), Martin found that the *Peterson* positions "actually reduced the risk profile of the overall portfolio, and that as the[ir] concentration . . . increased, overall portfolio risk declined," *id.* ¶ 13; *see id.* ¶ 21. In Martin's opinion, *Peterson* receivables reduced overall risk in three ways: they curbed credit risk, decreased duration risk, and were "largely uncorrelated to other portfolio assets." *Id.* ¶ 21.

*Peterson* improved the credit risk of the portfolio because, according to Martin, Respondents "appropriately assigned" to *Peterson* receivables the highest credit rating, "based on comprehensive due diligence it performed with the help of numerous legal experts and other professionals." *Id.* ¶ 25. By the time Respondents started purchasing *Peterson* receivables, the *Peterson* plaintiffs had already identified and restrained a corpus of funds and commenced a collection action. Later, the restrained funds were placed in a trust for the *Peterson* plaintiffs' benefit. Sebok conceded that this effectively eliminated credit risk and theft risk. Tr. 2588. In addition to the Iranian assets involved in *Clearstream I*, the *Peterson* plaintiffs could look to other Iranian assets to satisfy their judgment, including the Fifth Avenue property and the J.P. Morgan account. And if those avenues failed, receivables could be satisfied from the $1 billion fund for victims of terrorism. These alternative collection sources demonstrate that, even in the event that the *Peterson* collection action failed, Respondents had other options for recovering the fees and awards purchased by the Funds. I concur with Martin's endorsement of the credit rating Respondents ascribed to *Peterson*. Martin calculated the "weighted average rating of the entire portfolio" from June 2011 to September 2016, which he showed decreased—that is, got better—"as Peterson receivables were added and became a larger part of the entire portfolio." Ex. 2393 ¶ 25 & Ex. 1.

Martin also determined that *Peterson* receivables were subject to less credit risk because so many of them "were backed by greater collateral [the inventory of the Fay and Perles firms] than the average non-Peterson

receivable." *Id.* ¶¶ 26-30 & Ex. 2.[21] Respondents' maintenance of "effective and contractually stipulated control of cash payouts on the underlying claims" also reduced credit risk. *Id.* ¶ 31. I agree that—in theory—these contractual safeguards served to reduce credit risk. I cannot, however, conclude that they materially did so. Even though the *Peterson* receivables purchased from the Fay and Perles firms "were collateralized by the total receivables of those firms," Martin elected to calculate the collateralization ratio for those receivables based solely on the "overall legal fees in the Peterson litigation." *Id.* ¶ 30; *see* Tr. 4015, 4156-57. If the *Peterson* collection action failed, the supposedly excess collateral Martin used in his calculations would not exist to secure the receivables purchased by the Funds.

Nevertheless, I conclude that the characteristics that reduced the credit risk of the *Peterson* receivables may have made it less likely that Respondents' misrepresentations were material. In light of the foregoing analysis, I have also determined that Respondents' disclosures regarding credit risk were consistent with the credit-worthiness of the *Peterson* positions and that no additional disclosures were necessary.

Martin also analyzed the effect of *Peterson* on duration risk, which several investors testified was one of the primary risks Respondents discussed. Martin's Exhibit 3 reports his analysis of the impact of *Peterson* receivables on the duration of the Funds' entire portfolio for more than five years:

> For the first three years, June 2011 to June 2014, the duration impact was relatively minor, as Peterson receivables lengthened the overall portfolio duration by 5 to 12 months. For most of the later period, from February 2015 to September 2016, the Peterson receivables in aggregate had a shorter duration than the rest of the portfolio, lowering the overall portfolio duration by 1 to 7 months. In effect, the Peterson receivables reduced the duration risk of the entire portfolio between 2011 and 2016 because such receivables reduced portfolio duration when the size of the overall RD Legal portfolio was the largest.

---

[21]   Martin began the period for analysis when "the Fay and Perles receivables reached maximum exposure" and ended it "in the last full month prior to their final payoff." Ex. 2392 at Ex. 2 n.2.

Ex. 2393 ¶ 33 & Ex. 3. With respect to the period that *Peterson* attorney receivables increased overall portfolio duration, it did so with the corresponding benefit of increasing investors' returns on those receivables:

> While Peterson attorney-fee receivables took longer to mature than certain plaintiff receivables, this does not indicate an improper risk assessment of these assets by RD Legal because their average realized return of 34.23% was also substantially higher than the weighted average realized return of 20.93% for those plaintiff receivables that did mature or were sold to third parties on or before September 2016. In other words, the actual performance of these assets is consistent with the theory and practice of financial markets which, all else equal, expect assets with longer maturities and thus higher level of duration to risk produce higher returns for the investors.

Ex. 2393 ¶ 48 n.11.

Although the *Peterson* receivables at times increased the average expected duration of the Funds' investments, the attorney-fee receivables were actually increasing the Funds' return during the period when *Peterson* lengthened portfolio duration, and the *Peterson* receivables shortened overall duration at the time the portfolio was the largest. I thus cannot find that Respondents' disclosures related to duration were inadequate.

The Division contends that the Funds' increasing stake in *Peterson* from 2010 to 2015 rendered its representations about concentration and diversification risks inaccurate. The offering memoranda cautioned that investments "will be exposed entirely to the risks of" the Funds' legal receivables, lines of credit, and "other advances" positions, "without the protections against loss afforded by diversification." *E.g.*, Ex. 60 at 19. It continued:

> Concentration in a certain type of investment has the effect of exposing a significant portion of invested capital to the same or similar risks . . . and thereby increases investment risk as well as the portfolio volatility. Accordingly, the value of a Partnership investment may fluctuate more widely given this concentration, as compared with the fluctuation expected in a broadly diversified portfolio.

*Id.* The Funds' Form ADV did the same. Ex. 218 at 11. The offering memoranda do not further discuss concentration or diversification.

However, the Funds did claim in the DDQ that the portfolio was "constructed with diversification in mind," because it was "made-up of many litigants, many law firms, and a variety of different claims." Ex. 1332 at 12. In Metzger's view, the offering memoranda and DDQ presented "different ways of understanding diversification. The DDQ is stating that the strategy is concentrated but suggests that within the strategy there is diversification." Ex. 2396 ¶ 105. In other words, even though the offering memoranda warned investors that the Funds would not be protected against loss by diversification, the manager intended to seek diversification opportunities within the investment strategy.

Yet beginning in 2010, a substantial and increasing concentration of the purchased receivables related to *Peterson*. However, Metzger noted that the DDQ could be read to "suggest[] that if the obligor has very high creditworthiness that there will be less diversification, because there is less concern for the portfolio's overall risk of loss." *Id.* ¶ 110 (citing Ex. 1332 at 14). Thus for Metzger, after July 2013, virtually no level of concentration in *Peterson* would be too high, as he viewed it as "akin to buying nearly risk-free U.S. Treasury securities that were extremely safe through the government backstop, but also had high rates of returns." *Id.* ¶ 112; *see also id.* ¶¶ 114-16.

The Division responds that Metzger "acknowledged that his conclusion hinged on accepting as true Respondents' contention that *Peterson* involved no litigation risk." Div. Post-Hr'g Reply Br. at 21. I agree that this somewhat undercuts the force of Metzger's opinion.

Martin also concluded that "any claim that the concentration of Peterson receivables materially increased the overall risk to the portfolio . . . is fundamentally flawed because it inaccurately and indiscriminately treats all Peterson receivables as one undifferentiated investment with a uniform and correlated risk profile." Ex. 2393 ¶ 14. Instead, he found that:

> Peterson receivables were not monolithic, but instead differed in terms of their types and the structure of their cash flows, and, as the result, had different, non-correlated risk profiles. This diversification translated into differences in sensitivities of Peterson receivables to various types of risk, as evidenced by the fact that Peterson receivables experienced different payoff periods and produced different rates of return.

*Id.*; *see id.* ¶¶ 40-42, 48 & Exs. 6, 9. *Peterson* receivables had different expected rates of return and varying actual realized rates of return. *Id.* ¶¶ 43, 47 & Exs. 5A, 5C; *see id.* Ex. 7. Martin opined that "[s]uch differences in realized returns indicate that the variation within the universe of Peterson receivables by type and cash flow structure made these assets different from one another from [an] investment perspective." *Id.* ¶ 47.

The Division disputes Martin's analysis based on his testimonial concession that there was "correlation among the *Peterson* receivables themselves." Tr. 4152; Div. Post-Hr'g Reply Br. at 21. Martin acknowledged that correlation of portfolio assets is an important concept because "combining assets that have a lower or inverse correlation not only reduces the volatility of the portfolio as a whole but also allows the portfolio manager to invest more aggressively." Ex. 2393 ¶ 34. Although Martin found that *Peterson* receivables generally "were largely uncorrelated" with the rest of the portfolio, Ex. 2393 ¶¶ 35-36 & Ex. 4, he did not quantify the correlation among the *Peterson* receivables. Tr. 4152, 4209-10. Martin did determine that within the *Peterson* positions there were investments with non-correlated risk profiles. Ex. 2393 ¶ 49. As he explained, *Peterson* receivables were "structured differently from one another." *Id.* ¶ 44; *see id.* ¶ 45. But because Martin failed to calculate the correlation coefficients of the different *Peterson* receivables, I cannot fully rely on his opinion to determine the materiality of any concentration risk. And even if the receivables were purchased from different payors—that is, the firms or the plaintiffs—and had slightly different structures, the fact that all payments originated out of the same litigation would likely be the overwhelming factor in determining the correlation coefficient.

In sum, of Martin's (and Metzger's) analysis of objective indicia of the relative riskiness of the *Peterson* position, only Martin's opinion on credit risk provides persuasive support for Respondents' arguments on this issue. This is perhaps unsurprising because Martin acknowledged that he—like Sebok— did not form an opinion on the merits of the *Peterson* collection action. Tr. 4079-80. He disclaimed any attempt to compare the litigation risk posed by *Peterson* to that posed by other receivables in the Funds' portfolios. Tr. 4115-16.

Finally, the Division raised a number of other arguments that *Peterson* was a risky bet. First, the Division claims that both *Peterson* plaintiffs' attorney Perles and James Martin of Reed Smith assessed that the plaintiffs (and attorneys) may never collect. *See* Div. Post-Hr'g Br. at 19. While both expressed uncertainty over the timing of the plaintiffs' recovery, Perles testified he had been confident that the *Peterson* collection action would succeed, and in 2011 sent a lengthy email to Dersovitz taking that position.

Tr. 1685; *see also* Ex. 1252. As for James Martin, although the Reed Smith memoranda were written with the caution of any law firm predicting what judges would do, he explained that the memoranda on the likely success of each aspect of *Peterson* "were the reflection of our best professional judgment. And they came with that degree of confidence. So I sit by what we did, how we did it and the conclusions we came to." Tr. 3417. Notably, the other principal *Peterson* plaintiffs' attorney, Fay, expressed his belief that with all three branches of government supporting the turnover, "the Marine[s], soldiers and sailors and their families . . . were going to collect." Tr. 2456, 2459. Rather than relying on any one data point, Dersovitz was for years an avid consumer of multiple pertinent streams of information, as well as being an experienced plaintiffs' attorney himself, and he based his assessment of the case on an understanding of the factual and several legal bases for recovery. Even if the Supreme Court had ruled that one of three theories for recovery was unavailable, there were two other avenues that would have fully supported the turnover of assets.

Second, the Division cites language from two documents—an unrelated Reed Smith memorandum and a marketing letter to select *Peterson* plaintiffs—to suggest that Respondents thought the *Peterson* investments were unreasonably risky. *See* Div. Post-Hr'g Br. at 30; Div. Post-Hr'g Reply Br. at 9. This particular Reed Smith memorandum did not analyze any aspect of the *Peterson* collection action's likelihood of success, but instead addressed whether *Peterson* investments would be considered loans, which turned on the non-recourse nature of the transactions and the allocation of collection risk. Ex. 714 at 51. It therefore provided Respondents with no new or different information with regard to the likelihood of collecting on any *Peterson* position. Similarly, while Respondents' marketing correspondence to the *Peterson* plaintiffs acknowledged the possibility that the collection action would fail, it did so to provide assurance that Respondents' investment was a non-recourse sale transaction, and that under no circumstances would the plaintiffs need to return the fees paid to purchase portions of their judgments. Ex. 1384 at 6. In addition, Respondents acknowledged in that letter "the serious possibility that you might in fact be able to collect your portion [of the judgment] in the not too distant future." *Id.* The fact that the *Peterson* investments had modest and managed collection risk does not support the claim that Respondents had a special duty to disclose such risks associated with the *Peterson* trades to the Funds' investors.

Third, using the Iran SPV disclosures as a baseline, the Division contends that Respondents were obliged to make the same disclosures to all investors in the Funds. Yet the Division has not established why the Iran SPV set the baseline for proper disclosures under the Securities and

Exchange Acts. In addition, while the Iran SPV marketing materials purport to address "Potential Risks," Respondents' actual statements about those risks make clear that Respondents did not believe those risks were of any significance, nor would a reasonable investor find them material. For example, after identifying the potential risk that "the United States normalizes relations with Iran by entering into a Treaty that nullifies the previous Congressional Acts," the disclosure stated that Respondents "believe this is unlikely as [legislation] specifically prevents the Executive Branch of our Government [from] unblocking the subject assets." Ex. 45 at 2. Respondents' belief was supported by the analysis of Reed Smith. Ex. 573. The Iran SPV marketing materials likewise discounted the risk that additional claimants would reduce the *Peterson* recovery, and stated further that, "the risk that the [*Peterson*] judgment could be overturned is [de minimis]." Ex. 45 at 2.

The disclosures also differed because the Iran SPV was created for the sole purpose of investing in *Peterson*. While it was appropriate to disclose remote risks associated with the Iran SPV's inflexible and completely illiquid strategy, the Funds had a much broader, opportunistic investment mandate. Indeed, as mentioned, the Funds' offering memoranda did not discuss any particular position, since the investments would change as Respondents focused on different investment opportunities at different times. The Funds' investors retained the right to redeem at any time, after one year of investing, whereas the SPV did not allow investors to redeem unrealized gains before the *Peterson* receivables collected, which is a further reason why the SPV disclosures addressed even minute risks to collection.

In the end, the parties' arguments regarding the materiality of misrepresentations as they relate to the *Peterson* receivables are persuasive to varying degrees, but the evidence supporting them is slim. Neither the Division nor Respondents have convinced me. But it is the Division, not Respondents, that bears the burden of proof and persuasion. I therefore conclude that the Division has not proved by a preponderance of the evidence that Respondents' misrepresentations were material with respect to *Peterson*.

### 8.3. The Misstatements Were Material as Related to the Cohen and ONJ Positions

For the reasons articulated by Sebok, I find that the misstatements in the offering memoranda were material as to the Cohen and ONJ positions, because they failed to put investors on notice of the different class of risks associated with contingent litigation-based receivables. These were not small positions, either. At the end of January 2012, the ONJ and Cohen investments accounted for more than 30% of the portfolio on a fair value

basis, or 23% based on the dollars deployed. Ex. 2 at cells E9, G9, I9, K9. For the same reason, the misstatements in the Form ADV brochures and the DDQs that expressly disclaimed litigation risk were material.

Further, while "the reaction of individual investors is not determinative of materiality," *Richmark Capital Corp.*, Securities Act Release No. 8333, 2003 WL 22570712, at *5 (Nov. 7, 2003), many investors testified that they were aware of other investment opportunities that took on litigation risk, but that what so intrigued them about Respondents were the representations that the Funds did not. Investors and advisers, including Burrow, Condon, and Geraci, testified that knowing that the portfolio contained unsettled cases may have affected their decision to invest or recommend the Funds to their clients.

### 9. Respondents Did Not Act with Scienter But Were Negligent

#### 9.1. Lack of Intent to Deceive

While the Division attempts to use the evidence to craft a story that Respondents orchestrated a malicious scheme to deceive and defraud investors, the evidence supports a different narrative: that Respondents, though imperfect, operated the Funds in a creditable fashion, exceeding in most cases key standards and practices of the hedge fund industry with respect to disclosures, but in some regrettable respects acting inconsistently with the standard of care. The Division's argument springs from the proposition that "the Supreme Court 'repeatedly has described the "fundamental purpose" of the [Exchange] Act as implementing a 'philosophy of full disclosure.'" Div. Post-Hr'g Br. at 4. Yet, that platitude is not particularly useful outside its intended context. As one court explained, "while mutual funds . . . must register with the Commission and disclose their investment positions . . . hedge funds typically remain secretive about their positions and strategies, even to their own investors." *Goldstein v. SEC*, 451 F.3d 873, 875 (D.C. Cir. 2006) (citation omitted);[22] *cf. In re Phila.*

---

[22]   The court also noted how hedge funds are often structured to maximize the manager's discretion, without fetter from investors:

> Another distinctive feature of hedge funds is their management structure. Unlike mutual funds . . . , whose shareholders must explicitly approve of certain actions, domestic hedge funds are usually structured as limited partnerships to achieve maximum separation of ownership and management. In the typical arrangement, the general partner manages the fund . . . for a

(continued...)

*Newspapers, LLC*, 422 B.R. 553, 568 (Bankr. E.D. Pa. 2010) ("Hedge funds . . . have historically guarded their trading secrets fiercely."). It is wholly unsurprising that Respondents' key documents would not contain information about individual investment positions. In the hedge fund industry, this practice of secrecy extends to the due diligence phase. Metzger explained that:

> During the course of due diligence, many hedge fund managers do not like to disclose to prospective investors the specific positions held by the fund. A 2014 SEC Risk Alert observed that "while some managers were willing to provide additional transparency, others were reluctant to share detailed information about their alternative investments. In particular, these managers were sensitive to sharing position-level information, which they felt may compromise their ability to execute their strategies."

Ex. 2396 ¶ 11 (quoting Office of Compliance Inspections and Examinations, *Investment Adviser Due Diligence Processes for Selecting Alternative Investments and Their Respective Managers* 2-3 (Jan. 28, 2014), https://www.sec.gov/about/offices/ocie/adviser-due-diligence-alternative-investments.pdf).

The foregoing context of general hedge fund practice is important to my conclusion that Respondents acted, in a variety of ways, inconsistent with the Division's allegations of scienter. Collectively, the following information provided by Respondents to all investors, whether automatically or upon request, rebuts the allegation of scienter. These informational means were specifically referenced in the offering memoranda and, according to the testimony of Respondents' experts and Hirsch, presented a high level of disclosure to investors.

First, Respondents provided investors with a quarterly "Independent Accountant's Report On Applying Agreed-Upon Procedures," which included detailed information concerning troubled assets in the Funds' portfolio, including the ONJ and Cohen investments. Although some of the AUPs' boilerplate language incorrectly characterizes certain positions as

---

> fixed fee and a percentage of the gross profits from the fund. The limited partners are passive investors and generally take no part in management activities.

451 F.3d at 876 (internal citations omitted).

settlements, the narrative explanations of the troubled positions provided reasonably detailed, accurate descriptions of those positions, including in the view of the attorneys whose positions were under discussion, as they testified at the hearing. Although I found that the language in offering memoranda and consistent marketing material claiming that all receivables arose from settlements was misleading due to the existence of Cohen and ONJ non-settlement receivables in the portfolio, I do not find any intent to deceive because Respondents did not attempt to hide these investments. Rather, they reported quarterly to all investors about these so-called workout positions. Although Dersovitz provided some of the narrative information, the AUP was not an internal, self-serving report, but a "quarterly compliance report" prepared by "an independent Certified Public Accountant or law firm" to "identify and report on any delinquencies and that the funded assets remain in compliance with their respective agreements." Ex. 60 at 15-16. The reports were created three times a year and provided promptly to all investors. While the AUPs did not address the *Peterson* positions, that is because they were never delinquencies. Even when the Supreme Court unexpectedly granted certiorari in the *Peterson* turnover action, the only real consequence was to extend the investments' duration, allowing several positions to realize more interest income than expected. In other words, by the terms of the agreed upon procedures, there was no reason to report on *Peterson*.

Second, Respondents provided investors with annual audited financial statements that identified the Funds' top concentration of investments by payor. Every statement, without exception, shows a high degree of concentration with respect to at least one payor. While the Division asserts that the descriptions of payors on the reports, which changed over time, are deficient, this is unsupported by the evidence. The descriptions were affirmed by the independent auditor—not just in the reports, but also by the sworn testimony of Schall. Although there is some elasticity in how a payor or obligor could be reported, Schall credibly affirmed that the designations selected comported with the controlling principles of his profession in the preparation of such a document. The Division did not elect to present an expert witness to refute this testimony.

Metzger also is of the opinion that the statements' characterization of the *Peterson* receivables as "funds under control of the US Government" was consistent with the American Institute of CPAs' Audit and Accounting Guide for Investment Companies. Ex. 2396 ¶¶ 95-96. At the time of the hearing, Metzger had been a licensed CPA for thirty-five years. *Id.* at 58. He was the founding chairperson of the Investment Management Committee of the New York State Society of Certified Public Accountants, and a member of the Alternative Investments Task Force of the American Institute of Certified

Public Accountants. *Id.* I accept the views of Schall and Metzger to the effect that Respondents reported the outstanding positions appropriately in the annual report. Although the Division suggests that someone reading the annual statement could have misinterpreted it, Mantell's testimony provides evidence to the contrary. As soon as Mantell first received and reviewed the annual statement, he noted that the Fund was highly concentrated in a few obligors, asked the Respondents questions, and received prompt answers. After some period of time, taking the view that the concentrations were inconsistent with his risk profile, he redeemed his investment. As noted previously, the standard of practice in the hedge fund industry is to avoid any regular reporting of particular positions; but Respondents, in their annual statements, satisfied fully their self-imposed reporting obligation to provide investors with information on the top obligors. This reporting was appropriate under accounting standards and gave the investors information concerning the concentrated nature of the Funds. This is also inconsistent with deceiving investors concerning the high concentrations, as the Division suggests.

Third, Respondents' website hosted documents pertinent to the Funds, including the offering memoranda, subscription documents, financial statements, AUPs, and investor communications. This included the so-called Citibank Memo which described the Funds' increasing investments in *Peterson*.

Fourth, until late 2013, Respondents provided access to a document library on a Lotus Notes database, which contained the underwriting documents for every transaction the Funds executed. While relatively few investors elected to access and utilize the full Funds' database, it did in fact contain a detailed collection of information with respect to the legal receivable agreements. Although fully exploiting the information would require considerable time and skill, if, for example, an investor had wanted to use it to find additional information about the agreements concerning delinquencies—like the Cohen or Osborn workouts—the information was available.

Fifth, Respondents were responsive to investor questions. Investors could call, email, or meet in person, various employees, including Dersovitz, who would answer their questions or direct them to someone who could. Respondents and their employees appeared to strive genuinely to satisfy investors while carrying out the other components of their jobs. Once a nondisclosure agreement was in place, there do not appear to have been additional restrictions that prevented employees from getting investors requested information. There was no policy or practice of denying or providing false information. While the Division argues that investors had no

obligation to conduct diligence or follow-up, this misses the more important point that when investors sought information they got it, contradicting the claim that Respondents were trying to deceive investors.

The foregoing points are bolstered further by Martin's opinion that Respondents "acted appropriately and consistent with industry practices when assessing, marking, and reporting the value of assets comprising the investment portfolio it managed," including adequately reporting the composition and performance of the portfolio to investors. Ex. 2393 ¶¶ 15, 50, 74. While Martin did not purport to look at individual investor communications, his opinion is based on the structure of the Funds and their general operation and disclosures.

Based on these factors, I conclude that Respondents did not intend to deceive investors.

### 9.2. Negligence

As a threshold matter, Respondents contend that the Division "failed to establish an essential element of a negligence claim" because "the Division did not present *any* testimony—expert or otherwise—that sought to establish the standard of care applicable to Respondents' disclosures." Resp. Post-Hr'g Br. at 44. Respondents contend that the Second Circuit's decision in *SEC v. Ginder*, 752 F.3d 569 (2d Cir. 2014), should control the outcome here. In *Ginder*, the Commission tried a case against a broker based exclusively on the theory that the broker's alleged misconduct was intentional. *Id.* at 572. The jury rejected all claims of intentional misconduct, but found the broker liable under Sections 17(a)(2) and (3) on a negligence theory. *Id.* at 573. The Second Circuit reversed, holding that the evidence was insufficient to support a verdict against the broker under a negligence theory. In reaching its decision, the court wrote:

> The SEC ultimately succumbs to its strategic choice at trial to pursue a theory of scienter or nothing. Its entire jury presentation was premised on the idea that [the broker] violated Section 17(a) through intentional conduct. The SEC's summation relied solely on intent and recklessness; theories rejected by the jury. And as to negligence, the SEC never introduced testimony or any other evidence on the appropriate standard of care against which a jury could measure [the broker's] conduct. "[T]he SEC's failure to present any evidence that [the defendant] . . . violated an applicable standard of reasonable care was fatal to its case."

*Id.* at 576 (quoting *SEC v. Shanahan*, 646 F.3d 536, 546 (8th Cir. 2011)). *Ginder* did not present the Second Circuit with the "occasion to consider" the standard of care under Section 17(a)(2)-(3). 752 F.3d at 574. According to some district courts, "[u]nder these provisions, the definition of negligence is 'the failure to use reasonable care, which is the degree of care that a reasonably careful person would use under like circumstances.'" *SEC v. Wey*, 246 F. Supp. 3d 894, 913 (S.D.N.Y. 2017) (quoting *SEC v. Cole*, No. 12-cv-8167, 2015 WL 5737275, at *6 (S.D.N.Y. Sept. 19, 2015)).[23] "Such negligence 'may consist either of *doing* something that a reasonably careful person *would not do* under like circumstances, or in *failing* to do something that a reasonably careful person *would do* under like circumstances.'" *Cole*, 2015 WL 5737275, at *6 (quoting jury instructions from *SEC v. Stoker*, No. 11-cv-7388 (S.D.N.Y. July 31, 2012)). To the extent, however, that it cannot be determined what a reasonably careful person would or would not do under similar circumstances, no cause of action for negligence is supportable. While the Division focused most of its efforts on supporting its claims requiring scienter, it did not thereby forfeit or waive its claims based on negligence. To the extent that the factual record shows that Respondents committed acts or made omissions that similarly situated individuals exercising reasonable prudence would not have done, such acts or omissions may be sufficient to establish an actionable deviation from the standard of care. *See id.*

I find sufficient evidence in the record regarding the standard of care to conclude that Respondents did not meet that standard.

If an investor in the Funds were to assume the provisions in the offering memoranda are consistent, then the investor could reasonably assume that all of the Funds' past purchases arose from settlements or judgments. Metzger takes a contrary view. In his opinion, a reasonable investor would have perceived an inconsistency and tried to resolve it by calling the hedge fund manager. Tr. 5268, 5275-77; *see* Tr. 5270-71. According to Metzger, an investor should not necessarily refer to other documents—like marketing documents—because the offering memorandum is "the priority document," although he would give some weight to audited financial statements. Tr. 5268, 5271-72. The annual statements issued before the offering memorandum language changed in 2013 would have been of little or no help

---

[23]   *Accord SEC v. Jankovic*, No. 15-cv-1248, 2017 WL 1067788, at *14 (S.D.N.Y. Mar. 21, 2017) (stating that the standard of care "remains an open question" in the Second Circuit, and noting that "courts in this Circuit have not strayed far from a black-letter, 'reasonable person' standard in defining 'negligence' under Section 17(a)(2) and (3)").

in clarifying Metzger's perceived inconsistency. For example, the Offshore Fund's financial statements from 2008 through 2011 said that "all" receivables arose from settlements. *See* Ex. 11 at 23; Ex. 503 at 172; Ex. 1059 at 17; Ex. 1095 at 17. For 2012 and 2013, the language changed to reflect that the purchased receivables "typically" arise out of settlements. Ex. 13 at 19, 28; Ex. 2921 at 22, 34. All such references were removed for the 2014 statement. *See generally* Ex. 18. The same discrepancy appears in the audited annual financial statement for the Domestic Fund for 2008. *See* Ex. 1060 at 16. But the 2009 statement says that the purchased receivables "typically" arise out of settlements. Ex. 1092, at 10. The language is substantially similar for the years ending 2010 through 2013. Ex. 1142 at 17; Ex. 1291 at 22; Ex. 1550 at 18; Ex. 1878 at 18. Beginning in 2014, that language was removed, as it was for the Offshore Fund. *See generally* Exs. 2078, 2262.

Thus, following Metzger's recommendation, it appears that an investor in the Domestic Fund, at least, who perceived a conflict in the offering memorandum and in the exercise of due diligence reviewed the annual statements where the language had been changed to "typically," would have confirmed there was a contradiction and would have had reason to ask the manager. Even if all of this is true, it still demonstrates that the offering memorandum's language was not drafted in a reasonably prudent manner. That an investor could possibly have figured out the accurate information does not excuse the offering memoranda's internal contradiction.

Although Dersovitz eventually changed the offering memorandum's language in response to investor confusion, he disagreed with Metzger's testimony that there was an inconsistency. But his disagreement was based on his belief that an investor who had conducted extreme (and somewhat convoluted) due diligence into the background of Dersovitz and his funds would have concluded it was not inconsistent. Tr. 5460-75. In addition, Dersovitz testified at length concerning other provisions in the offering memoranda that allowed the Funds to purchase receivables other than those arising from settlements. Tr. 5468-75. But the question is not whether non-settlement positions were allowed by the offering documents; but whether use of the inaccurate language represents a departure from the standard of reasonable prudence that a hedge fund would use in drafting its offering memorandum, when its portfolio already contained assets that did not arise from a settlement or judgment. The plain language of each offering memorandum is either going to be read as consistent by an investor—because "purchased" is retrospective and "will purchase" is prospective—such that the reader could conclude that up until the time the offering memorandum was drafted only settlement receivables were purchased, though judgment receivables could be in the future. Or, the language might be read as

inconsistent. But the fact that an investor could do enough digging to determine what was meant does not make the inaccuracy a prudent inclusion.

As noted, in 2013, the offering memoranda were amended to remove the exclusive language with respect to settlements, and to include cases in which "a judgment has been entered against a judgment debtor." Ex. 342 at 43, 51; Ex. 348 at 16, 21. Hirsch testified that the change was made in February 2013 to include *Peterson*. Tr. 4626-29.[24] Dersovitz likewise testified that judgments were added to this language because Respondents "had started" making *Peterson* investments, Tr. 5490-91, and that the "all of the legal fee receivables purchased" language was eventually removed because it was a "source of confusion":

> We realized later on that this was a source of confusion. And then took it—acknowledged that we took it out. We removed this, okay?
>
> Because you could get one notion from this and perhaps a different notion from the objectives. And that's why we ultimately pulled it.
>
> But it was not our intent to mislead anyone ever.

Tr. 6546-47; *see also* Tr. 5463-64, 6256-57. According to Dersovitz, when Respondents "started" investing in receivables arising from the *Peterson* judgment "back in 2010," they did not change the offering memoranda because those documents, among others, "underwent an evolutionary process" based on Respondents' "constantly trying to improve them." Tr. 5492. He also testified that "documents get better over time. . . . As you're doing things and as you're drafting pleadings, they improve over time." Tr. 5463.

I have no reason to doubt the consistent accounts of Hirsch and Dersovitz, but that does not mean that inaccurate language between 2010 and 2012 is consistent with the standard of care of what a reasonably prudent hedge fund would do. Nor does their explanation address whether the language was ever appropriate for a portfolio that already contained legal fee receivables based neither in settlements nor judgments. I find that the

---

[24] Hirsch explained that in her experience, when part of an offering memorandum was "no longer true," it would "most likely" be revised. Tr. 4573.

offering memoranda language with respect to all legal receivables arising from settlements and judgments represented an inaccuracy that is inconsistent with the reasonable care a hedge fund should take when it in fact had substantial positions in receivables based on pending litigation rather than settlements and judgments.

Regarding Respondents' DDQs, Metzger explained that "another way to interpret" them is that the DDQ "uses settlements as an example of a fee acceleration . . . . But not . . . every fee acceleration investment requires that a settlement had been reached." Ex. 2396 ¶ 79. I agree that the DDQs might be plausibly interpreted in two dramatically different ways—(1) 95% of the Funds' investments are in factoring settlements, or (2) 95% of the Funds' investments are in legal receivable factoring, of which settlements are but one example. But up through 2012, the offering memoranda said the Funds had "only" factored settlements—which would have been a further reason for the reader of the DDQ to understand that the 95% related to settlements only. If Respondents meant to use settlements only as an example of what they factored, they could have made that clear by using any of the following phrases: "for example," "e.g.," "for instance," or "such as."[25] The fact that the DDQ can give rise to considerable confusion—based on the conflicting interpretation identified by Respondents' own expert—demonstrates that reasonable prudence was not exercised in its drafting.

### 9.3. Recklessness

Based on the analysis in the preceding two sections, I conclude that Respondents' conduct did not rise to the level of extreme recklessness and thus they lacked scienter. Among the most troubling misstatements were the express disclaimers of litigation risk in the DDQs, *e.g.*, Ex. 48 at 9, but they did not rise to the level of recklessness for two reasons. First, DDQs are marketing materials, which investors should treat skeptically. Had such statements appeared in the offering memoranda, it may have been reckless. Second, the misstatements were in answer to a question about the Funds' strategy, and Dersovitz and Hirsch testified that they did not view the ONJ and Cohen matters as part of the Funds' strategy, but as one-off workouts of other, strategy-compliant positions that had gone wrong. While the

---

[25]   Indeed, the DDQ form itself, as adopted by Respondents, uses "e.g." *See* Ex. 1479 at 4 ("Does the firm or advisor have any relationship which may affect its trading flexibility, e.g. associated broker/dealer?"); *id.* at 14 ("Are any third parties involved in verifying adherence to risk limits, e.g. the fund's administrator?").

misstatements in the offering memoranda and Forms ADV were a departure from the standard of care, they were not an "extreme" one. Further, the information, access, and responsiveness Respondents provided to investors, which I concluded negated a finding of intent to deceive, likewise weighs against a conclusion of recklessness.

*　　*　　*

Because of my conclusion that Respondents lacked scienter, the claims under Exchange Act Section 10(b) and Rule 10b-5 and Securities Act Section 17(a)(1) fail and will be dismissed. Since I have concluded that Respondents failed to adhere to the appropriate standard of care and made repeated materially misleading statements over a period of several years, I find them liable for willfully violating Securities Act Section 17(a)(2) and (a)(3).

My conclusion that Respondents lacked scienter also negates aiding and abetting liability against Dersovitz. *See Monetta Fin. Servs., Inc. v. SEC*, 390 F.3d 952, 956 (7th Cir. 2004). I do, however, find Dersovitz to be a cause of RD Legal Capital's Section 17(a) violation, as he knew the composition of his Funds' portfolio and had final approval over the Funds' offering documents and other written materials at times when those documents did not adequately describe the risks of the Funds. *See Fuller*, 2003 WL 22016309, at *4-6.

## Remedies

### 10. Cease-and-Desist Order

Securities Act Section 8A and Exchange Act Section 21C authorize a cease-and-desist order against any person where it is found that such person violated or has caused the violation of those acts or rules thereunder. OIP at 15; 15 U.S.C. §§ 77h-1(a), 78u-3(a).

The Division requests that both Respondents be ordered to cease and desist from committing (and Dersovitz, from causing) future violations of Securities Act Section 17(a) and Exchange Act Section 10(b) and Rule 10b-5. Div. Post-Hr'g Br. at 47. Having found no liability under Securities Act Section 17(a)(1) or Exchange Act Section 10(b) and Rule 10b-5, I consider the request under Securities Act Section 8A with respect to Respondents' violations of Section 17(a)(2) and (a)(3).

In determining whether a cease-and-desist order is warranted, I must consider the following nine criteria,[26] no one of which is dispositive—(1) the egregiousness or "seriousness" of the violations, (2) the "isolated or recurrent nature" of the violations, (3) "the respondent's state of mind" (also referred to as the "degree of scienter involved"), (4) "the sincerity of . . . assurances against future violations," (5) the "recognition of the wrongful nature of his or her conduct," (6) "the respondent's opportunity to commit future violations," (7) "whether the violation is recent," (8) "the degree of harm to investors or the marketplace resulting from the violation," and (9) "the remedial function to be served by the cease-and-desist order in the context of any other sanctions being sought in the same proceedings." *WHX Corp. v. SEC*, 362 F.3d 854, 859 (D.C. Cir. 2004) (quoting *WHX Corp.*, Exchange Act Release No. 47980, 2003 WL 21283081, at *11 (June 4, 2003)). Also, "there 'must be a showing of some risk of future violation,' though not necessarily a very great risk." *Id.* (quoting *WHX Corp.*, 2003 WL 21283081, at *10); *see also KPMG Peat Marwick LLP*, 2001 WL 47245, at *24.

### 10.1. Seriousness

Notwithstanding the mitigating factors discussed below, I find that Respondents' various deficiencies with respect to the "workout" positions are serious, because they could confuse investors concerning the character of more than 15% of the Funds' portfolio.[27] An investor could plausibly understand that the Cohen and ONJ positions were settlement or judgment based receivables, instead of what they were: positions that were dependent on liability or damages that were not yet established. While Respondents make two points that mitigate to an extent the seriousness of the violations concerning workouts, I do not find them sufficiently extenuating to forbear from ordering a cessation of violative conduct.

Respondents first argue that the seriousness of their violations is mitigated by the AUPs, which were sent on a quarterly basis and provided investors with assessments of the underperforming Cohen and Osborn positions. Although certain boilerplate language of those reports inaccurately employs the term "settlement" with respect to those positions, the narrative descriptions of those positions provide sufficient and accurate detail to advise investors of the non-settled nature of those cases, the available collateral of

---

[26]   The first six criteria are the so-called *Steadman* factors. *See Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir. 1979), *aff'd on other grounds*, 450 U.S. 91 (1981).

[27]   *E.g.*, Ex. 2 row 56.

the firms, and other pertinent issues. Each AUP was sent to every investor by the Funds' third-party administrator. Although prospective investors were not given AUPs as a matter of course, the reports are described in the offering memoranda, and Respondents would provide copies to prospective investors who asked for them and signed a nondisclosure agreement. Thus, I find that these reports somewhat mitigate the seriousness of the violation. But they do not fully do so because some people invested without reviewing or receiving the AUPs.

Second, Respondents argue that the lack of loss to investors is a mitigating factor. Setting aside the fact that the vast majority of investors profited handsomely from their investments, the Division correctly contends that, in at least some cases, investors' returns have been delayed. While Respondents have submitted evidence indicating that investors continue to receive sizable returns and there may ultimately be no loss on these investments, delays in the return of investment capital and profits thereon can be serious. Because the contingent fee legal receivables were among the poorest performers of the Funds' investments—hence their conspicuous mention in the AUPs—it is reasonable to conclude that those positions contributed to the delay.

Overall, the mitigating factors raised by Respondents do not negate a finding of seriousness. Moreover, although Respondents' violations were committed with negligence rather than scienter, the Commission considers violations of the antifraud provisions to be "especially serious." *Peter Siris*, Exchange Act Release No. 71068, 2013 WL 6528874, at *6 (Dec. 12, 2013), *pet. denied*, 773 F.3d 89 (D.C. Cir. 2014).

### 10.2. Isolated or Recurrent Nature

I concur with the Division that this proceeding is not about an isolated misstatement because Respondents' deficiencies persisted "over the course of several years." Div. Post-Hr'g Br. at 46. Respondents do not appear to address this issue. Although one could argue that the deficiencies in the offering memoranda and other documents represent preliminary errors that simply carried over, the repeated failure to correct them is sufficient to render the violations recurring.

### 10.3. Mental State

Although I did not find that Respondents acted with scienter, Respondents have not presented a persuasive argument as to why the remedy sought is inappropriate in light of my finding that they were negligent. This is not a case, for example, where, after being alerted to their deviation from the standard of care, a hedge fund had already or immediately

thereafter corrected the deficiencies. Instead, Respondents' failure to adhere to the appropriate standard of care persisted for several years.

### 10.4. Recognition of Wrongdoing and Sincerity of Assurances

Respondents vigorously contested liability, so they did not offer assurances against future wrongdoing nor was there recognition of wrongdoing. I do not hold this against Respondents; indeed, my finding of no scienter vindicates their stance with respect to a majority of the allegations in the OIP.[28]

### 10.5. Opportunity to Commit Future Violations

At present, in the absence of a cease-and-desist order, Respondents would be able to commit further Section 17(a)(2) and (a)(3) violations. I am sympathetic to the Division's position that it would be "troubling" for Dersovitz to continue working in the industry without any change in the way Respondents do business, because opportunities will arise in which so-called "workouts" will have to be disclosed in accordance with the standard of care. Div. Post-Hr'g Br. at 47. A cease-and-desist order will ensure that those circumstances will not result in additional violations.

### 10.6. Recency of Violations

The violations, which continued through Respondents' most recent representations up until the time of the hearing, are sufficiently recent to favor a cease-and-desist order.

### 10.7. Harm to Investors or the Marketplace

Most testifying investors profited from their investment in the Funds; some had not as of the hearing, but the Funds have continued to receive payments and distribute them to investors. However, consideration of the public interest "extends beyond the consideration of particular investors to the public-at-large." *See Christopher A. Lowry*, Investment Advisers Act of 1940 Release No. 2052, 2002 WL 1997959, at *6 (Aug. 30, 2002), *petition for review denied*, 340 F.3d 501 (8th Cir. 2003). And the Commission considers

---

[28]  The Division argues that some of the evidence demonstrates that Respondents' behavior was especially callous and takes issue with some of Dersovitz's testimony. Div. Post-Hr'g Br. at 46-47. I conclude, however, that the Division misinterpreted Dersovitz's testimony under the circumstances, and I do not find that the record supports the Division's intimation that he was lying or is averse to telling the truth.

conduct that involves the dissemination of false and misleading statements or deprives investors of full disclosure to make informed decisions to necessarily harm the marketplace and erode investor confidence. *See Gordon Brent Pierce*, Securities Act Release No. 9555, 2014 WL 896757, at *23 (Mar. 7, 2014), *petition for review denied*, 786 F.3d 1027 (D.C. Cir. 2015); *Ira Weiss*, Securities Act Release No. 8641, 2005 WL 3273381, at *16 (Dec. 2, 2005), *petition for review denied*, 468 F.3d 849 (D.C. Cir. 2006).

However, Respondents aver that a "cease-and-desist order that prevents Dersovitz from continuing to raise and invest capital would directly harm" investors. Resp. Post-Hr'g Br. at 49. But Respondents are being ordered to cease and desist from violations of the securities statutes, not from raising and investing capital, so Respondents' concern is inapplicable and this factor weighs in favor of imposing a cease-and-desist order.

### 10.8. The Remedial Function in the Context of Other Sanctions Sought

A cease-and-desist order should expeditiously stop all violations. While such an order may not be necessary if Respondents were permanently barred from operating in the industry, because this decision does not do so, practical concerns support a cease-and-desist order. In addition, the civil penalties, which are based on Respondents' past violations (even if the penalties will provide some measure of deterrence), are best used in tandem with a cease-and-desist order, so that past misconduct is punished and future, potential misconduct is prohibited. Finally, the Commission has held that "in the ordinary case, a finding of a past violation is sufficient to demonstrate a risk of future ones" to justify a cease-and-desist order. *Malouf*, 2016 WL 4035575, at *25. Here, I have found not just a single past violation, but several, occurring over a period of years.

## 11. Suspension

Advisers Act Section 203(f) authorizes the Commission to censure, limit the activities of, suspend for a period not exceeding 12 months, or bar from association any person if, as relevant here, (1) that person was associated with an investment adviser at the time of the alleged misconduct, (2) that person willfully violated any provision of the Securities Act, and (3) the sanction is in the public interest. *See* 15 U.S.C. § 80b-3(f), (e)(5). Investment Company Act Section 9(b) authorizes the Commission to prohibit, conditionally or unconditionally and either permanently or for a period of time, any person from serving or acting in certain capacities with a registered investment company if, as relevant here, (1) that person willfully violated any provision of the Securities Act, and (2) the sanction is in the public interest. 15 U.S.C. § 80a-9(b)(2).

The Division seeks a permanent industry bar against Dersovitz as president and CEO of RD Legal Capital, an entity registered with the Commission as an investment adviser for most of the period of the misconduct described above. As I found in the conclusions of law, Dersovitz committed willful violations of the Securities Act. I therefore consider the public interest, including the *Steadman* factors, deterrence, and any mitigating factors. *See Dembski*, 2017 WL 1103685, at *13-14.

Respondents contend that an industry bar against Dersovitz "would directly harm the Commission's core constituency: investors," because "Dersovitz earned substantial profits for his investors." Resp. Post-Hr'g Br. at 49. The Division counters that the Funds are, according to Dersovitz, "self-liquidating." Div. Post-Hr'g Br. at 47 n.58 (citing Tr. 5878-79). But the Division overstates the point, as Dersovitz testified that "the funds *to some extent* are self-liquidating," and noted ways in which they were not. Tr. 5878-79. To permanently bar Dersovitz, who by the terms of the offering memoranda represents the key to managing and continuing the operation of the Funds, would quite likely adversely impact those investors who are awaiting principal or interest. However, the adverse impact on investors is not by itself determinative. The array of remedies ordered must be sufficient to end the unlawful practice and deter not just the wrongdoer but also dissuade industry actors from engaging in similar misconduct.

Here, in light of the *Steadman* factors already discussed, I have determined that the cease-and-desist order and the civil penalties nearly satisfy the needs of deterrence sufficient to dissuade wrongful conduct, without imposing a permanent bar. However, to ensure that the purposes of both specific and general deterrence are satisfied, I will suspend Dersovitz for a period of six months from association with an investment adviser and other components of the securities industry, and prohibit him from serving or acting in capacities with a registered investment company for the same period. While the addition of a suspension to the foregoing remedies will impose temporary consequences on Dersovitz, and may regrettably work some adverse impact on investors, it is necessary to ensure that Dersovitz and similarly situated industry actors understand the serious consequences of even negligent violation of the antifraud provisions.

## 12. Civil Penalties

Securities Act Section 8A authorizes civil monetary penalties where, as here, Respondents violated or caused a violation of any provision of the Securities Act, if such penalties are in the public interest. *See* 15 U.S.C. § 77h-1(g)(1)(A)-(B). The Act sets forth a three-tiered maximum penalty amount for each act or omission. First-tier penalties are permitted

based on any violation of the Act. *See id.* § 77h-1(g)(2)(A). Second-tier penalties require a finding that the violations "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," that is, scienter, *see id.* § 77h-1(g)(2)(B); *SEC v. M&A W., Inc.*, 538 F.3d 1043, 1054 (9th Cir. 2008); and third-tier penalties require a further finding that the violations directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons, or substantial pecuniary gain to the respondent, 15 U.S.C. § 77h-1(g)(2)(C). As Respondents did not violate Securities Act Section 17(a) with scienter, it would be inappropriate to expose them to second- or third-tier penalties.[29]

In deciding whether penalties are in the public interest, the Commission considers: (1) whether the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; (2) the resulting harm, directly or indirectly, to other persons; (3) any unjust enrichment and prior restitution; (4) the respondent's prior regulatory record; (5) the need for deterrence; and (6) such other matters as justice may require. *Dembski*, 2017 WL 1103685, at *15 (citing 15 U.S.C. §§ 78u-2(c), 80a-9(d)(3), 80b-3(i)(3)).

As to the first factor, Respondents' violations involved mere negligence.

Regarding harm to others, the Division notes that while many investors profited, "some are still waiting for hundreds of thousands of dollars of the principal they invested." Div. Post-Hr'g Br. at 44.[30] Notwithstanding the investors who have not yet received all their profits or principal, for purposes of this factor it is important to observe that the vast majority of investors, including virtually all of those who testified at the hearing, profited from

---

[29]   I do not agree with the Division's arguments that the risk of loss with respect to *Peterson* justifies a higher penalty tier, *see* Div. Post-Hr'g Br. at 44, because I have not found punishable violations with respect to *Peterson*. The Division also argues that the ONJ and Cohen matters "highlight" the risk of loss because Respondents "still have not collected amounts equal to their advances." Div. Post-Hr'g Reply at 22. However, the Funds' ONJ investments have in fact been profitable, and even though the Cohen positions were written down, the Funds overall still yielded a positive return for investors. Notably, the risks associated with those cases were regularly audited and reported to Fund investors by an independent law firm.

[30]   Since the hearing, Respondents submitted evidence that they have collected an additional $30 million for the Funds, $20 million of which has already been distributed to investors. Resp. Disgorgement Reply at 10 & Ex. B.

their investments. Metzger, Respondents' expert, compared investing with Respondents to three other hedge fund indices, the S&P 500, and Barclays Aggregate Bond Index from October 2007 through 2016. That analysis, presented in Appendix C to Metzger's expert report, Ex. 2396, shows that investing with Respondents would have yielded by far the greatest return over that period:

| Fund or Index | Annualized Return | Cumulative Return |
|---|---|---|
| RD Legal | 13.50% | 222.64% |
| Hedge Fund Research, Inc. (HFRI), Fund Weighted Composite Index | 0.56% | 5.35% |
| HFRI RV: Fixed Income-Asset Backed Index | 8.51% | 112.93% |
| HFRI ED: Distressed/ Restructuring Index | 3.34% | 35.51% |
| S&P 500 | 3.41% | 36.35% |
| Barclays Aggregate Bond Index | 4.25% | 46.96% |

The third factor, unjust enrichment, is satisfied to the extent that in the absence of the violations Respondents may have received fewer investments than they would have otherwise, and having less capital, would have been able to generate less profit. However, a critical mitigating aspect is that, unlike a typical hedge fund, Respondents were not enriched at all unless they were first producing the preferred return of 13.5% for investors. While the Division averred that Respondents were improperly making draws from the funds based on inflated valuations, I previously found those assertions to be unsupported. This is therefore very different from the typical case where a respondent is enriched at the direct detriment to an investor.

With respect to the fourth factor, Respondents do not have any prior violations of "the Federal securities laws, State securities laws, or the rules of a self-regulatory organization." 15 U.S.C. § 80b-3(i)(3)(D). Nor have they been "convicted" or "enjoined by a court of competent jurisdiction from violations of such laws or rules." *Id.* The Division contends that there are a "bevy of investor suits" against Respondents. Div. Post-Hr'g Reply Br. at 23 (citing Ex. 475 at 8, 10). But the evidence cited by the Division reveals two suits that were pending as of the hearing, which is insufficient to constitute a prior

95

violation for purposes of deciding penalties. Respondents' absence of prior violation weighs in their favor.

The fifth factor, deterrence, weighs in favor of penalties. Here, it would not be enough simply to find that Respondents' conduct was unlawful and order them to stop. In the absence of a financial penalty for each violation, Respondents or others could make the determination, however unbecoming, that it is an acceptable risk for them to play outside the rules if there is not a notable punishment for being caught.

The sixth factor does not warrant extensive discussion, but an excessive penalty would be disproportionate to the nature of the misconduct.

The Division contends that I should "penalize 'each' of Respondents' acts and omissions," suggesting, at the least, a penalty for each defrauded investor who testified. Div. Post-Hr'g Br. at 45. While I agree that, to maximize the value of deterrence, each proven violation should be subject to a penalty, I do not agree with the Division's suggestion as to how to count the violations, as it could be based on tactical decisions by the Division about how many witnesses to call and who was available to testify. In this case, the best way to count the violations is to identify the number of different documents that contain actionable misrepresentations (including different versions of such documents, over time) and assign a penalty to each. I have found eight offering memoranda, four Forms ADV,[31] and three DDQs to contain material misstatements. The maximum first-tier penalty against an entity increased from $75,000 to $80,000 on March 6, 2013. *See* 17 C.F.R. § 201.1001, Table I; Adjustments to Civil Monetary Penalty Amounts, 83 Fed. Reg. 1,396 (Jan. 11, 2018); Adjustments to Civil Monetary Penalty Amounts, 78 Fed. Reg. 14,179, 14,181-82 (Mar. 5, 2013). Ten of the documents were dated before that date. *See* Exs. 61-65, 218, 219, 220, 591, 1640. Five post-date it. *See* Exs. 48, 66, 67, 1900, 1932. The maximum first-tier penalty for a natural person was $7,500 for the entire period during which the misrepresentations were made. *See* 78 Fed. Reg. at 14,181-82.

Based on the foregoing factors, I have determined that penalties are warranted, but due to the extenuating and mitigating facts discussed especially in the second, third, and fourth factors, the penalty I will assign to each of the foregoing violations will be set at half of the maximum amount authorized for each violation. Dersovitz will be given fifteen penalties of

---

[31]   Although the 2011 Form ADV was created outside the five-year statute of limitations, Respondents distributed it to investors within the limitations period. *See* Ex. 252.

$3,750 each, for a total of $56,250. RD Legal Capital will be given ten penalties of $37,500 and five of $40,000, for a total of $575,000.

## 13. Disgorgement

The Division requests disgorgement of "all profits earned through the fraudulent sale of interests" in the Funds in the five years preceding the OIP, which the Division calculates to be more than $56 million. Div. Post-Hr'g Br. at 42. Respondents oppose the Division's request on a number of grounds, including that disgorgement is not in the public interest and that they are unable to pay the amounts sought.

Disgorgement and prejudgment interest are discretionary, equitable remedies. *See* 15 U.S.C. §§ 77h-1(e) ("the Commission *may* enter an order requiring accounting and disgorgement, including reasonable interest" (emphasis added)), 78u-2(e), 78u-3(e) (same); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474-76 (2d Cir. 1996). The Division bears the initial burden to show that its disgorgement figure "reasonably approximates" Respondents' unjust enrichment and is "causally connected to the violation." *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231-32 (D.C. Cir. 1989). The burden then shifts to Respondents to demonstrate that the Division's estimate is not a reasonable approximation. *Id.* at 1232.

In *Jay T. Comeaux*, the Commission stated that it applies the above standard for determining disgorgement and rejected a respondent's contention that it should apply the public-interest factors set forth in *Steadman v. SEC*[32] and the securities statutes. *See* Securities Act Release No. 9633, 2014 WL 4160054, at *5 (Aug. 21, 2014). The Commission remanded *Comeaux* because the Division did not support its summary disposition motion with sufficient evidence on its disgorgement amount and directed that there be "further proceedings to determine what, if any, disgorgement is in the public interest." *Id.* at *3-4. But the Commission did not categorically hold that disgorgement must be found in the public interest whenever there is a causal relationship of profits to the violations. Indeed, "the Commission's broad discretion in fashioning sanctions in the public interest cannot be strictly cabined according to some mechanical formula." *Blinder, Robinson & Co. v. SEC*, 837 F.2d 1099, 1113 (D.C. Cir. 1988).

A more searching public-interest inquiry is appropriate here. *Cf. Scott Epstein*, Exchange Act Release No. 59328, 2009 WL 223611, at *21 n.75 (Jan. 30, 2009) (the sanctions inquiry "depends on the facts and circumstances of

---

[32]   *See* 603 F.2d at 1140.

the particular case . . . ."), *pet. denied*, 416 F. App'x 142 (3d Cir. 2010). The Supreme Court recently held that SEC disgorgement is a punitive sanction. *See Kokesh v. SEC*, 137 S. Ct. 1635, 1643-45 (2017).[33] In light of *Kokesh*, a disgorgement award of more than $50 million—in this case and under these specific facts—may trigger constitutional scrutiny. *See Hudson v. United States*, 522 U.S. 93, 102-03 (1997) ("The Due Process and Equal Protection Clauses . . . protect individuals from sanctions which are downright irrational. The Eighth Amendment protects against excessive civil fines . . . ." (internal citations omitted)); *see also United States v. Bajakajian*, 524 U.S. 321, 331 n.6 (1998) (noting that the excessive fines clause reaches a monetary sanction levied in nominally civil proceedings "if it constitutes punishment even in part"); *SEC v. Metter*, 706 F. App'x 699, 703 (2d Cir. 2017) ("[W]e assume without deciding that, in light of . . . *Kokesh* . . . , the [$52 million] disgorgement liability imposed in this matter was essentially punitive in nature and thus was a fine within the meaning of the Excessive Fines Clause of the Eighth Amendment."). "The principle that a punishment should be proportionate to the [offense] is deeply rooted and frequently repeated in common-law jurisprudence." *Solem v. Helm*, 463 U.S. 277, 284 (1983).

The typical public-interest considerations would largely address constitutional concerns and mitigate the risk of an appellate remand. Nonetheless, I need not adopt any particular test here as the Division failed to carry its burden, and, in any event as explained below, the public interest does not support the requested sanction. *Cf. PAZ Sec., Inc. v. SEC*, 566 F.3d 1172, 1175 (D.C. Cir. 2009) ("We did not, however, direct the Commission to follow the *Steadman* analysis in every case.").

Respondents contend that the Division has failed to meet its burden of establishing the unjust enrichment causally connected to Respondents' violations. Respondents point out that the Division seeks disgorgement of all revenue, regardless of source, and does not distinguish between "profits derived from investors who would have invested despite any alleged misrepresentations [and] RDLC's profits from managed accounts and third-party participations." Resp. Post-Hr'g Br. at 47. Nor does the Division establish how much of the revenue is attributable to "trades that were consistent with the Funds' primary strategy,  and those [that] were not"—or, at least, those, such as *Peterson*, that the Division failed to establish fell

---

[33]   Contrary to Respondents' argument, disgorgement is not subject to the statutory limits on civil penalties. *Kokesh* did not disturb the securities statutes that authorize disgorgement in addition to penalties in this proceeding. *See* 15 U.S.C. §§ 77h-1(e), 78u-2(e), 78u-3(e); OIP at 15.

outside of the scope of the Funds' governing documents. *Id.* The Division did not attempt to answer these questions. Case law does recognize that because of the difficulty in separating "legal from illegal profit . . . , it is proper to assume that all profits gained while defendants were in violation of the law constituted ill-gotten gains." *SEC v. Bilzerian*, 814 F. Supp. 116, 121 (D.D.C. 1993) (internal citations omitted), *aff'd*, 29 F.3d 689 (D.C. Cir. 1994). However, the Division must still "show but-for causation between a [respondent]'s violations and profits." *Comeaux*, 2014 WL 4160054, at *3. Here, I find that the Division has not met its burden, especially in light of my finding that the Division also did not meet its burden with respect to the *Peterson* positions, which were such a large portion of the Funds.

Even if the Division had carried its initial burden, an aspect of this proceeding meaningfully distinguishes it from cases relied upon by the Division and leads me to conclude that disgorgement is not in the public interest. The hedge fund structure devised and employed by Respondents represented a protective and profitable structure for the Funds' investors. Metzger explained the considerable differences between the Funds and other investments:

> RDLC does not receive any management fee for its operation of the Funds. The Funds do not follow any form of the "2 and 20" model[34] that is common in the hedge fund industry. Moreover, RDLC pays for all [routine] overhead costs of the Funds, which is uncommon for a fund manager that does not receive a management fee.

Ex. 2396 ¶ 23. Thus, Respondents had to hit their target returns for investors before they took profits. *Id.* ¶¶ 23-25. As a result of the Funds' structure,

---

34   Metzger explained that:

> Under the "2 and 20" model, the fund manager receives a flat 2 percent management fee based on the total value of assets under management, and an additional 20 percent of any profits earned. Here, by contrast, there is no management fee, performance fee, or origination fee for the Funds. RDLC receives no compensation or return of any kind until investors receive their full 13.5 percent annual target return.

Ex. 2396 ¶ 23 n.7.

Respondents bore significant risk. Respondents' inability to pay briefing shows that Respondents absorbed losses in lean periods to ensure that investors would continue to receive distributions. As Respondents' most recent submissions have illustrated, even as their considerable cost burdens have forced them to restrict the scope of their operation and personnel, they nonetheless continue to return payments to investors. This is not a case where the public interest supports taking past profits away from Respondents.

Because I determined that disgorgement is not warranted by the special circumstances presented here, consideration of Respondents' remaining arguments is unnecessary.[35]

### 14. Ability to Pay

The Commission may consider a respondent's ability to pay in determining civil penalties and disgorgement. *See* 15 U.S.C. § 77h-1(g)(3); 17 C.F.R. § 201.630(a). Ability to pay is only one factor that informs that determination. *Gregory O. Trautman*, Securities Act of 1933 Release No. 9088, 2009 WL 6761741, at *24 (Dec. 15, 2009). Even when a respondent demonstrates an inability to pay, the Commission has discretion not to waive the monetary sanction. *Id.*

Respondents argue that they are each unable to pay disgorgement or civil penalties.[36]  But the foundations of these arguments are unpersuasive.

RD Legal Capital has not presented sufficient evidence to determine what its ability to pay is.

---

[35]   Respondents also contend that the Division "failed to meet it threshold burden" by attempting "to pass off the entirety of the company's revenues as profits" and "completely ignor[ing] Respondents' disclosure of legitimate ordinary expenses identified in the very document on which the Division relies." Resp. Post-Hr'g Br. at 46-47.

[36]   The parties' briefing on this issue, as well as related exhibits and testimony, have been filed under seal. I have redacted from the public version of this decision those portions in which the harm resulting from disclosure would outweigh the benefits of disclosure. *See* 17 C.F.R. § 201.322(b).



It is possible that Respondents would not be able to pay the full measure of disgorgement requested by the Division. However, because I am imposing less than $1 million in penalties against Respondents and not ordering any disgorgement, I reject Respondents' claims of inability to pay.

Further, Dersovitz is still a licensed attorney in New York, and while this decision may have adverse effects on his reputation, I have only barred him from the securities industry for six months, so he may have continued opportunities to work.

### Record Certification

Pursuant to 17 C.F.R. § 201.351(b), I certify that the record includes the items set forth in the record index issued by the Commission's Office of the Secretary on November 22, 2017, and the items post-dating the record index as listed in Appendix A.

### Order

I ORDER that the Division's claims under Securities Act of 1933 Section 17(a)(1) and Securities Exchange Act of 1934 Section 10(b) and Rule 10b-5 thereunder are DISMISSED.

I FURTHER ORDER that, pursuant to Section 8A(a) of the Securities Act of 1933, Roni Dersovitz and RD Legal Capital, LLC, shall CEASE AND DESIST from committing or causing violations, and any future violations, of Section 17(a)(2) or (a)(3) of the Securities Act.

I FURTHER ORDER that, pursuant to Section 203(f) of the Investment Advisers Act of 1940, Roni Dersovitz is SUSPENDED for six months from being associated with an investment adviser, broker, dealer, municipal securities dealers, municipal advisor, transfer agent, or nationally recognized statistical rating organization.

I FURTHER ORDER that, pursuant to Section 9(b) of the Investment Company Act of 1940, Roni Dersovitz is PROHIBITED for six months from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter.

I FURTHER ORDER that, pursuant to Section 8A(g) of the Securities Act of 1933, Roni Dersovitz shall PAY A CIVIL MONEY PENALTY in the amount of $56,250.

I FURTHER ORDER that, pursuant to Section 8A(g) of the Securities Act of 1933, RD Legal Capital, LLC, shall PAY A CIVIL MONEY PENALTY in the amount of $575,000.

Payment of civil penalties shall be made no later than twenty-one days following the day this initial decision becomes final, unless the Commission directs otherwise. Payment shall be made in one of the following ways: (1) transmitted electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request; (2) direct payments from a bank account via Pay.gov through the SEC website at http://www.sec.gov/ofm; or (3) by certified check, bank cashier's check, bank money order, or United States postal money order made payable to the Securities and Exchange Commission and hand-delivered or mailed to the following address along with a cover letter identifying the Respondent and Administrative Proceeding No. 3-17342: Enterprise Services Center, Accounts Receivable Branch, HQ Bldg., Room 181, AMZ-341, 6500 South MacArthur Blvd., Oklahoma City, Oklahoma 73169. A copy of the cover letter and instrument of payment shall be sent to the Commission's Division of Enforcement, directed to the attention of counsel of record.

This initial decision shall become effective in accordance with and subject to the provisions of Rule 360 of the Commission's Rules of Practice, 17 C.F.R. § 201.360. Pursuant to that rule, a party may file a petition for review

of this initial decision within twenty-one days after service of the initial decision. A party may also file a motion to correct a manifest error of fact within ten days of the initial decision, pursuant to Rule 111 of the Commission's Rules of Practice, 17 C.F.R. § 201.111. If a motion to correct a manifest error of fact is filed by a party, then a party shall have twenty-one days to file a petition for review from the date of the undersigned's order resolving such motion to correct a manifest error of fact.

The initial decision will not become final until the Commission enters an order of finality. The Commission will enter an order of finality unless a party files a petition for review or motion to correct a manifest error of fact or the Commission determines on its own initiative to review the initial decision as to a party. If any of these events occur, the initial decision shall not become final as to that party.

Jason S. Patil
Administrative Law Judge